IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| STATE OF MISSOURI *ex rel.* ANDREW BAILEY, ATTORNEY GENERAL OF MISSOURI, | |
| *Plaintiff,* | |
| v. | Case No. |
| STARBUCKS CORP., | |
| *Defendant.* | |

## COMPLAINT

Plaintiff, the State of Missouri, appearing on the relation of its Attorney General, for its Complaint respectfully alleges as follows:

## INTRODUCTION

1.    Missouri brings this lawsuit because Starbucks has violated federal and state laws prohibiting race discrimination.  Starbucks ties compensation to racial and sex-based quotas, discriminates on the basis of race and sex in training and advancement opportunities, and discriminates on the basis of race and sex with respect to its board membership.  All of this is unlawful.

2.    Just two years ago, the Supreme Court made clear that federal law does not tolerate differential treatment based on race: "Eliminating racial discrimination means

eliminating all of it." *Students for Fair Admissions, Inc. v. Pres. and Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023) (*SFFA*).[1]

3.    That is because "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Id.* at 208.

4.    This principle applies not only to college admissions, but also, as here, to employment decisions.

5.    One of the most important pieces of legislation in this Nation's history to help ensure all are treated equal and protected from the harms of discrimination is the Civil Rights Act of 1964.

6.    Its plain language "irrefutably demonstrates that Congress meant precisely what it said in §§ 703(a) and (d) [what is now 42 U.S.C. § 2000e-2(a), (d)]—that no racial discrimination in employment is permissible under Title VII, not even preferential treatment of minorities to correct racial imbalance." *United Steelworkers of Am., AFL-CIO-CLC v. Weber*, 443 U.S. 193, 230 (1979) (Rehnquist, J., dissenting).

---

[1] Starbucks advocated, by way of amicus brief, against what became the Court's *SFFA* opinion. *See* Brief for Major Am. Business Enters. as Amici Curiae Supporting Respondents at 47, *SFFA*, 600 U.S. 181 (2023) (No. 20-1199), 2022 WL 3130774; *Starbucks Equity, Inclusion and Diversity Timeline*, STARBUCKS (Aug. 1, 2022), https://about.starbucks.com/press/2022/starbucks-equity-and-inclusion-timeline/ (Timeline).

Regarding Starbucks' "Timeline", unfortunately, and for reasons unknown to Plaintiff, many, though not all, of the links on Starbucks' website attempt to lead to other posts of Starbucks that are no longer available. *E.g.*, *id.* (link under January 2022 about "Starbucks shar[ing about its] expanded efforts to advance racial and social equity on behalf of partners and communities.").

7.    "In passing Title VII, Congress outlawed all racial discrimination, recognizing that no discrimination based on race is benign, that no action disadvantaging a person because of his color is affirmative." *Steelworkers*, 443 U.S. at 254 (Rehnquist, J., dissenting).

8.    Indeed, "that statute was conceived and enacted to make discrimination against any individual illegal." *Steelworkers*, 443 U.S. at 218 (Burger, C.J., dissenting).

9.    Most people know discrimination is wrong, and that "[t]he way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007) (plurality op.).

10.    After all, racial "classifications promote notions of racial inferiority and lead to a politics of racial hostility, reinforce the belief, held by too many for too much of our history, that individuals should be judged by the color of their skin, and endorse race-based reasoning and the conception of a Nation divided into racial blocs, thus contributing to an escalation of racial hostility and conflict." *Parents Involved*, 551 U.S. at 746 (cleaned up).

11.    Starbucks unfortunately disagrees.

12.    Indeed, for years, and to this day, Starbucks has engaged in employment discrimination, one of the most odious practices possible.

13.    And although it might have a right to disagree with that sentiment, it does not have a right to discriminate on the basis of race. *See, e.g.*, *Am. All. for Equal Rights v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 777 (11th Cir. 2024) (holding that the right to freedom of expression does not grant a right to discriminate on the basis of race).

3

14.    Yet, that is precisely what Starbucks has done, is doing, and, if not stopped by the judicial system, will keep doing here in Missouri.

15.    It has told Missourians—employees, applicants, and consumers alike—that Starbucks is a great place to work, where everyone is treated equally.

16.    But these statements are false, misleading, and deceptive.

17.    Rather, Starbucks has decided to require outright race- and sex-based discrimination in hiring via quotas, segregate employees on unlawful bases, and single out preferred groups for additional training and employment benefits.

18.    "There is perhaps no device more destructive to the notion of equality than the *numerus clausus*—the quota." *Steelworkers*, 443 U.S. at 254 (Rehnquist, J., dissenting).

19.    "Whether described as 'benign discrimination' or 'affirmative action,' the racial quota is nonetheless a creator of castes, a two-edged sword that must demean one in order to prefer another." *Steelworkers*, 443 U.S. at 254 (Rehnquist, J., dissenting).

20.    "'[O]utright racial balancing' is 'patently unconstitutional.'" *SFFA*, 600 U.S. at 223 (quoting *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 311 (2013)).

21.    So no one, not even Starbucks, can lawfully "desire 'some specified percentage of a particular group merely because of its race or ethnic origin.'" *SFFA*, 600 U.S. at 211 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 329–30 (2003)).

22.    While the opinions of Chief Justice Burger and Justice Rehnquist did not originally win out in their day, cases like *Students for Fair Admission* have made clear that "[e]liminating racial discrimination means eliminating all of it." *SFFA*, 600 U.S. at 206.

23.     Federal and state antidiscrimination law does not permit treating one person better than another on the basis of race or sex.

**PARTIES**

**I.      Plaintiff State of Missouri *ex rel.* Andrew Bailey**

24.     Plaintiff State of Missouri is a sovereign State of the United States of America.

25.     Andrew Bailey is the 44th Attorney General of the State of Missouri.

26.     Attorney General Bailey is authorized to bring actions on behalf of Missouri that are "necessary to protect the rights and interests of the state, and enforce any and all rights, interests or claims against any and all persons, firms or corporations in whatever court or jurisdiction such action may be necessary."  Mo. Rev. Stat. § 27.060.

27.     The State of Missouri, on the relation of its Attorney General, brings this action to put an end to Starbucks' campaign of systemic racial, sexual, and sexual orientation discrimination.

28.     It comes to this Court asking for an order it should never have had to ask for: an order compelling Starbucks to end its discriminatory patterns and practices.

29.     Missouri, through its Attorney General, has the authority to bring this action because this suit alleges Starbucks has, is, and will keep engaging in systemic race and sex discrimination against Missourians, which is conduct in which the State has an interest under Mo. Rev. Stat. §§ 27.060, 213.126.

30.     Missouri has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general.

31.     A State's interests in the health and well-being of its residents extend beyond mere physical interests to economic and commercial interests.

32.    States have a similar state in securing residents from the harmful effects of discrimination.

33.    Deliberate efforts to stigmatize the labor force as inferior carry a universal sting.

34.    States can seek, in the federal courts, to protect their residents from such discrimination to the extent that it violates federal law.

35.    Missouri sues to vindicate its quasi-sovereign interest in securing its residents from the harmful effects of race, sex, and sexual orientation discrimination that Starbucks has caused, is causing, and, if not stopped, will keep causing in its employment and, thus also, economic patterns and practices.

36.    States have a quasi-sovereign interest in not being discriminatorily denied their rightful status within the federal system.

37.    This means that states can ensure that they and their residents are not excluded from the benefits that are to flow from participation in the federal system.

38.    Thus, states need not wait for the Federal Government to vindicate the states' interest in the removal of barriers to the participation by its residents in the free flow of commerce.

39.    Similarly, federal statutes creating benefits or alleviating hardships create interests that states will obviously wish to have accrue to its residents.

40.    Therefore, Missouri has an interest, independent of the benefits that might accrue to any particular individual, in assuring that the benefits of the federal system are not denied to its general population.

41.     Federal statutes, more specifically Title VII and 42 U.S.C. § 1981, create benefits or alleviate hardships for all because they seek to deter employment discrimination on the bases of race, color, sex, and national origin and provides relief from it when it unlawfully happens.  *See*, *e.g.*, 42 U.S.C. § 2000e-2(a); 42 U.S.C. § 1981 (race).

42.     Thus, Missouri sues to vindicate its quasi-sovereign interest in ensuring its residents are not excluded from the benefits that are to flow from, and hardships that are to be alleviated by, Title VII and § 1981.

43.     One helpful indication in determining whether an alleged injury to the health and welfare of their citizens suffices to give states standing to sue is whether the injury is one that states, if they could, would likely attempt to address through their sovereign lawmaking powers.

44.     The injury of being subject to unlawful employment discrimination is indeed an injury that Missouri attempts to address through its sovereign lawmaking powers vis-a-vis Missouri's Human Rights Act (MHRA).  *See*, *e.g.*, Mo. Rev. Stat. § 213.055.1(1).

45.     Nevertheless, Starbucks' patterns and practices, as explained further below, negatively affect and impact a sufficiently substantial segment of Missouri's population.

46.     As of 2023, Starbucks has nearly 200 locations in Missouri.[2]

---

[2] *Starbucks Stores by State 2024*, WORLD POPULATION REV., https://worldpopulationreview.com/state-rankings/starbucks-stores-by-state (last visited Feb. 3, 2025).

47.    Since at least 2020, Starbucks has employed, and still employs, hundreds, if not thousands, of Missourians and receives employment applications from hundreds more.

48.    Starbucks also employ persons whom, though they might not live in Missouri, nevertheless perform work that Starbucks intends to have direct employment and economic effects in Missouri.

49.    As just a few examples, Starbucks employs a North America President,[3] a Senior Vice President of U.S. Operations,[4] Senior Vice Presidents of U.S. Retail Operations,[5] a Senior Vice President of Digital for North America,[6] a Senior Vice President of U.S. Licensed Stores,[7] and a Senior Vice President of Store Development for the Americas.[8]

---

[3] *Sara Trilling*, STARBUCKS, https://about.starbucks.com/leadership/sara-trilling/ (last visited Feb. 3, 2025).

[4] *Dennis Brockman*, STARBUCKS, https://about.starbucks.com/leadership/dennis-brockman/ (last visited Feb. 3, 2025) ("Prior to that, he was a regional vice president for the Midwest region . . . .").

[5] *Jon Liechty*, STARBUCKS, https://about.starbucks.com/leadership/jon-liechty/ (last visited Feb. 3, 2025) ("leading Starbucks company-operated retail stores in the . . . Midwest . . . region[]."); *Brooke O'Berry*, STARBUCKS, https://about.starbucks.com/leadership/brooke-oberry-2/ (last visited Feb. 3, 2025).

[6] *Paul Riedel*, STARBUCKS, https://about.starbucks.com/leadership/paul-riedel/ (last visited Feb. 3, 2025).

[7] *Mark Ring*, STARBUCKS, https://about.starbucks.com/stories/leadership/mark-ring/ (last visited Feb. 3, 2025).

[8] *Angele Robinson-Gaylord*, STARBUCKS, https://about.starbucks.com/stories/leadership/angele-robinson-gaylord-2/ (last visited Feb. 3, 2025).

50.    Missouri incorporates into each allegation[9] regarding Starbucks' employees, officers, or agents that, at all times relevant and material to the allegations herein, *e.g.*, when said persons: [1] were subject to meeting or exceeding Starbucks' quota expectations; [2] reviewed applicant information or interviewed applicants; [3] suffered adverse employment actions; or [4] failed or refused to hire applicants, said persons resided or worked for Starbucks in Missouri or performed work for Starbucks that Starbucks intended to have direct or indirect economic or employment effects in Missouri, in whole or in part.

51.    As of January 13, 2024, Starbucks has 234 job openings in Missouri, ranging from barista to store manager to district manager.[10]

52.    In addition to the hundreds of in-person jobs in Missouri, Starbucks offers nationwide jobs that are "100% remote" and thus can be filled by residents of Missouri.[11]

53.    Missouri incorporates into each allegation regarding applicants that, at all times relevant and material to the allegations herein, *e.g.*, when [1] applicants applied to work for Starbucks or [2] Starbucks failed or refused to hire said applicants, said applicants resided in Missouri or applied to perform work for Starbucks in Missouri or

---

[9] *See* Fed. R. Civ. P. 10(c).

[10] *Jobs at Starbucks*, STARBUCKS, https://starbucks.eightfold.ai/careers?location=MO%2C%20United%20States&pid=481062704985&domain=starbucks.com&sort_by=relevance&hl=en-US&triggerGoButton=false&triggerGo-Button=true (last visited Jan. 13, 2025).

[11] *Corporate – Starbucks Careers*, STARBUCKS, https://careers.starbucks.com/discover-opportunities/corporate/ (last visited Feb. 3, 2025) ("There are certain roles that are 100% in-office and others that are 100% remote.").

for work that Starbucks intended to have direct economic or employment effects in Missouri, in whole or in part.

54.    Starbucks will employ individuals whom will live in Missouri when they work for Starbucks, will work for Starbucks in Missouri, or will perform work for Starbucks that Starbucks intends to have direct or indirect economic or employment effects in Missouri, in whole or in part.

55.    Missouri incorporates into each allegation regarding said prospective or future employees, officers, or agents that, at all times relevant and material to the allegations herein, *e.g.*, when said persons: [1] apply to work for Starbucks; [2] are subject to meeting or exceeding Starbucks' quota expectations; or [3] suffer adverse employment actions, said persons will live in Missouri when they work for Starbucks, will work for Starbucks in Missouri, or will perform work for Starbucks that Starbucks intends to have direct economic or employment effects in Missouri, in whole or in part.

56.    Starbucks' policies harm the many Missourians whom work, or would like to work, at Starbucks, but have been, are being, or will be discriminated against as future victims on the basis of their race, sex, or inclusion in other protected groups.

57.    As of July 1, 2024, the races and ethnic origins of Missouri's population are as follows: [1] 11.7 black; [2] 0.6% American Indian and Alaska Native; [3] 2.3% Asian; [4] 0.2% Native Hawaiian and other Pacific Islander; [5] 2.7% two or more races; [6] 5.3% Hispanic or Latino; and [7] 77.9% white, not Hispanic or Latino.[12]

---

[12] *QuickFacts: Missouri*, U.S. CENSUS BUREAU, https://www.census.gov/quickfacts/fact/table/MO# (last visited Jan. 13, 2025).

58.     Women make up 50.7% of Missouri's population.[13]

59.     Between 2019 and 2023, those 16 years and older made up 62.7% of Missouri's population in the civilian labor force.[14]

60.     Women made up 59.1% of those 16 years and older Missourians in the civilian labor force.[15]

61.     But for decades, 100% of Missourians have been, and are to be, protected by federal and state anti-discrimination laws.  42 U.S.C. §§ 2000e-2–2000e-5; *id.* § 1981; Mo. Rev. Stat. §§ 213.055, .077, .126.

62.     Those Missourians make up an identifiable group of individual residents.

63.     The injuries that Starbucks' discriminatory patterns, practices, and policies cause also create indirect effects on an even greater portion of Missouri's population: consumers of Starbucks' goods and services.

64.     Starbucks no doubt serves more consumers in Missouri than it has employees in Missouri.

65.     By making employment decisions based on characteristics that have nothing to do with one's ability to work well, Starbucks, for example, hires people by thumbing the scale based on at least one of Starbucks' preferred immutable characteristics rather than an evaluation of an applicant's merit and qualifications.

---

[13] *Id.*

[14] *Id.*

[15] *Id.*

66. Making hiring decision on non-merit considerations will skew the hiring pool towards people who are less qualified to perform their work, increasing costs for Missouri's consumers.

67. This is because more mistakes are made, more time is required to train and make up for such mistakes, even though mistakes would occur less and resources, including time and materials, would be better preserved by employees with better (and actual) job qualifications.

68. So, with Starbucks' discriminatory patterns, practices, and policies, Missouri's consumers are required to pay higher prices and wait longer for goods and services that could be provided for less had Starbucks employed the most qualified workers, regardless of their race, color, sex, or national origin.

## II.     Defendant

69. Defendant Starbucks Corp. ("Starbucks") is a for-profit, multinational corporation with dozens of locations throughout Missouri, including dozens of locations in the Eastern District of Missouri (*e.g.*, 315 Chestnut Street, St. Louis, Missouri 63102).[16]

70. Starbucks is a publicly traded company under the ticker symbol "SBUX" with more than 1 billion shares outstanding.[17]

---

[16] *Store Locator*, STARBUCKS, https://www.starbucks.com/store-locator?map =38.627702,-90.18981,14z (last visited Jan. 13, 2025).

[17] *STARBUCKS CORP SBUX on Nasdaq*, SECS. & EXCH. COMM'N, https://www.sec.gov/edgar/browse/?CIK=829224&owner=exclude (last visited Feb. 3, 2025).

71.    Starbucks is a federal contractor (UEI: LKN7SNYDQEZ3).[18]

72.    As of September 29, 2024, Starbucks has as many as 211,000 employees in all 50 States.[19]

73.    Starbucks is incorporated in the State of Washington, with its principal place of business at 2401 Utah Ave. South, Suite 800 MS: S-LA1, Seattle, Washington 98134.[20]

74.    Starbucks has a certificate of authority (Charter No. F00396209) to do business in the State of Missouri pursuant to Mo. Rev. Stat. § 351.572.1.[21]

75.    Starbucks' registered agent is Prentice-Hall Corp. System, located at 221 Bolivar Street, Jefferson City, Missouri 65101.[22]

### JURISDICTION AND VENUE

76.    This Court has subject matter jurisdiction over the federal claims under 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. § 2000e-5(f)(3) because this case involves claims under Title VII of the Civil Rights Act of 1964, as well as 42 U.S.C. § 1981.

77.    This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

---

[18] *Starbucks' 2024 EEO-1 Report*, STARBUCKS (May 31, 2024), https://about.starbucks.com/uploads/2024/08/EEO-1-2023.pdf.

[19] *Starbucks' Form 10-K*, SECS. & EXCH. COMM'N (Nov. 20, 2024), https://www.sec.gov/ix?doc=/Archives/edgar/data/829224/000082922424000057/sbux-20240929.htm.

[20] *Starbucks' 2024 Annual Registration Report*, MO. SEC'Y OF STATE (June 28, 2024), https://bsd.sos.mo.gov/Common/CorrespondenceItemViewHandler.ashx?IsTIFF=true&filedDocumentid=136283649&version=2.

[21] *Gen. Business - For Profit Details as of 1/13/2025*, MO. SEC'Y OF STATE (Jan. 13, 2025), https://bsd.sos.mo.gov/BusinessEntity/BusinessEntityDetail.aspx?ID=519649&page=beSearch (Charter Info.)

[22] *Id.*

78.    This Court has the authority to issue the requested relief under 28 U.S.C. §§ 2201–2202 and 42 U.S.C. § 2000e-5(f)(3)-(g) and this Court's inherent equitable authority.

79.    Exercising general personal jurisdiction is proper under the Due Process Clause because Defendant has a certificate of authority with the Secretary of State, *see* Mo. Rev. Stat. § 351.572.1, which constitutes consent to personal jurisdiction in the courts of the State of Missouri, *see id.* § 351.582.2; *see also Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023).

80.    Exercising specific personal jurisdiction is proper under the Due Process Clause because Defendant has such a deep and systemic presence in Missouri that it can reasonably foresee being sued in Missouri.  *See Ford Motor Co. v. Montana Eighth Judicial Dist. Court*, 592 U.S. 351, 364–65 (2021).

81.    In the alternative, exercising specific personal jurisdiction is proper under the Due Process Clause because Defendant has purposefully availed itself of the benefits of doing business in this State by opening Missouri locations and staffing those locations with Missouri residents, and this suit arises out of the employment decisions Starbucks has made to staff those locations as well as 100% remote jobs for which Missouri residents can apply.  *See Myers v. Casino Queen, Inc.*, 689 F.3d 904, 914 (8th Cir. 2012).

82.    Exercising personal jurisdiction is proper under Missouri's long-arm statute because doing so would comply with the requirements of the Due Process Clause.  *See, e.g.*, *Pitcher v. Centene Corp.*, 602 S.W.3d 216, 226–28 (Mo. App. W.D. 2020).

83.   Venue is proper in this judicial district because: [1] Plaintiff alleges that Starbucks' unlawful employment practices have been committed herein; [2] Plaintiff alleges employment records relevant to such practices are maintained and administered herein; and [3] persons aggrieved by Starbucks' unlawful employment practices would have worked for Starbucks herein but for Starbucks' alleged unlawful employment practices.  42 U.S.C. § 2000e-5(f)(3).

### FACTS COMMON TO ALL COUNTS

**I.   Starbucks' commitment to diversity, equity, and inclusion (DEI) is mere pretext for its actual commitment to unlawful discrimination.**

84.   "At Starbucks, inclusion and belonging must be everyday realities—on both sides of the counter and in our corporate support center as well."[23]

85.   In October 2020, "Starbucks share[d] [six] next steps it's taking to advance racial and social equity."[24]

86.   First, Starbucks committed to "[l]aunching a mentorship program connecting BIPOC (Black, Indigenous and People of Color) partners to senior leaders and investing in strategic partnerships with professional organizations that focus on the development of BIPOC talent."[25]

---

[23] *2022 Notice of Annual Meeting of Shareholders and Proxy Statement*, STARBUCKS at 7 (Jan. 28, 2022), https://s203.q4cdn.com/326826266/files/doc_financials/2021/ar/SBUX-2022-Proxy-Statement.pdf (page numbers refer to PDF page numbers) (2022 Proxy).

[24] Timeline, *supra* note 1.

[25] *Id.*

87.    Starbucks defines "BIPOC" as "Black, Indigenous, and People of Color."[26]

88.    Second, Starbucks committed to "[d]isclosing data reflecting the diversity of our current workforce."[27]

89.    Third, Starbucks committed to "[s]etting and tracking annual inclusion and diversity goals of achieving BIPOC representation of at least 30 percent at all corporate levels and at least 40 percent of all retail and manufacturing roles by 2025."[28]

90.    Fourth, Starbucks committed to "[c]onnecting the building of inclusive and diverse teams to our executive compensation program."[29]

91.    Fifth, Starbucks committed to "[j]oining peer organizations in the Board Diversity Action Alliance committed to racially and ethnically diverse representation on corporate boards of directors."[30]

92.    Sixth, Starbucks committed to "[e]stablishing [an] Inclusion and Diversity Executive Council to provide internal governance to integrate inclusion and diversity throughout the organization."[31]

---

[26] *Starbucks' 2024 Notice of Annual Meeting of Shareholders and Proxy Statement*, STARBUCKS at 64 (Jan. 25, 2024), https://s203.q4cdn.com/326826266/files/doc_financials/2023/2024-proxy-statement.pdf) (2024 Proxy).

[27] Timeline, *supra* note 1.

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.*

93.    Since 2021, Starbucks has "believe[d] it is [its] responsibility to advance racial and social equity."[32]

94.    Starbucks has sought to "advance diversity, equity, and inclusion on behalf of [its] partners, customers and communities."[33]

95.    Starbucks seeks to "advance equity in hiring and promotions by developing frameworks, tools, and processes to ensure that diversity goals are woven into business decisions; identifying new programs and initiatives to bolster diversity within the company; and measuring the impact of diversity strategies and programs."[34]

96.    To that end, "Starbucks has made specific racial equity commitments based on [its] principles of being intentional, transparent, and accountable at all levels . . . ."[35]

97.    Starbucks seeks to have its "inclusion and diversity reflect[] the myriad populations [it] serves . . . and society at large."[36]

---

[32] *Starbucks Fiscal 2021 Annual Report (Form 10-K)*, STARBUCKS at 7 (Nov. 19, 2021), https://s203.q4cdn.com/326826266/files/doc_financials/2021/ar/Starbucks-Fiscal-2021-Annual-Report.pdf (2021 Annual Report).

[33] *Id.*

[34] Eric Holder, *A Report to Starbucks On the Progress of its Efforts to Promote Civil Rights, Equity, Diversity, and Inclusion*, Covington & Burling LLP at 22 (March 31, 2021), https://about.starbucks.com/uploads/2021/03/Starbucks-2021-Civil-Rights-Assessment.pdf (Holder Report).

[35] 2021 Annual Report, *supra* note 32, at 7.

[36] 2024 Proxy, *supra* note 26, at 103.

98.    Starbucks has been advised "to execute diligently and thoughtfully the commitments discussed above, and . . . monitor its progress toward achieving these commitments and address proactively any potential impediments."[37]

99.    To that end, Starbucks remains committed "to building an inclusive and diverse Starbucks."[38]

100.   And, in Starbucks' eyes, "[r]eal inclusion requires intent."[39]

### A.    Starbucks financially incentivizes discriminatory quotas by tying compensation to DEI "goals."

101.   In 2021, Starbucks "[i]nvest[ed] in strategic partnerships with professional organizations that focus on the development of BIPOC talent, providing additional development opportunities for our BIPOC partners."[40]

102.   Starbucks "set[] annual Inclusion and Diversity goals based on retention rates and progress towards achieving BIPOC representation."[41]

103.   "As of August 23, 2020, the Starbucks U.S. partner base was 69% women and 47% Black, Indigenous, and People of Color (BIPOC)."[42]

---

[37] Holder Report, *supra* note 34, at 23.

[38] Sara Kelly, *Message to Starbucks partners about our commitment to equity and opportunity*, Starbucks (June 30, 2023), https://about.starbucks.com/press/2023/message-to-starbucks-partners-about-our-commitment-to-equity-and-opportunity/.

[39] *Id.*

[40] 2021 Annual Report, *supra* note 32, at 7.

[41] *Id.*

[42] *2021 Notice of Annual Meeting of Shareholders and Proxy Statement*, STARBUCKS at 16 (Jan. 22, 2021), https://s203.q4cdn.com/326826266/files/doc_financials/2020/ar/SBUX-2021-Proxy-Statement.pdf (2021 Proxy).

104.    Yet, one of Starbucks' "goals" is an express racial and sex-based quotas: to have "[a]t least 40% BIPOC representation and 55% women in all retail roles, by 2025 in the U.S."[43]

105.    A second of Starbucks' "goals" is to have "[a]t least 30% BIPOC representation and 50% women for all enterprise roles, including senior leadership, by 2025 in the U.S."[44]

106.    A third of Starbucks' "goals" is to have "[a]t least 40% BIPOC representation and 30% women in all manufacturing roles by 2025 in the U.S."[45]

107.    "Breaking down [Starbucks'] BIPOC representation further, [its] partners [we]re 8% Black, 27% Hispanic or Latinx, 6% Asian, 5% Multiracial, 0.6% American Indian or Alaskan Native and 0.6% Native Hawaiian or other Pacific Islander."[46]

108.    "Latinx" is a term used by DEI activists in place of "Latino" or "Latina" because they do not like that the Spanish language builds gender into its grammar.

109.    In fact, the vast majority of Latino Americans do not use "Latinx" to describe themselves, and "75% of Latinos who have heard of the term Latinx say it *should not* be

---

[43] 2021 Annual Report, *supra* note 32, at 7; *Starbucks 2021 Global Environmental & Social Impact Report*, STARBUCKS at 50, https://stories.starbucks.com/uploads/2022/04/Starbucks-2021-Global-Environmental-and-Social-Impact-Report-1.pdf (last visited Jan. 13, 2025) (2021 ESG).

[44] 2021 ESG, *supra* note 43, at 50.

[45] *Id.*; 2021 Annual Report, *supra* note 32, at 7.

[46] 2021 Proxy, *supra* note 42, at 16.

used to describe the Hispanic or Latino population, up from 65% saying the same in 2019."[47]

110.   In 2023, Starbucks decided to soften or water down its "goals" language by describing its efforts as merely "aspirational."[48]

111.   But this language is mere pretext.

112.   Starbucks' percentages are not mere aspirational goals.

113.   Rather, Starbucks has set quotas based on unlawful bases.

114.   To help ensure these quotas are met, Starbucks has committed to be "accountable for measurable results at the highest levels of the organization, connecting the building of inclusive and diverse teams and our sustainability objectives to our executive compensation program through clearly set goals and metrics."[49]

115.   "In September 2020, [Starbucks'] Compensation Committee approved the incorporation of additional targets into both [Starbucks'] short-term and long-term fiscal 2021 incentive plans (Annual Incentive Bonus Plan and LSP [Leadership Stock Plan])

---

[47] Luis Noe-Bustamante, *Latinx Awareness has Doubled Among U.S. Hispanics Since 2019, but Only 4% Use It*, PEW RSCH. CTR. 7, 16 (Sept. 12, 2024), https://www.pewresearch.org/wp-content/uploads/sites/20/2024/09/RE_2024.09.12_Latinx_REPORT.pdf.

[48] *Starbucks Fiscal 2023 Annual Report*, STARBUCKS at 8 (Nov. 17, 2023), https://s203.q4cdn.com/326826266/files/doc_financials/2024/ar/fy23-annual-report.pdf (2023 Annual Report).

[49] 2021 Proxy, *supra* note 42, at 51; *see* 2021 Annual Report, *supra* note 32, at 7; *2023 Notice of Annual meeting of Shareholders and Proxy Statement*, STARBUCKS at 54 (Jan. 27, 2023), https://s203.q4cdn.com/326826266/files/doc_financials/2022/ar/Starbucks-2023-Proxy-Statement.pdf (2023 Proxy).

for [its] U.S.-based senior leadership team members at the senior vice president level and above."[50]

116.   "With respect to the Annual Incentive Bonus Plan design, the weighting of the IPF [Individual Performance Factor] was increased from 30% to 50% of the overall payout calculation, with the goal of holding senior leaders individually accountable to drive inclusion and sustainability at Starbucks, among meeting other goals."[51]

117.   "With respect to the fiscal 2021 LSP design, [Starbucks vowed to] hold [its] senior leaders collectively accountable for meeting a 3-year representation target."[52]

118.   "This representation target focuses on improvement in Black, Indigenous and LatinX representation at the manager level and above, with a 3-year target of improving Black, Indigenous and LatinX representation by more than 5% by 2023."[53]

119.   "The representation metric . . . operate[ed] as a modifier to the payout of the fiscal 2021 LSP PRSU award, with the following levels of modification based on representation growth:  (i) an upward modifier of 110% if the representation target equals or exceeds 5%; (ii) reducing the awards payout by 5% if the representation goal is not achieved but growth is positive and below 5%; and (iii) reducing the award payout by 10% if representation falls over the three-year performance period."[54]

---

[50] 2021 Proxy, *supra* note 42, at 51–52.

[51] *Id.* at 52.

[52] *Id.*

[53] *Id.*

[54] *Id.*; Holder Report, *supra* note 34, at 20.

120. "With the inclusion and diversity metrics contributing to an increased weighting of the IPF in the overall payout calculation of the Annual Incentive Bonus and adding an inclusion and diversity modifier to the PRSU awards of the LSP, [Starbucks] fe[lt] that [it] [was] continuing to demonstrate [its] long-standing commitment to a culture of inclusion."[55]

121. So, Starbucks "modified [its] executive compensation programs beginning in fiscal 2021."[56]

122. In October 2020, Starbucks' then-CEO Kevin Johnson issued a letter to Starbucks' employees to explain this executive tying.[57]

123. In it, "Starbucks announced that it would for the first time link executive compensation with success in achieving the Company's Environmental Social Governance (ESG) goals."[58]

124. Starbucks said it would do this in part by directly connecting or "tying" its executives' pay to "the building of inclusive and diverse teams" and other "diversity goals."[59]

---

[55] 2021 Proxy, *supra* note 42, at 52.

[56] *Id.* at 51.

[57] Holder Report, *supra* note 34, at 20; Catherine Thorbecke, *Starbucks to tie executive compensation to meeting its diversity goals*, ABC NEWS (Oct. 15, 2020), https://abcnews.go.com/Business/starbucks-tie-executive-compensation-meeting-diversity-goals/story?id=73629368.

[58] Holder Report, *supra* note 34, at 20; Thorbecke, *supra* note 57.

[59] Thorbecke, *supra* note 57.

125.   But, as explained earlier, these "diversity" goals in fact are race- and sex-based quotas.

126.   So, "beginning in fiscal 2021," Starbucks "[i]ncorporat[ed] metrics focused on building inclusive and diverse teams into [its] executive compensation programs . . . ."[60]

127.   In keeping with its insistence on holding its leadership accountable, Starbucks takes a carrot-and-stick approach to implementing its quotas.

128.   Executives who meet the quota get a carrot: an increased bonus.

129.   Executives who do not are hit with the stick: a decreased bonus, if one is even awarded.

130.   Starbucks tied "ten percent of the overall bonus payout calculation . . . to creating an inclusive environment where everyone belongs . . . ."[61]

131.   Starbucks tied its executives' pay for the same reasons in FY2022.[62]

132.   Indeed, to "creat[e] accountability at the leadership levels" "100% of Starbucks executives ha[d] compensation tied to the building of inclusive and diverse teams."[63]

---

[60] 2021 Annual Report, *supra* note 32, at 7; 2021 ESG, *supra* note 43, at 45.

[61] 2021 ESG, *supra* note 43, at 45.

[62] *Starbucks Fiscal 2022 Global Environmental & Social Impact report*, STARBUCKS 49, https://stories.starbucks.com/uploads/2023/04/2022-Starbucks-Global-Environmental-Social-Impact-Report.pdf (last visited Jan. 13, 2025) (2022 ESG); 2023 Proxy, *supra* note 49, at 45.

[63] *Our Progress on Advancing Equity and Inclusion*, STARBUCKS (2022), https://stories.starbucks.com/uploads/2022/01/SBX220112-Starbucks-Inclusion-and-Equity-Infographic_8.5x14in_2.pdf (Our Progress).

133.    Starbucks did the same in FY2023 but at 7.5% instead of 10%.[64]

134.    Starbucks maintaining its tied or financially-incentivized racial and sex-based quotas should come as no surprise, especially given the history of some of its leadership.

135.    As but one example, on September 9, 2024, Brian Niccol became Starbucks' CEO.[65]

136.    Before he was Starbucks' CEO, Niccol was Chipotle's CEO.[66]

137.    Under his leadership, Chipotle, like Starbucks, began to tie executive compensation to ESG goals, review "internal diversity data to identify areas requiring more focus and making strategic plans to address those areas through hiring, development, and ERGs" or Employee Resource Groups, pilot "a mentorship program identifying a diverse group of high potential talent for development and greater advancement within the company," and include a "Chief Diversity, Inclusion, and People Officer . . . to champion a culture of diversity," and appoint "diverse representatives on Chipotle's Board of Directors."[67]

---

[64] *Fiscal 2023 Starbucks Global Impact report*, STARBUCKS at 30, https://stories.starbucks.com/uploads/2024/02/2023-Starbucks-Global-Impact-Report.pdf (last visited Jan. 30, 2024) (2023 ESG); 2024 Proxy, *supra* note 26, at 72.

[65] *Starbucks names Brian Niccol as Chairman and Chief Executive Officer*, STARBUCKS (Aug. 13, 2024), https://archive.is/GuNA1.

[66] *Id.*; *Starbucks 2025 Notice of Annual Meeting of Shareholders and Proxy Statement*, STARBUCKS 14 (Jan. 24, 2025), https://s203.q4cdn.com/326826266/files/doc_financials/2024/ar/Starbucks-2025-Proxy-Statement.pdf (page numbers refer to PDF page numbers) (2025 Proxy).

[67] *Progress Update on Chipotle's Pledge to Drive Change*, CHIPOTLE, https://archive.is/IGPWW (last visited Jan. 30, 2025).

138.    Another reason why no one should be surprised that Starbucks tied or financially-incentivized racial and sex-based quotas is because of those whom Starbucks has hired as consultants.

139.    In fiscal years 2020 and 2021, Starbucks' "Compensation Committee engaged F.W. Cook & Co., Inc. ("F.W. Cook") as its outside independent compensation consultant."[68]

140.    "During fiscal 2020, F.W. Cook did not perform any services for Starbucks other than making recommendations with respect to executive compensation and nonemployee director compensation under its engagement by the Compensation Committee."[69]

141.    In 2022, one of F.W. Cook's principals, Elaine Yim, said that, "Being able to say that a specific portion of the incentive plan, whether annual or long term, is going to be tied to our diversity and inclusion effort sends a much clearer message about a company's commitment to DEI than a company statement . . . There is definitely more of a push toward addressing the question: how do we hold our executives accountable for results being accomplished in a meaningful way?"[70]

---

[68] 2021 Proxy, *supra* note 42, at 51; 2022 Proxy, *supra* note 23, at 77.

[69] 2021 Proxy, *supra* note 42, at 51.

[70] David Yang & Elaine Yim, *Delivering On Diversity: What does the call for stronger diversity, equity and inclusion efforts mean for compensation committees?*, F.W. COOK 2 (Jan. 10, 2022), https://www.fwcook.com/Publications-Events/Articles/Delivering-on-Diversity/

142.    But because "defining meaningful DEI goals to link to incentive pay is no small feat," and because "[m]etrics viewed as too rigorous or unfair will disgruntle plan participants, while those viewed as too easy to achieve may raise shareholder ire[,] . . . many companies are taking a calculated approach to incorporating DEI metrics into incentive pay formulas."[71]

143.    F.W. Cook even encouraged more companies to "creat[e] or elevat[e] the role of the chief diversity officer (CDO)" because compensation committees members, now with "this additional interest or obligation to review DEI initiative results and workforce diversity trends . . . need someone to be able to build that capacity and report on their findings."[72]

144.    Beginning in September 2021 and through fiscal year 2024, Starbucks' "Compensation Committee engaged Pay Governance as its outside independent compensation consultant."[73]

145.    In 2021, Pay Governance wrote about how, even back then, "[a] veritable cottage industry of consulting advice has sprung up to help companies and compensation committees consider if and how EESG and DEI are best incorporated into incentive plans."[74]

---

[71] *Id.* at 2.

[72] *Id.* at 2.

[73] 2023 Proxy, *supra* note 49, at 58; 2024 Proxy, *supra* note 26, at 76; 2025 Proxy, *supra* note 66, at 67.

[74] John D. England, *Considering a Culturally Congruent EESG and DEI Component in Incentive Plans*, PAY GOVERNANCE (July 21, 2021), https://archive.is/YPIVP.

26

146.    If incorporating these incentive plans was not enough, meeting or exceeding Starbucks' numerical quotas was not all that one had to do to get their payout.[75]

147.    Employees, officers, and agents subject to Starbucks' quota system could obtain a payout based on Starbucks' "inclusion and diversity performance goals" only if he or she agreed to participate in Starbucks' mentorship program.[76]

148.    Starbucks' mentorship program required one to "[s]erve as a mentor to BIPOC mentees and demonstrate a meaningful time commitment demonstrated through monthly group meetings with all mentees and monthly individual meetings with each mentee."[77]

149.    Even if one participated in the mentorship program, the percentage of one's payout depended on Starbucks' "BIPOC Retention Rate."[78]

150.    If one had a quota retention rate of greater than 87%, Starbucks awarded only a 50% payout.[79]

151.    If one had a quota retention rate of greater than 90%, Starbucks awarded a 100% payout.[80]

---

[75] 2023 Proxy, *supra* note 49, at 60.

[76] 2024 Proxy, *supra* note 26, at 64.

[77] *Id.*

[78] *Id.*

[79] *Id.*

[80] *Id.*

152.    If one had a quota retention rate of greater than 98%, Starbucks awarded a 200% payout.[81]

153.    Even if one participated in the mentorship program and retained a sufficient rate of employees of certain races and colors, the percentage of one's payout depended on Starbucks' "Inclusive Leadership Survey."[82]

154.    Starbucks' "Inclusive Leadership Survey" was based "on a scale of 1–5."[83]

155.    If one achieved a score between 2.0 and 2.49, Starbucks awarded only a 50% payout.[84]

156.    If one achieved a score between 3.0 and 3.49, Starbucks awarded a 100% payout.[85]

157.    If one achieved a score between 4.5 and 5.0, Starbucks awarded a 200% payout.[86]

158.    Starbucks' "goals"—race- and sex-based quotas—had real effects.

159.    Unquestionably, Starbucks paid "[a]nnual cash incentive awards for" executives "pursuant to [its] Annual Incentive Bonus Plan."[87]

---

[81] *Id.*

[82] *Id.*

[83] *Id.*

[84] *Id.*

[85] *Id.*

[86] *Id.*

[87] *Id.* at 61.

160.    In 2021, these "resulted in the increase of [Starbucks'] individual performance factor (IPF) of the Annual Incentive Bonus Plan from 30% to 50% of the overall payout calculation."[88]

161.    Further, Starbucks' "PRSUs (awarded in November 2020) paid out at 102.8% of target as a result of the 126.67% average achievement against [its] . . . three-year inclusion and diversity modifier."[89]

162.    In 2023, "[e]ach of [Starbucks'] NEOs [named executive officers] who was eligible to earn an annual cash incentive award under the Annual Incentive Bonus Plan earned an award based on [Starbucks'] . . . progress against [its] inclusion an diversity initiatives (payout ranged from 100% to 137.5% of target) . . . ."[90]

163.    As of September 28, 2024, Starbucks' U.S. workforce was 8.1% black, 31.7% Hispanic, 5.6% Asian, 47.8% white, 0.6% American Indian or Alaska Native, and 0.5% Native Hawaiian or Other Pacific Islander.[91]

164.    Starbucks' U.S. workforce was 70.9% women and 28.4% men.[92]

165.    In other words, since 2020, Starbuck's workface has become more female and less white.

---

[88] 2021 ESG, *supra* note 43, at 45.

[89] 2024 Proxy, *supra* note 26, at 57.

[90] *Id.*

[91] *Workforce Diversity at Starbucks*, STARBUCKS (Oct. 30, 2024), https://about.starbucks.com/stories/2024/workforce-diversity-at-starbucks/ (Workforce Diversity).

[92] *Id.*

166. "[I]n the U.S.[,] diverse partners represent more than 51.9% of [Starbucks']
retail team and more than 37.9% of [its] corporate roles."[93]

167. Because of these numbers and the size of Starbucks, what Starbucks said was
required to meet its quotas happened.

168. Starbucks has distributed written training materials, shareholder documents,
public reports, or other written statements, including emails and internal memoranda,
that state that Starbucks relies on the above-referenced quota system.

169. Starbucks has distributed written training materials, shareholder documents,
public reports, or other written statements, including emails and internal memoranda,
that state that Starbucks ties executive compensation to the executive's ability to meet
the quotas.

170. The success or failure of Starbucks' employees, officers, and agents subject to
its quotas in meeting their racial and sex-based quotas are embedded into performance
reviews.

171. Starbucks has caused, is causing, and will cause employees, officers, and
agents whom fail to meet the diversity quotas to suffer adverse employment actions,
whether it be through providing decreased bonuses or payouts, issuing negative
employment evaluations, placing them on  performance improvement plans (or PIPs),
and/or terminating their employment or contractual relationship with Starbucks.

172. For fiscal year 2024, however, and despite its promise of transparency,
Starbucks tried to hide better what it was doing.

---

[93] *Id.*

173.    Due to the nature of tying compensation to race- and sex-based numbers, *i.e.*, quotas, on January 5, 2024, Starbucks' management proposed and recommended approving "a non-binding advisory . . . compensation" plan for executive officers" to Starbucks' shareholders (Proposal 2).[94]

174.    Starbucks' proposed changing "fiscal year 2024 executive compensation program" by removing its 7.5% based on "inclusion and diversity" from its Annual Incentive Bonus plan.[95]

175.    Instead, "75% of each participant's target incentive opportunity w[ould] be earned based on adjusted net revenue and adjusted operating income financial metrics (increased from 70%) . . . ."[96]

176.    Further, "25% of each participant's target incentive opportunity w[ould] be tied to individual performance."[97]

177.    Starbucks' "Compensation Committee . . . assess[es] individual performance using a scorecard of quantifiable business or functional key performance indicators ('KPIs') and enterprise leadership goals, including a new belonging goal for all participants in the plan to ensure that leaders have accountability for their direct line of

---

[94] 2024 Proxy, *supra* note 26, at 53.

[95] *Id.* at 78.

[96] *Id.*

[97] *Id.*

sight and to align with our belief that creating a culture of belonging is critical to drive collaboration."[98]

178.    Starbucks "revised the representation modifier of [its] fiscal year 2024 PRSU program, which [it] now refer[s] to as [its] talent modifier, to [allegedly] include a broader spectrum of the workforce and provide for different representation improvement targets in connection with this change."[99]

179.    Even though Starbucks might claim its ESG performance goals and how it attempts to attain them has changed over the years, those goals "continue to be objective and quantitative to ensure clear, rigorous goal-setting with respect to [Starbucks'] ESG strategies and objectives."[100]

180.    Starbucks' Board reiterated at its 2024 Annual Meeting of Shareholders its recommendation that the shareholders approve Proposal 2.[101]

181.    A majority of Starbucks' shareholders approved Proposal 2.[102]

182.    In 2025, Starbucks reiterated that it still uses its "talent modifier" to "hold[] [its] senior leaders collectively accountable for meeting a three-year talent goal for the

---

[98] *Id.*

[99] *Id.*

[100] 2023 Proxy, *supra* note 49, at 60.

[101] *Transcript: Starbucks 2024 Annual Meeting of Shareholders*, STARBUCKS at 11 (Mar. 13, 2024), https://s203.q4cdn.com/326826266/files/doc_events/2024/03/1/2024-Annual-Meeting-of-Shareholders-Transcript.pdf (Transcript).

[102] Starbucks' 2024 Form 8-K at 2 (Mar. 13, 2024), https://d18rn0p25nwr6d.cloudfront.net/CIK-0000829224/2a7456d3-7753-4446-97f9-4389e578048c.pdf (Votes).

fiscal year 2024 PRSUs, which focuses on improvement in U.S. people of color representation at the manager level and above by 1.5 percentage points or more by fiscal year 2026."[103]

183.   "The talent metric . . . operate[s] as a modifier of up to 10% to the payout of fiscal year 2024 PRSU awards."[104]

184.   Starbucks reminded everyone that this is the same "talent metric" that it "first introduced . . . to [its] PRSU design beginning in fiscal year 2021."[105]

185.   So, despite varying its name and specific percentages over the years, Starbucks still considers DEI metrics as part of its KPIs.

186.   This comes as no surprise since other companies have been found to use such a metric as part of their KPIs.  *See*, *e.g.*, *Powers v. Broken Hill Proprietary (USA), Inc.*, 2022 WL 17097437, at *1, *9, *10, *13 (S.D. Tex. Nov. 21, 2022); *Duvall v. Novant Health, Inc.*, 95 F.4th 778, 782, 784, 789, 791, 795 (4th Cir. 2024); *Duvall v. Novant Health Inc.*, 2022 WL 3331263 (W.D.N.C. Aug. 11, 2022).

187.   Even as late as December 12, 2024, "a majority [more than 75%] of S&P 500 companies and more than 40% of Russell 3000 firms that use environmental, social, and governance metrics in executive pay still link compensation to achieving DEI goals."[106]

---

[103] 2025 Proxy, *supra* note 66, at 62–63.

[104] *Id.* at 62.

[105] *Id.*

[106] Andrew Ramonas, *DEI-Tied Executive Pay Loses Ground at Companies Amid Backlash*, Bloomberg L. (Dec. 12, 2024), https://archive.is/HvK5Q.

188.   Indeed, "[e]ven if prevalence in incentive plans has declined, the discussion in the board room has not."[107]

      **B.**    **Starbucks provides discriminatory advancement opportunities.**

      **1.**    **Starbucks has discriminatory training and mentoring programs.**

189.   In 2021, Starbucks "[l]aunch[ed] mentorship [and leadership accelerator] program[s] connecting black, indigenous and people of color ('BIPOC') partners to senior leaders, beginning with a cohort of leaders, senior vice president and above, as well as BIPOC directors in corporate and retail roles."[108]

190.   "In its initial phase, BIPOC directors who have opted into the program as mentees w[ere] paired with senior vice presidents and above who . . . serve[d] as mentors."[109]

191.   "This program includes a mix of one-on-one sessions between mentors and mentees, mentorship circles with a 1:3 mentor-mentee ratio, and community events."[110]

192.   Minority employees are given a mentor in the senior leadership team at the company, one-on-one training, and mentorship sessions.

193.   But employees of other races were not.

---

[107] *Id.*

[108] 2021 Proxy, *supra* note 42, at 17; Timeline, *supra* note 1.

[109] Holder Report, *supra* note 34, at 16.

[110] *Id.*, at 16–17.

194. Since 2012, as part of its "Starbucks Diversity Mentorship Program," Starbucks "connect Starbucks in-house lawyers with junior attorneys from diverse backgrounds in one-to-one mentorship relationships."[111]

195. Minorities and women are allowed to participate in this program.

196. But white men are not.

197. In 2022, Starbucks "[e]xpanded [its] mentorship program designed to foster and deepen understanding of inclusion, diversity, equity and accessibility and provide partners in corporate and retail roles, including Black, Indigenous and people of color ('BIPOC') and lesbian, gay, bisexual, transgender, queer and/or questioning ('LGBTQ+') partners, development opportunities and connections with senior leaders."[112]

198. Individuals of other races or other sexes (as interpreted by the Supreme Court in *Bostock v. Clayton County*, 590 U.S. 644 (2020)), were excluded from this program.

---

[111] *The Starbucks Law & Corporate Affairs Department is now accepting applications for its 2024-2025 Diversity Mentorship Program!*, WASH. WOMEN LAWYERS (Sept. 3, 2024), https://www.wwl.org/itemsofinterest/13401977; *see also Assoc. Lauren Parris Earns Starbucks Mentorship*, HELSELL FETTERMAN (July 23, 2012), https://www.helsell.com/helsell-news/associate-lauren-parris-earns-starbucks-mentorship/; *Starbucks Mentorship Program*, VIETNAMESE-AM. BAR. ASS'N OF WASH. (May 6, 2017), https://www.vabaw.com/news/2017/6/23/starbucks-mentorship-program; *Seattle Assoc. Amy Taylor Invited to Participate in Starbucks' Diversity Mentorship Program*, GRSM (Aug. 2020), https://www.grsm.com/insight/amy-taylor-invited-to-participate-in-starbucks-diversity-mentorship-program/.

[112] *Starbucks Fiscal 2022 Annual Report (Form 10-K)*, STARBUCKS 6 (Nov. 18, 2022), https://d18rn0p25nwr6d.cloudfront.net/CIK-0000829224/0bf5535f-877e-4550-aae7-610a8d843e5b.pdf (2022 Annual Report).

199.   In 2023, Starbucks "[e]xpanded [its] mentorship program designed to prioritize [its] partners' sense of belonging by creating an inclusive and supportive environment."[113]

**2.   Starbucks segregates its employees on the basis of race and sex, and then provides preferred minorities with additional job benefits.**

200.   Starbucks has "Partner Networks."[114]

201.   Partner Networks "are partner-led groups that bring together people with shared identities and experiences, along with allies."[115]

202.   Starbucks' Partner Networks serve as a source of job benefits for its employees.

203.   Starbucks' Black Partner Network "[s]hare[s] the heritage of the African diaspora to develop partners, advise our business and enrich Starbucks contribution to our customers and communities."[116]

204.   Starbucks' "Hora del Café" "[c]elebrate[s], honor[s], and advocate[s] for the vibrancy and diversity of [Starbucks'] Latin American partners and community."[117]

205.   Starbucks' "India Partner Network" "[d]evelop[s] a global community contributing to the growth of the India market, celebrate Indian culture and support the

---

[113] 2023 Annual Report, *supra* note 48, at 8.

[114] *Starbucks Partner Networks help create a culture of belonging*, Starbucks (Aug. 24, 2020), https://about.starbucks.com/stories/2020/starbucks-partner-networks-help-create-a-culture-of-belonging/ (Partner Networks).

[115] *Id.*

[116] *Id.*

[117] *Id.*

growth of partners by providing the right resources in advancement of their career paths."[118]

206.   Starbucks' "Indigenous Network" exists "[t]o preserve and celebrate Indigenous cultural values, . . . interweave communities by teaching and understanding our heritage[,] unite and continuously Walk in Beauty."[119]

207.   Starbucks' "Pan-Asian Partner Network" "[f]oster[s] meaningful connections and elevate the impact of Pan-Asian partners and allies within Starbucks and the community."[120]

208.   Starbucks' "Pride Network" "[c]hampions [Starbucks'] community of partners across the diverse rainbow of Sexual Orientation, Gender Identity [&] Expression (SOGIE) as [Starbucks'] drive[s] change by advocating for safe and inclusive environments for all."[121]

209.   Starbucks' "Women's Impact Network" seeks to "[i]gnite the power of women to make an impact through partners, allies and community."[122]

210.   "In 2021, as part of Starbucks I&D [Inclusion & Diversity] strategy, [Starbucks vowed] to continue to invest in its Partner Networks by: working closely with the Black Partner Network, Hora Del Café, India Partner Network, Indigenous Partner Network,

---

[118] *Id.*

[119] *Id.*

[120] *Id.*

[121] *Id.*

[122] *Id.*

and Pan-Asian Partner Network to better understand and support the experiences of BIPOC partners."[123]

211.   "As part of this commitment, [starting in] May 2020, Starbucks CEO Kevin Johnson . . . hosted quarterly roundtables with leaders of the Partner Networks."[124]

212.   Starbucks also vowed to "invest[] in additional Partner Network development and recognition programs across all Networks, including an I&D Virtual Leadership Summit in March 2021."[125]

213.   These Partner Networks serve as liaisons between leadership and the rank-and-file.

214.   On information and belief, Starbucks provides targeted training for advancement to people who belong to these Partner Networks.

215.   The items of business included in Starbucks' aforementioned Annual Meeting of Shareholders also included *inter alia* a shareholder proposal (Proposal 5).[126]

216.   Proposal 5 proposed Starbucks to "conduct an audit and report to determine if and to what extent its programs and practices direct systemic discrimination against groups or types of employees, including 'non-diverse' employees."[127]

---

[123] Holder Report, *supra* note 34, at 17.

[124] *Id.*

[125] *Id.*

[126] 2024 Proxy, *supra* note 26, at 102.

[127] *Id.*

217.   Proposal 5 proposed "the audit and report would include a review of the Partner Networks that have been established at" Starbucks.[128]

218.   Proposal 5 proposed "[t]he report . . . be publicly disclosed on [Starbucks'] website."[129]

219.   Proposal 5's Supporting Statement said, "Membership in such groups is often based on surface-level characteristics such as race, sex, and sexual orientation."[130]

220.   Proposal 5's Supporting Statement identified that "Starbucks has no Partner Networks . . . for any 'non-diverse' groups."[131]

221.   Proposal 5's Supporting Statement alleged that "many programs Starbucks has established . . . facilitate disparate treatment in hiring and promotion against the 'non-diverse.'"[132]

222.   Proposal 5's Supporting Statement stated that "[t]he content of the current Partner Network groups' recommendations and activities would further substantiate that claim and would help to demonstrate if there's systemic discrimination by viewpoint at Starbucks."[133]

---

[128] *Id.*

[129] *Id.*

[130] *Id.*

[131] *Id.*

[132] *Id.*

[133] *Id.*

223.   Starbucks' board "recommend[ed] that shareholders vote AGAINST this proposal . . . ."[134]

224.   Starbucks' board claimed that "Partners of represented and underrepresented groups are not only allowed but encouraged to participate fully."[135]

225.   Starbucks' board claimed also that Starbucks "and each of [its] Partner Network satisfy . . . EEOC [the U.S. Equal Employment Opportunity Commission) criteria . . . ."[136]

226.   But, on information and belief, Starbucks' claims are merely pretext to cover up its unlawfully discriminatory intentions.

227.   Starbucks' board reiterated at Starbuck's Annual Shareholder meeting on March 13, 2024 its recommendation against Proposal 5.[137]

228.   A majority of Starbucks' shareholders voted against Proposal 5.[138]

### C.   Starbucks has committed itself to using a quota for its corporate boards.

229.   In October 2020, Starbucks announced that it joined "peer organizations in the Board Diversity Action Alliance committed to racially and ethnically diverse representation on corporate boards of directors."[139]

---

[134] *Id.* at 103.

[135] *Id.*

[136] *Id.*

[137] Transcript, *supra* note 101, at 15.

[138] Votes, *supra* note 102, at 3.

[139] Timeline, *supra* note 1; 2021 Proxy, *supra* note 42, at 11.

230.    "The Board Diversity Action Alliance works to increase the representation of racially and ethnically diverse directors on corporate boards of directors, beginning with Black directors."[140]

231.    The Board Diversity Action Alliance (BDAA) believes "[i]f companies seek to become more inclusive the work has to start with the board."[141]

232.    "The Board Diversity Action Alliance believes that corporate diversity and board diversity go hand in hand – leadership starts at the top."[142]

233.    BDAA "[s]ignatories will accelerate change by supporting a concerted enterprise transformation approach to diversity by integrating talent, accountability and engagement."[143]

234.    "Signatories [have] voluntarily commit[ted] to 1. Increase the number of Black directors on its corporate board of directors to one or more; 2. Disclosure of the self-identified race and ethnicity of directors on corporate boards; [and] 3. Report on Diversity, Equity and Inclusion measures on an annual basis."[144]

235.    Some    of    the    "[d]esirable    [q]ualities    and    [s]kills"    Starbucks' Nominating/Governance Committee sought director candidates to possess include being able to "contribute to the board of directors' overall diversity - diversity being broadly

---

[140] 2021 ESG, *supra* note 43, at 15.

[141] *The Board Diversity Action Alliance*, BD. DIVERSITY ACTION ALL., https://boarddiversityactionalliance.com/ (last visited Jan. 13, 2025) (BDAA).

[142] *Id.*

[143] *Id.*

[144] *Id.*

construed to mean a variety of opinions, perspectives, personal and professional experiences and backgrounds, such as gender, race and ethnicity differences, as well as other differentiating characteristics."[145]

236.    As of January 24, 2020, eight of Starbucks' thirteen directors "self-identified" as men and five "self-identified" as women.[146]

237.    Six of Starbucks' directors had "Ethnic Diversity."[147]

238.    Three of Starbucks' directors had "National Diversity."[148]

239.    Starbucks marked all of its directors as having "the key experience, qualifications, and attributes" of "Gender, Ethnic, or National Diversity" except Richard E Allison, Jr., Andrew Campion, Keven R. Johnson, Joshua Cooper, and Myron E. Ullman, III.[149]

240.    "In FY21, Starbucks announced that Mellody Hobson would build on her experience since joining the Starbucks board of directors in 2005 by serving as the company's non-executive chair."[150]

---

[145] *2020 Notice of Annual Meeting of Shareholders and Proxy Statement*, STARBUCKS at 33 (Jan. 24, 2020), https://s203.q4cdn.com/326826266/files/doc_financials/2019/ar/2020-Proxy-Statement.pdf (2020 Proxy).

[146] *Id.* at 22–27.

[147] *Id.* at 22.

[148] *Id.*

[149] *Id.* at 22–27.

[150] 2021 ESG, *supra* note 43, at 15.

241.   "At the time of this groundbreaking announcement, only 15 companies where the director is not also the CEO among the S&P 500 had a female chair, and none of the women represented identified as Black."[151]

242.   As of January 22, 2021, Starbucks required "each [director] nominee [to] affirm a commitment to furthering diversity and inclusion."[152]

243.   Starbucks clarified that its "Nominating/Governance Committee will require the search firm to include in its initial list of candidates qualified candidates who reflect diverse backgrounds, including, but not limited to, diversity of race, ethnicity, national origin, gender and sexual orientation."[153]

244.   By the time of its January 2021 report, seven of Starbucks' twelve directors "self-identified" as men and five "self-identified" as women.[154]

245.   Three directors "self-identified" as "Asian," two "self-identified" as "Black," one "self-identified" as "Hispanic or Latinx," and six "self-identified" as "White."[155]

246.   Starbucks marked all directors as having "the key experience, qualifications, and attributes" of "Gender, Ethnic, or National Diversity" except Richard E Allison, Jr., Andrew Campion, Keven R. Johnson, and Joshua Cooper Ramo.[156]

---

[151] *Id.*

[152] 2021 Proxy, *supra* note 42, at 10, 34.

[153] *Id.* at 35.

[154] *Id.* at 24–28; *Starbucks' 2020 Global Environmental & Social Impact Report*, STARBUCKS at 14 (2020), https://stories.starbucks.com/uploads/2021/04/Starbucks-2020-Global-Environmental-and-Social-Impact-Report.pdf (2020 ESG).

[155] 2021 Proxy, *supra* note 42, at 24

[156] *Id.*

43

247.  As of January 6, 2022, seven of Starbucks' eleven directors "self-identified" as men and four "self-identified" as women.[157]

248.  "None of [Starbucks'] directors self-identified as lesbian, gay, bisexual, transgender, or a member of the queer community."[158]

249.  One director "self-identified" as "African American or Black," three "self-identified" "Asian," one "self-identified" as "Hispanic or Latinx," and six "self-identified" as "White."[159]

250.  Starbucks marked all of its directors as having "the key experience, qualifications, and attributes" of "Gender, Ethnic, or National Diversity" except Richard E Allison, Jr., Andrew Campion, Keven R. Johnson, and Joshua Cooper.[160]

251.  The following year, as of January 27, 2023, six of Starbucks' nine directors "self-identified" as men and three "self-identified" as women.[161]

252.  Two directors "self-identified" as "Asian," one "self-identified" as "Black," zero "self-identified" as "Hispanic or Latinx," and five "self-identified" as "White."[162]

---

[157] 2022 Proxy, *supra* note 23, at 28.

[158] *Id.*

[159] *Id.*

[160] *Id.* at 28–32.

[161] 2023 Proxy, *supra* note 49, at 36.

[162] *Id.* at 11.

253.   Starbucks marked all of its directors as having "the key experience, qualifications, and attributes" of "Gender, Ethnic, or National Diversity" except Richard E Allison, Jr., Andrew Campion, and Howard Schultz.[163]

254.   As of January 5, 2024, eight of Starbucks' eleven directors "self-identified" as men, three "self-identified" as women, and zero "self-identified" as "Non-Binary."[164]

255.   One director "self-identified" as "LGBTQ+."[165]

256.   One director "self-identified" as "African American or Black," zero "self-identified" as "Alaskan Native or American Indian," four "self-identified" as "Asian," one "self-identified" as "Hispanic or Latinx," zero "self-identified" as "Native Hawaiian or Pacific Islander," five "self-identified" as "White," and zero "self-identified" as "Two or More Races or Ethnicities."[166]

257.   Starbucks marked all of its directors as having "the key experience, qualifications, and attributes" of "Gender, Ethnic, or National Diversity" except Richard E Allison, Jr., Andrew Campion, and Mike Sievert.[167]

258.   As of January 24, 2025, seven of Starbucks' nine directors "self-identified" as men, two "self-identified" as women, and zero "self-identified" as "Non-Binary."[168]

---

[163] *Id.* at 22–26.

[164] 2024 Proxy, *supra* note 26, at 25.

[165] *Id.*

[166] *Id.*

[167] *Id.* at 24–31.

[168] 2025 Proxy, *supra* note 66, at 17.

259.    One director "self-identified" as "LGBTQ+."[169]

260.    Zero directors "self-identified" as "African American or Black," zero "self-identified" as "Alaskan Native or American Indian," two "self-identified" as "Asian," one "self-identified" as "Hispanic or Latinx," zero "self-identified" as "Native Hawaiian or Pacific Islander," six "self-identified" as "White," and zero "self-identified" as "Two or More Races or Ethnicities."[170]

261.    Starbucks marked all of its directors as having "the key experience, qualifications, and attributes" of "Gender, Ethnic, or National Diversity" except Ritch Allison, Andy Campion, Brian Niccol, and Mike Sievert.[171]

## II.    Starbucks has violated, is violating, and will continue to violate, Federal and Missouri antidiscrimination laws.

262.    Starbucks is engaged in a pattern or practice of resistance to the full enjoyment of the rights granted by federal and Missouri state law.  Mo. Rev. Stat. § 213.126.1.

263.    Groups of persons have been denied rights granted by federal and Missouri state law.  Mo. Rev. Stat. § 213.126.1.

264.    Such denials raise an issue of general public importance.  Mo. Rev. Stat. § 213.126.1.

265.    The Attorney General has reasonable cause to believe those affected by Starbucks' patterns or practices of resistance to the full enjoyment, and the denial, of

---

[169] *Id.*

[170] *Id.*

[171] *Id.* at 12–13, 16, 18–22.

any of the rights granted by federal and Missouri state law include at least Group 1, *i.e.*, former or current employees, officers, or agents of Starbucks.

266.   The Attorney General has reasonable cause to believe those affected by Starbucks' patterns or practices of resistance to the full enjoyment, and the denial, of any of the rights granted by federal and Missouri state law include at least Group 2, *i.e.*, applicants or prospective employees, officers, or agents living in or interested in working in Missouri at the time they applied for employment with Starbucks.

267.   The Attorney General has reasonable cause to believe those affected by Starbucks' patterns or practices of resistance to the full enjoyment, and the denial, of any of the rights granted by federal and Missouri state law include at least Group 3, *i.e.*, former or current employees, officers, or agents living in or working in Missouri at the time they were employed by Starbucks.

## CAUSES OF ACTION

### Count 1
### Unlawful Hiring, Firing, and Discriminatory Practices
### 42 U.S.C. § 2000e-2(a)(1)

268.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

269.   It is an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2(a)(1).

270.   Starbucks is a person.  *Id.* § 2000e(a).

271.   Starbucks is a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year. *Id.* § 2000e(b).

272.   Starbucks is an employer. *Id.* § 2000e(a)-(b).

273.   Starbucks has failed or refused to hire or discharged or otherwise discriminated against individuals with respect to their compensation, terms, conditions, or privileges of employment, because of an individual's race, color, religion, sex, or national origin. *Id.* § 2000e-2(a)(1).

274.   Those against whom Starbucks has discriminated, is discriminating, and will discriminate are members of protected classes.

275.   Specifically, Starbucks' discrimination occurs on the basis of race, on the basis of sex (giving preference to women employees and applicants), and (under the rationale of *Bostock*) on the basis of sex (giving preference to non-heterosexual employees and applicants). *Id.* § 2000e-2(m).

276.   Those against whom Starbucks has discriminated, is discriminating, and will discriminate have, are, or would otherwise meet Starbucks' legitimate expectations.

277.   Those against whom Starbucks has discriminated, is discriminating, and will discriminate suffered, are suffering, or will suffer an adverse employment action.

278.   Starbucks has, is, and will take adverse employment actions by following an affirmative action plan.

279.   These persons have been, are, or will be treated differently than persons similarly situated in all relevant respects.

280.    Starbucks has violated, is violating, and will continue to violate *Id.* § 2000e-2(a)(1).

## Count 2
### Unlawful Hiring, Firing, and Discriminatory Practices
### Mo. Rev. Stat. §§ 213.055.1(1)(a), 213.126.1

281.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

282.    Missouri courts rely on federal case law to interpret the Missouri Human Rights Act (MHRA).  *E.g.*, *Matthews v. Harley-Davidson*, 685 S.W.3d 360, 366–67 (Mo. 2024), *reh'g denied* (Apr. 2, 2024).

283.    It is an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of an individual's race, color, religion, national origin, sex, or ancestry.  Mo. Rev. Stat. § 213.055.1(1)(a).

284.    Starbucks is a person.  *Id.* § 213.010(15).

285.    Starbucks is a person engaged in an industry affecting commerce who has six or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.  *Id.* § 213.010(8).

286.    Starbucks is an employer.  *Id.* § 213.010(8), (15).

287.    Starbucks has failed or refused to hire or discharged or otherwise discriminated against individuals with respect to their compensation, terms, conditions, or privileges of employment because of their race, color, religion, national origin, sex, or ancestry.  *Id.* § 213.055.1(1)(a).

288.    Those against whom Starbucks has discriminated, is discriminating, and will discriminate are members of groups protected under the MHRA.

289.    Those against whom Starbucks has discriminated, is discriminating, and will discriminate suffered, are suffering, or will suffer an adverse employment action.

290.    The protected group membership of those against whom Starbucks has discriminated, is discriminating, or will discriminate was, is, or will be a motivating factor for the adverse employment action. *Id.* § 213.010(2) (defining "because" or "because of" "as it relates to the adverse decision or action, [to mean] the protected criterion was the motivating factor").

291.    The protected groups' classifications of those against whom Starbucks has discriminated, is discriminating, or will discriminate "actually played a role in the adverse action or decision and had a determinative influence on the adverse decision or action." *Id.* § 213.010(19).

292.    Those against whom Starbucks has discriminated, is discriminating, and will discriminate were, are, or will be damaged as a result.

293.    Starbucks has violated, is violating, and will continue to violate Mo. Rev. Stat. § 213.055.1(1)(a).

## Count 3
### Unlawful Attempted or Actual Aiding, Abetting, Compelling, or Coercion
### Mo. Rev. Stat. § 213.070.1(1)

294.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

295.   It is an unlawful discriminatory practice for an employer to aid, abet, incite, compel, or coerce the commission of acts prohibited under Mo. Rev. Stat. chapter 213 or to attempt to do so.  *Id.* § 213.070.1(1).

296.   Starbucks has, is, or will aid, abet, incite, compel, or coerce the commission of acts prohibited under Mo. Rev. Stat. chapter 213 and will attempt to do so.

297.   Starbucks has, is, or will assist in or facilitate the commission of an act that results in harm or loss, or otherwise promotes the act's accomplishment.

298.   Starbucks knew, knows, or will know that the conduct described earlier constitutes a breach of duty and gives substantial assistance or encouragement to those engaged in such conduct.

299.   Starbucks has, is, or will provoke or stir up the commission of acts prohibited under Mo. Rev. Stat. chapter 213 and will attempt to do so.

300.   Starbucks has, is, or will cause or bring about by force, threats, or overwhelming pressure the commission of acts prohibited under Mo. Rev. Stat. chapter 213 and will attempt to do so.

301.   Starbucks has violated, is violating, and will continue to violate Mo. Rev. Stat. § 213.070.1(1).

### Count 4
### Unlawful Training Programs
### 42 U.S.C. § 2000e-2(d)

302.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

303.   It is an unlawful employment practice for any employer to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to,

or employment in, any program established to provide apprenticeship or other training."
42 U.S.C. § 2000e-2(d).

304.   Starbucks has discriminated against individuals because of their race, color, religion, sex, or national origin in admission to, or employment in, a program established to provide apprenticeship or other training.

305.   Discrimination on the basis of sexual orientation is discrimination on the basis of "sex" under Title VII as interpreted by the Supreme Court.  *Bostock*, 590 U.S. at 651–52.

306.   Starbucks has violated, is violating, and will continue to violate 42 U.S.C. § 2000e-2(d).

## Count 5
## Unlawful Training Programs
## Mo. Rev. Stat. §§ 213.055.1(2), 213.126.1

307.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

308.   It is an unlawful employment practice for any employer to discriminate against any individual because of his race, color, religion, national origin, sex, or ancestry in admission to, or employment in, any program established to provide apprenticeship or other training.  Mo. Rev. Stat. § 213.055.1(2).

309.   Starbucks has discriminated against individuals because of their race, color, religion, national origin, sex, or ancestry in admission to, or employment in, a program established to provide apprenticeship or other training.

310.   The Supreme Court of Missouri has held that "sexual stereotyping during employment is an unlawful employment practice" under the MHRA.   *Lampley v. Missouri Comm'n on Human Rights*, 570 S.W.3d 16, 24–26 (Mo. 2019).

311.   Starbucks has violated, is violating, and will continue to violate Mo. Rev. Stat. § 213.055.1(2).

### Count 6
### Unlawful Limiting, Segregation, or Classification
### 42 U.S.C. § 2000e-2(a)(2)

312.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

313.   It is an unlawful employment practice for an employer to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2(a)(2).

314.   Starbucks has limited, segregated, or classified its employees or applicants for employment in a way which deprives or tends to deprive individuals of employment opportunities or otherwise adversely affect their status as an employee, because of their race, color, religion, sex, or national origin.  *Id.* § 2000e-2(a)(2).

315.   Starbucks has violated, is violating, and will continue to violate 42 U.S.C. § 2000e-2(d).

## Count 7
### Unlawful Limiting, Segregation, or Classification
### Mo. Rev. Stat. §§ 213.055.1(1)(b) and 213.126.1

316.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

317.    It is an unlawful employment practice for an employer to limit, segregate, or classify their employees or employment applicants in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's color, national origin, sex, or ancestry.  Mo. Rev. Stat. § 213.055.1(1)(b).

318.    Starbucks has, is, and will limit, segregate, or classify its employees or employment applicants in a way which would deprive or tend to deprive individuals of employment opportunities or otherwise adversely affect their status as an employee, because of such individual's color, national origin, sex, or ancestry.

319.    Starbucks has violated, is violating, and will continue to violate Mo. Rev. Stat. § 213.055.1(1)(b).

## Count 8
### Unlawful Printing or Circulation
### 42 U.S.C. § 2000e-3(b)

320.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

321.    It is an unlawful employment practice for an employer to print or publish or cause to be printed or published any notice or advertisement relating to employment by such an employer or relating to admission to, or employment in, any program established to provide apprenticeship or other training indicating any preference, limitation,

specification, or discrimination, based on race, color, sex, or national origin.  42 U.S.C. § 2000e-3(b).

322.   Starbucks has printed or published or caused to be printed or published a notice or advertisement relating to employment with Starbucks or relating to admission to, or employment in, a program established to provide apprenticeship or other training indicating a preference, limitation, specification, or discrimination, based on race, color, sex, or national origin.

323.   Starbucks has violated, is violating, and will continue to violate 42 U.S.C. § 2000e-3(b).

**Count 9**
**Unlawful Printing or Circulation**
**Mo. Rev. Stat. §§ 213.055.1(3) and 213.126.1**

324.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

325.   It is an unlawful employment practice for an employer to print or circulate or cause to be printed or circulated any statement, advertisement or publication, or to use any form of application for employment or to make any inquiry in connection with prospective employment, which expresses, directly or indirectly, any limitation, specification, or discrimination, because of race, color, national origin, sex, or ancestry. Mo. Rev. Stat. § 213.055.1(3).

326.   Starbucks has, is, or will print or circulate or cause to be printed or circulated a statement, advertisement or publication, or use a form of application for employment or make an inquiry in connection with prospective employment, which expresses, directly

55

or indirectly, a limitation, specification, or discrimination, because of race, color, national origin, sex, or ancestry.

327.    Starbucks has violated, is violating, and will continue to violate Mo. Rev. Stat. § 213.055.1(3).

**Count 10**
**Discriminatory Contracting Impairment**
**42 U.S.C. § 1981**

328.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

329.    All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.  42 U.S.C. § 1981(a).

330.    For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.  *Id.* § 1981(b).

331.    The rights protected by this section are protected against impairment by nongovernmental discrimination.  *Id.* § 1981(c).

332.    Missourians were, are, and will be members of protected classes because of their race and color, some of whom are white or not "BIPOC."

333.    Said Missourians were, are, or will be contractors or would-be contractors with employment relationships with Starbucks.

334.    Starbucks has, is, or will interfere with that activity of "mak[ing] and enforc[ing]" contracts with said persons.

335.    Starbucks has, is, or will interfere with that activity because of its intent to discriminate against said persons because of their race or color.

336.    Starbucks has violated, is violating, and will continue to violate 42 U.S.C. § 1981.

### PRAYER FOR RELIEF

The State of Missouri *ex rel.* Andrew Bailey respectfully requests that this Court:

1.    Declare, adjudge, and decree that the patterns or practices detailed herein are unlawful under the Civil Rights Acts of 1866 (42 U.S.C. § 1981) and 1964 (Title VII) and the MHRA;

2.    Temporarily restrain and preliminarily and permanently enjoin Starbucks, its employees, officers, and agents from unlawfully discriminating on the bases of race, color, sex, national origin, or ancestry;

3.    Temporarily restrain and preliminarily and permanently enjoin Starbucks, its employees, officers, and agents from unlawfully misrepresenting to job applicants and customers that it does not engage in unlawful discrimination on the bases of race, color, sex, national origin, or ancestry;

4.      Award damages to the Plaintiff, including but not limited to, compensatory damages, double damages, treble damages, liquidated damages, punitive damages, and nominal damages in an amount to be determined at trial;

5.      Order Starbucks to provide a remedial notice to all employees wherever located or, in the alternative, all employees at Missouri locations explaining that its affirmative action practices violate Civil Rights Acts of 1866 and 1964  and the MHRA in a form and with content to be approved by the Plaintiff;

6.      Order Starbucks to change all written policies to reflect that the patterns or practices detailed herein are unlawful and will immediately cease;

7.      Order Starbucks to re-hire any employee and rescind any discipline imposed against any employee who was fired or disciplined pursuant to the patterns or practices detailed herein;

8.      Order Starbucks to account for and disgorge any moneys earned as a result of the patterns or practices detailed herein;

9.      Order Starbucks to pay the Plaintiff's costs and attorneys' fees, 42 U.S.C. § 2000e–5(k);

10.      Order all other relief the Attorney General deems necessary to ensure the full enjoyment of the rights granted by chapter 213 of Mo. Rev. Stat, *id.* § 213.126.1; and

11.      Award all other relief this Court deems equitable and just.

Dated: February 11, 2025                    Respectfully submitted,


**ANDREW BAILEY**
ATTORNEY GENERAL

JOSHUA M. DIVINE
SOLICITOR GENERAL


s/ *Peter F. Donohue, Sr.*
Peter F. Donohue Sr., #75835(MO)
  *Deputy Director of Special Litigation*
Patrick Sullivan, #42968(MO)
  *Chief of Litigation*
Victoria Lowell, #76461(MO)
Dominic X. Barceleau, #76510(MO)
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
207 West High Street
Jefferson City, MO 65102
Phone: (314) 3407838
Patrick.Sullivan@ago.mo.gov
Peter.Donohue@ago.mo.gov
Victoria.Lowell@ago.mo.gov
Dominic.Barceleau@ago.mo.gov

*Counsel for Plaintiff*