**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

STATE OF MISSOURI *ex rel.* ANDREW BAILEY,
ATTORNEY GENERAL OF MISSOURI,

        *Plaintiff,*

           v.                                       Case No. 4:25-cv-00165-JAR

STARBUCKS CORP. ,

        *Defendant.*

**MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES.................................................................................................. iii

INTRODUCTION.................................................................................................................... 1

FACTS & BACKGROUND ...................................................................................................... 2

ARGUMENT........................................................................................................................... 5

   I.   **This Court has personal jurisdiction because Starbucks applies its discriminatory policies in Missouri and, independently, Starbucks consented to general jurisdiction.** .............................................................................................................. 5

      A.  This Court plainly has specific jurisdiction............................................................ 5

      B.  Starbucks consented to this Court's jurisdiction.................................................. 7

  II.  **This Court has subject matter jurisdiction.** ............................................................ 8

 III. **The Attorney General is authorized to bring this action.** ...................................... 10

      A.  The Attorney General is authorized to sue under Title VII. ............................... 10

      B.  Title VII's exhaustion provisions do not apply.................................................... 11

      C.  The Attorney General is authorized to sue under § 1981. .................................. 14

      D.  The MHRA claims are within the Attorney General's statutory authority. ....................... 16

 IV. **The Complaint states a claim.** ................................................................................. 17

CONCLUSION...................................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                   Page(s)

*Ace Prop. & Cas. Ins. Co. v. Fed. Crop Ins. Corp.,*
   440 F.3d 992 (8th Cir. 2006) ...................................................................................11

*Albemarle Paper Co v. Moody,*
   422 U.S. 405 (1975) ...............................................................................................12

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
   458 U.S. 592 (1982) ..................................................................7, 8, 9, 10, 13, 14

*Bartlett v. U.S. Dept. of Agric.,*
   716 F.3d 464 (8th Cir. 2013) ...................................................................................11

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) .................................................................................................6

*Carlsen v. GameStop, Inc.,*
   833 F.3d 903 (8th Cir. 2016) ....................................................................................5

*Cole v. Group Health Plan, Inc.,*
   105 F.4th 1110 (8th Cir. 2024) ...............................................................................16

*Collins v. Union Pac. R.R. Co.,*
   108 F.4th 1049 (8th Cir. 2024) ...............................................................................16

*Commonwealth of Mass. v. Bull HN Info. Sys., Inc.,*
   16 F. Supp.2d 90 (D. Mass. 1998) ..........................................................................14

*Commonwealth of Penn. v. Glickman,*
   370 F. Supp. 724 (W.D. Pa. 1974) ..........................................................................14

*Commonwealth of Penn. v. Porter,*
   659 F.2d 306 (3d Cir. 1981) ....................................................................................14

*Dept. of Com. v. New York,*
   588 U.S. 752 (2019) .................................................................................................6

*Dill v. IBM.,*
   1:24-CV-852, 2025 WL 913744 (W.D. Mich. Mar. 26, 2025) .............................1, 6

*Doe v. Teachers Council, Inc.,*
   757 F. Supp. 3d 1142 (D. Or. 2024)) .......................................................................6

*Domino's Pizza, Inc. v. McDonald,*
   546 U.S. 470 (2006) ...............................................................................................13

*FCS Advisors, LLC v. Missouri,*
    929 F.3d 618 (8th Cir. 2019) ..................................................................................13

*Ford Motor Co. v. Montana Eighth Judicial Dist. Court,*
    592 U.S. 351 (2021) ...................................................................................... 5, 6, 7

*Fort Bend Cnty., v. Davis,*
    587 U.S. 541 (2019) ............................................................................................11

*Fowlkes v. Ironworkers Loc. 40,*
    790 F.3d 378 (2d Cir. 2015) ...............................................................................11

*Glick v. W. Power Sports, Inc.,*
    944 F.3d 714 (8th Cir. 2019) ..............................................................................16

*Int'l Broth. of Teamsters v. United States,*
    431 U.S. 324 (1977) ............................................................................................16

*Jones v. Am. State Bank,*
    857 F.2d 494 (8th Cir. 1988) ..............................................................................13

*Kentucky v. Biden,*
    23 F.4th 585 (6th Cir. 2022) ...............................................................8, 10, 14, 15

*Knowlton v. Allied Van Lines, Inc.,*
    900 F.2d 1196 (8th Cir. 1990) ..............................................................................7

*Mallory v. Norfolk S. Ry. Co.,*
    600 U.S. 122 (2023) ..............................................................................................7

*Matthews v. Harley-Davidson,*
    685 S.W.3d 360 (Mo. 2024) ...............................................................................16

*Missouri ex rel. Koster v. Harris,*
    847 F.3d 646 (9th Cir. 2017) ................................................................................9

*Mitchell v. Eli Lilly & Co.,*
    159 F. Supp. 3d 967 (E.D. Mo. 2016) ..................................................................7

*New York ex rel. Abrams v. Holliday Inns, Inc.,*
    656 F. Supp. 675 (W.D.N.Y. 1984) ......................................................................9

*New York ex rel. James v. Niagara-Wheatfield Central School District,*
    119 F.4th 270 (2d Cir. 2024) .............................................................................8, 9

*New York ex rel. Vacco v. Mid Hudson Med. Group, P. C.,*
    877 F. Supp. 143 (S.D.N.Y. 1995) ..................................................................8, 14

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
  551 U.S. 701 (2007) ................................................................................................2

*Parisi v. Boeing Co.*,
  400 F.3d 583 (8th Cir. 2005) ................................................................................17

*Phillips v. Starbucks Corp.*,
  No. 19-cv-19432, 2023 WL 5274541 (D.N.J. Aug. 16, 2023) ..............................2

*Rann v. Chao*,
  154 F.Supp.2d 61 (D.D.C. 2001) ..........................................................................11

*Raymond v. Bd. of Regents of the Univ. of Minn.*,
  847 F.3d 585 (8th Cir. 2017) .......................................................................... 11, 13

*Salas v. Wis. Dep't of Corr.*,
  493 F.3d 913 (7th Cir. 2007) .................................................................................11

*Saunders v. Mills*,
  172 F. Supp. 3d 74 (D.D.C. 2016) ........................................................................11

*SFFA v. Harvard*,
  600 U.S. 181 (2023) .................................................................................... 1, 16–17

*State ex rel.Anheuser-Busch, LLC v. Moriarity*,
  589 S.W.3d 567 (Mo. 2019) ..................................................................................10

*State ex rel. Norfolk S. Ry. Co. v. Dolan*,
  512 S.W.3d 41 (Mo. 2017) .....................................................................................7

*Tennessee Coal, Iron & R. Co. v. George*,
  233 U.S. 354 (1914) ..............................................................................................15

*Watson v. Fraternal Order of Eagles*,
  915 F.2d 235 (6th Cir. 1990) .................................................................................13

*Williams v. Preeminent Protective Services, Inc.*,
  81 F. Supp. 3d 265 (E.D.N.Y. 2015) ......................................................................6

*Williams v. Target Stores*,
  479 F. App'x 26 (8th Cir. 2012) ............................................................................11

*Zigler v. Edward D. Jones & Co., L.P.*,
  676 F. Supp. 3d 615 (N.D. Ill. 2023) ......................................................................6

*Zipes v. Trans World Airlines, Inc.*,
  455 U.S. 385 (1982) ..............................................................................................11

**Statutes**

42 U.S.C. § 2000e-2 .................................................................................................................16

42 U.S.C. § 2000e-5 ............................................................................................................ 10, 12

42 U.S.C. § 2000e-6 .................................................................................................................12

42 U.S.C. § 2000e ...........................................................................................................1, 10, 12

Mo. Rev. Stat. § 213.055 ..........................................................................................................16

Mo. Rev. Stat. § 213.070 ..........................................................................................................18

Mo. Rev. Stat. § 351.572 ............................................................................................................6

Mo. Rev. Stat. § 351.582 ............................................................................................................7

Mo. Rev. Stat. § 351.594 ............................................................................................................7

Mo. Rev. Stat. § 620.2020 ........................................................................................................16

15 Pa. Cons. Stat. § 402(d) .........................................................................................................7

**Regulations**

29 C.F.R. § 1601.7(1) ...............................................................................................................12

## <u>INTRODUCTION</u>

Just like Harvard did two years ago, Starbucks insists that it cannot obtain its cultural goals unless it treats people differently based on protected characteristics. But organizations subject to federal antidiscrimination laws "may *never* use race as a stereotype or negative," which occurs whenever race is used in a "zero-sum" context such as college admissions or employment. *SFFA v. Harvard*, 600 U.S. 181, 213, 218 (2023) (emphasis added).

This Court need look no further than Starbucks' concession that it adjusted compensation based on whether managers achieved race-, sex-, and sexual-orientation-based quotas. ECF 17 at 10. In March, a federal court allowed a suit against IBM to proceed based on a similar set of allegations— that IBM tied compensation to race-based hiring goals. The court let the suit proceed because IBM "implemented a system of financial incentives" to "incentivize[ ] [its] managers to discriminate" based on race. *Dill v. IBM.*, No. 1:24-CV-852, 2025 WL 913744, at *5, *7 (W.D. Mich. Mar. 26, 2025).

Every shield Starbucks tries to raise crumples. Starbucks operates nearly 200 stores in Missouri, hiring and firing Missourians under "a system of financial incentives" that encourages managers to discriminate. *Id.* Yet Starbucks argues with a straight face (and without evidence) that it has insufficient contacts for a Missouri court to hear claims related to those decisions. Starbucks insists that only "persons" can sue under Title VII, but "person" is expressly defined to include "governments." 42 U.S.C. § 2000e(a). Starbucks similarly relies on inapposite analogies. Limits on suits by shareholders against corporations have no relevance to a *parens patriae* suit, where the State sues not because of a reduction in stock price, but because of injury to a substantial number of its citizens. States regularly sue as *parens patriae* in response to widespread discrimination.

Starbucks was recently slammed with a $25.6 million verdict for firing a manager because she was white.[1] *Phillips v. Starbucks Corp.*, No. 19-cv-19432, 2023 WL 5274541, at *1 (D.N.J. Aug. 16, 2023). Starbucks sets overt race and sex-based quotas for hiring and firing. It creates mentorship programs that exclude people based on race, sex, or sexual orientation. It forces executives to participate in those programs. And it ties all of this to executive compensation, where those who engage in discrimination are paid handsomely. "The way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007) (plurality op.). This Court should deny the motion to dismiss.

## FACTS & BACKGROUND

"Starbucks ties compensation to racial and sex-based quotas, discriminates on the basis of race and sex in training and advancement opportunities, and discriminates on the basis of race and sex with respect to its board membership. All of this is unlawful." ECF 1, ¶ 1. Starbucks "has told Missourians—employees, applicants, and consumers alike—that Starbucks is a great place to work, where everyone is treated equally." *Id.*, ¶ 15. "But these statements are false, misleading, and deceptive." *Id.*, ¶ 16. "Rather, Starbucks has decided to require outright race- and sex-based discrimination in hiring via quotas, segregate employees on unlawful bases, and single out preferred groups for additional training and employment benefits." *Id.*, ¶ 17.

Additionally, "Starbucks has made specific racial equity commitments"—*i.e.*, it has set racial quotas for its hiring managers. *Id.*, ¶ 96. One of those quotas is "to have at least 40% BIPOC representation and 55% women in all retail stores, by 2025 in the U.S.," including in Missouri. *Id.*, ¶ 104 (cleaned up). In "enterprise roles" and "senior leadership" roles, Starbucks has set a quota of "30%

---

[1] *Jury awards $25.6 million to white Starbucks manager fired after the arrests of 2 Black men*, Assoc. Press (June 14, 2023), https://apnews.com/article/starbucks-racism-philadelphia-manager-lawsuit-bfa9cd9a897dff402f8547f167455d10.

BIPOC representation and 50% women." *Id.*, ¶ 105. For manufacturing roles, Starbucks has set a quota of "40% BIPOC representation and 30% women." *Id.*, ¶ 106. Finally, Starbucks is part of the Board Diversity Action Alliance, which forces its members to reserve at least one board seat for members of a certain race. *Id.*, ¶¶ 229–61.

"Executives who meet the quota get a carrot: an increased bonus. Executives who do not are hit with the stick: a deceased bonus, if one is even awarded." *Id.*, ¶¶ 128–29. "100% of Starbucks executives had compensation tied to the building of inclusive and diverse teams." *Id.*, ¶ 132 (cleaned up). Executives receive a performance bonus and stock options if they meet the racial quotas. *Id.*, ¶¶ 115–24. But their bonuses are decreased if they do not. *Id.*

"If incorporating these incentive plans was not enough, meeting or exceeding Starbucks' numerical quotas was not all that one had to do to get their payout." *Id.*, ¶ 146. Beyond just meeting those quotas, Starbucks requires all its executives "to participate in Starbucks' mentorship program." *Id.*, ¶ 147. And even within that mentorship program, Starbucks included a quota system. *Id.*, ¶ 149. If an executive's "BIPOC Retention Rate" is below 90%, they lose half their bonus. *Id.*, ¶¶ 150–51. Meanwhile, an executive who obtains the quota rate would receive twice their bonus. *Id.*, ¶ 152.

These mentorship programs are extensive and valuable to those not excluded from participation. Starbucks has "a mentorship program connecting BIPOC (Black, Indigenous, and People of Color) partners to senior leaders and investing in strategic partnerships with professional organizations that focus on the development of BIPOC talent." *Id.*, ¶ 86. Each mentee is paired with an executive at or above the senior vice president level, and they receive "one-on-one sessions between mentors and mentees, mentorship circles with a 1:3 mentor-mentee ratio, and community events." *Id.*, ¶¶ 190–91. Additionally, Starbucks' in-house legal team will work with "junior attorneys from diverse backgrounds in one-to-one mentorship relationships." *Id.*, ¶ 194. Only employees of certain races are given these opportunities. *Id.*, ¶¶ 192–93, 195–96. And Starbucks gives similar mentorship opportunities to

3

transgender employees and employees attracted to the same sex, but not to heterosexual or non-transgender employees. *Id.*, ¶¶ 197–99.

The benefits in training and advancement do not stop with formal mentorship programs. Starbucks also has "Partner Networks" where it groups employees based on race, sex, and sexual orientation, such as groups for Hispanic employees or employees who identify as transgender. *Id.*, ¶¶ 200–14. "Starbucks' Partner Networks serve as a source of job benefits for its employees." *Id.*, ¶ 202. Members of Partner Networks receive "additional" "development and recognition programs," including "targeted training for advancement." *Id.*, ¶¶ 212–14.

There's more. "Even if one participated in the mentorship program and retained a sufficient rate of employees of certain races and colors, the percentage of one's payout depended on Starbucks' 'Inclusive Leadership Survey.'" *Id.*, ¶ 153. An executive's bonus would be cut if their score fell below 3.0 out of 5, and the bonus would be increased if their score was above 4.5. *Id.*, ¶¶ 154–57.

"As of 2023, Starbucks has nearly 200 locations in Missouri." *Id.*, ¶ 46. "Since at least 2020, Starbucks has employed, and still employs, hundreds, if not thousands, of Missourians and receives employment applications from hundreds more." *Id.*, ¶ 47. "Starbucks also employ[s] persons whom, though they might not live in Missouri, nevertheless perform work that Starbucks intends to have direct employment and economic effects in Missouri." *Id.*, ¶ 48. Starbucks has hundreds of job openings at Missouri stores at any one time, and it has hundreds more that are fully remote "and thus can be filled by residents of Missouri." *Id.*, ¶ 52. Importantly, "Missouri incorporates into each allegation" of the Complaint that the targets of the discrimination "resided or worked for Starbucks in Missouri or performed work for Starbucks that Starbucks intended to have direct or indirect economic or employment effects in Missouri, in whole or in part." *Id.*, ¶¶ 50, 53, 55 (footnote omitted).

4

## ARGUMENT

This Court reviews facial attacks on a Complaint by accepting the allegations as true and giving the plaintiff all favorable inferences. *E.g.*, *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016). If the allegations plausibly state a claim for relief, then the Court will deny the motion. *See, e.g.*, *id.* at 908–10. Each of Starbucks' arguments (jurisdiction and sufficiency of the Complaint) fails.

**I.    This Court has personal jurisdiction because Starbucks applies its discriminatory policies in Missouri and, independently, Starbucks consented to general jurisdiction.**

Starbucks does not dispute that Missouri's long-arm statute applies. It instead asserts that there is neither specific nor general jurisdiction. ECF 17, pp. 11–13. The Supreme Court has "recogniz[ed] two kinds of personal jurisdiction: general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction." *Ford Motor Co. v. Montana Eighth Judicial Dist. Court*, 592 U.S. 351, 358 (2021). General jurisdiction allows a court to hear "any and all claims" against the defendant. *Id.* Specific jurisdiction allows a court to hear claims arising out of or related to the defendant's conduct in or actions toward the forum State. *Id.* at 359–60. This Court has both kinds of jurisdiction. This case challenges actions taken by Starbucks in Missouri, and Starbucks is subject to all the obligations of domestic corporations, including the obligation to submit to general jurisdiction.

### A.  This Court plainly has specific jurisdiction.

A court has personal jurisdiction when the defendant takes "some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State." *Ford Motor*, 592 U.S. at 359 (brackets in original) (citation omitted). This usually happens when the defendant has "deliberately reached out beyond its home—by, for example, exploiting a market in the forum state or entering a contractual relationship there." *Id.* (cleaned up). Once purposeful availment is satisfied, a court will exercise jurisdiction over any suit involving "an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id.* at 359–60 (cleaned up). Additionally, a defendant can be sued in a forum where it has such deep and systemic ties that it can reasonably

foresee being sued for the acts undertaken in that jurisdiction, even if the acts giving rise to the lawsuit happened in a different State. *See id.* at 363–64.

Starbucks does not contest that it can be subject to specific jurisdiction in Missouri. Courts routinely hold that foreign defendants can be sued in the plaintiff's home State if the defendant discriminated against the plaintiff in that State. *See, e.g., Doe v. Tchrs. Council, Inc.*, 757 F. Supp. 3d 1142 (D. Or. 2024) (holding that an Oregon court could assert specific jurisdiction over a foreign defendant who discriminated against a job applicant that applied for jobs in Oregon); *Zigler v. Edward D. Jones & Co., L.P.*, 676 F. Supp. 3d 615, 620 (N.D. Ill. 2023) (same in Illinois); *Williams v. Preeminent Protective Services, Inc.*, 81 F. Supp. 3d 265, 272–73 (E.D.N.Y. 2015) (same in New York).

Instead, Starbucks insists the Complaint lacks enough allegations. ECF 17, pp. 12–13. But the Complaint alleges that Starbucks has nearly two hundred stores and thousands of employees in Missouri. ECF 1, ¶¶ 46–48, 51–52. And the Complaint alleges that Starbucks has taken adverse employment actions against employees and job applicants *in Missouri* because of national policies. *Id.*, ¶¶ 45, 50–56. Starbucks tries to downplay these allegations as conclusory, ECF 17, pp. 12–13, but Missouri's allegations are far from a mere "formulaic recitation of the elements of a cause of action," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). And just like IBM's, Starbucks' "system of financial incentives … support an inference that [the corporation] improperly considers race or gender," *IBM*, 2025 WL 91374 at *5 (cleaned up). Soo too, Missouri's Complaint against Starbucks supports the plausible inference that Starbucks' national race-based and sex-based policies are in fact carried out in Missouri. Far from Starbucks' insistence (at 14) that these allegations are "speculating," Missouri managers "will likely react in predictable ways" to Starbucks dangling financial incentives to discriminate. *Dept. of Com. v. New York*, 588 U.S. 752, 768 (2019).

6

**B. Starbucks consented to this Court's jurisdiction.**

Missouri generally requires foreign corporations to have a certificate of authority to do business in Missouri. Mo. Rev. Stat. § 351.572. And foreign corporations, in registering to do business, consent to the "same" rights and obligations as domestic corporations. *Id.* § 351.582.2. As everyone agrees, a Missouri court can exercise general personal jurisdiction over a Missouri corporation. *See, e.g.,* *Ford Motor*, 592 U.S. at 358–59. So, because Missouri compels foreign corporations to accept the "same" obligations as domestic corporations, foreign corporations who seek a certificate of authority from Missouri consent to general jurisdiction. Mo. Rev. Stat. § 351.582.2. Two years ago, the Supreme Court upheld the validity of these kinds of laws. *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122 (2023).

Starbucks tries to avoid this straightforward conclusion by relying on the wrong statute. Starbucks is correct that a *different* statute, § 351.594.1, does not compel foreign corporations to consent to general jurisdiction—because the statute merely concerns rules about service. *State ex rel. Norfolk S. Ry. Co. v. Dolan*, 512 S.W.3d 41, 52–53 (Mo. 2017) ("[S]ection 351.594.1 provides *the type of service* an agent for service of process can receive.") (emphasis added). Starbucks ignores that the State is not relying on § 351.594.1—which governs how a foreign corporation must be served—but instead on § 351.582.2, which requires all foreign corporations with certificates of authority to consent to be bound by the "same duties" as domestic corporations, including the obligation to submit to general jurisdiction. *See, e.g., Mitchell v. Eli Lilly & Co.*, 159 F. Supp. 3d 967, 978 (E.D. Mo. 2016); *Knowlton v. Allied Van Lines, Inc.*, 900 F.2d 1196, 1199 (8th Cir. 1990) ("One of the most solidly established ways of giving such consent is to designate an agent for service of process within the State."); *Sondergard v. Miles, Inc.*, 985 F.2d 1389, 1393 (8th Cir. 1993). Indeed, two years ago the Supreme Court relied on a textually identical statute when it confirmed that consent by registration is constitutional. *See Mallory*, 600 U.S. at 134 (citing 15 Pa. Cons. Stat. § 402(d) (foreign corporations "shall be subject to the same liabilities, restrictions, duties and penalties ... imposed on domestic entities" (ellipsis in original))).

## II.    This Court has subject matter jurisdiction.

This Court has subject matter jurisdiction because Missouri has *parens patriae* standing to bring this suit. States can sue as *parens patriae* to assert quasi-sovereign interests. *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982). Quasi-sovereign interests are those "interests that the State has in the well-being of its populace." *Id.* at 602. Put differently, when "a sufficiently substantial segment of its population" is harmed (787 people in *Snapp*), *id.* at 607, "the state *itself*" is harmed and can sue, *Kentucky v. Biden*, 23 F.4th 585, 599–601 (6th Cir. 2022) (emphasis in original) (holding that States could challenge a federal contractor vaccination mandate because it harmed a substantial number of people in the States).

Unsurprisingly, then, States regularly sue as *parens patriae* to challenge widespread discrimination. Just last year, the Second Circuit permitted New York to sue one of its school districts for allegedly violating Title IX. *See New York ex rel. James v. Niagara-Wheatfield Central School District*, 119 F.4th 270, 278 (2d Cir. 2024). New York alleged that the district ignored rampant sexual misconduct that had become so pervasive that it harmed "the School District's community as a whole." *Id.* at 274. The Second Circuit held that the State had *parens patriae* standing to sue. *Id.* at 284. The Second Circuit said that the State could sue as *parens patriae* because the misconduct affected a substantial number of people. *Niagara-Wheatfield*, 119 F.4th at 281–84. Similarly, New York was allowed to sue a health clinic over disability accommodations as *parens patriae* because the State has a quasi-sovereign interest in ensuring that its citizens do not face unlawful discrimination. *New York ex rel. Vacco v. Mid Hudson Med. Group, P. C.*, 877 F. Supp. 143, 147 (S.D.N.Y. 1995). And private litigants could not obtain complete relief through individual suits because a single person facing discrimination could not sue to redress the broader harm that the State suffers when large portions of its population are subject to discrimination. *Id.* at 148–49 ("[T]he remote possibility that [a plaintiff] could obtain relief for himself does not preclude the Attorney General from seeking 'complete relief' for all current and future" harms).

Indeed, *Snapp* is itself a discrimination case brought by Puerto Rico as *parens patriae* because harm to a few hundred Puerto Ricans was tantamount to harm to the territory itself. *Snapp*, 458 U.S. at 596, 608.

Starbucks insists that the number of people affected is too small to support *parens patriae* standing, but again *Snapp* holds the opposite. To "determin[e] whether an alleged injury to the health and welfare of its citizens suffices to give the State standing to sue as *parens patriae*," the Supreme Court has looked at "whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers." *Snapp*, 458 U.S. at 607. That is precisely what Missouri has done by enacting employment discrimination laws. And the number of Missourians affected here—thousands—is more than the 787 affected in *Snapp*.

Under these cases, the State has *parens patriae* standing. *First*, the Complaint alleges a harm to a substantial number of Missourians all of whom belong to an identifiable group—people who do not have Starbucks' preferred racial or sex characteristics. *See, e.g.*, ECF 1, ¶¶ 104–06, 192–93, 195–96. *Second*, the Complaint alleges harms to the State more broadly by alleging that Starbucks is "stigmatiz[ing]" its "labor force as inferior," which "carr[ies] a universal sting." *Id.*, ¶ 33. The Complaint also alleges that Starbucks is denying Missourians' ability to participate "in the free flow of commerce," and the State has a broader economic interest in redressing that harm. *Id.*, ¶¶ 36–40. *Third*, the Complaint alleges violations of federal civil rights law, which is a quasi-sovereign interest. *Id.*, ¶ 34. *Fourth*, individual suits cannot provide complete relief to the State because individual suits would not resolve the harm to the entire State. Additionally, "private litigants 'have greater incentive to compromise requests for injunctive relief in exchange for increased money damages'" while the State "faces no such conflict." *In re New York City Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 399 (S.D.N.Y. 2021) (quoting *People v. Peter & John's Pump House*, 914 F. Supp. 809, 813 (N.D.N.Y. 1996)). And the "numerous and complex issues presented in this lawsuit, coupled with the sheer breadth of

relief that the State seeks, make it apparent that the State's claims require resources and expertise that private parties often lack." *Id.*

Starbucks tries to avoid this conclusion by relying on two non-binding cases, *see* ECF 17, p. 14, but neither is availing. *New York ex rel. Abrams v. Holliday Inns, Inc.* was dismissed for lack of standing because the State was suing to redress a harm faced by just *10* people. 656 F. Supp. 675, 677–78 (W.D.N.Y. 1984). But here, the State is alleging harm to a greater number than in *Snapp*. Additionally, *Holiday Inns* may not even be good law anymore because the Second Circuit allowed New York to base its *parens patriae* standing on harms to just 34 people in *Niagara-Wheatfield*, 119 F.4th at 274. The second case, *Missouri ex rel. Koster v. Harris*, was dismissed because a suit by a few industry groups—"large egg producers"—could rectify the entire harm. 847 F.3d 646, 653 (9th Cir. 2017). But here, the State is asserting employment discrimination against thousands of people, and that large of a group of individual citizens cannot reasonably be expected to bring thousands of individual suits.

## III.    The Attorney General is authorized to bring this action.

Perhaps sensing its inability to have this claim dismissed on jurisdictional grounds, Starbucks pivots, arguing that the Attorney General lacks authority to bring this action. Those arguments fail.

### A.  The Attorney General is authorized to sue under Title VII.

Starbucks ignores half the text when it asserts (ECF 17 at 15) that Title VII can be enforced only by "persons" and "not government entities." To the contrary, the text expressly permits governments to sue. Title VII authorizes civil suits by a "person claiming to be aggrieved." 42 U.S.C. § 2000e-5. But Starbucks overlooks that "person" is defined to include "governments, governmental agencies, [and] political subdivisions." 42 U.S.C. § 2000e(a). "When read together, these provisions clearly authorize the State of [Missouri], as a 'government,' to bring suit under Title VII." *EEOC v. FedEx*, 268 F. Supp. 2d 192, 197 (E.D.N.Y. 2003).

10

Having ignored the text, Starbucks musters only a solo opinion from a Missouri Supreme Court judge that the other six judges disagreed with. In *State ex rel. Anheuser-Busch, LLC v. Moriarity*, Judge Draper wrote separately because he disagreed with "the principal opinion," which required a person to be "aggrieved" to sue under Missouri antidiscrimination law. 589 S.W.3d 567, 573–74 (Mo. 2019) (Draper, J., concurring in the result). Judge Draper believed aggrievement is not necessary because the Attorney General can sue to enforce that law, and Judge Draper believed "the attorney general cannot demonstrate he or she is 'aggrieved.'" *Id.*

Of course, the other six judges *disagreed* with the sole authority on which Starbucks relies. But even assuming Judge Draper were correct, that would not matter. The Missouri Attorney General enforces Missouri law not in the State's *quasi*-sovereign capacity, but instead in the State's *sovereign* capacity "to create and enforce a legal code." *Snapp*, 458 U.S. at 601. In contrast, where (as here) the State is suing because a large enough segment of the population has been harmed that "the state *itself*" is harmed, *Kentucky v. Biden*, 23 F.4th at 599–601, Missouri has in fact been "aggrieved."

**B.  Title VII's exhaustion provisions do not apply.**

It is Starbucks' "burden to prove its affirmative defense of lack of exhaustion, and any doubt on the issue must be resolved in favor" of the State. *Williams v. Target Stores*, 479 F. App'x 26, 28 (8th Cir. 2012) (citing *Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 922 (7th Cir. 2007) (failure to exhaust is affirmative defense that is defendant's burden to prove; "tie must go to the plaintiff")). Starbucks has failed satisfy its burden. While it correctly points out that Title VII includes administrative remedies, it ignores the well-established exceptions to exhaustion.

Title VII's administrative exhaustion provisions are not jurisdictional. *See Fort Bend Cnty., v. Davis*, 587 U.S. 541, 550 (2019). They are thus subject to equitable exceptions. *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982) ("We hold that filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute

of limitations, is subject to waiver, estoppel, and equitable tolling."). One exception is futility. The Eighth Circuit has held that a "party may be excused from exhausting administrative remedies . . . if further administrative procedures would be futile." *Ace Prop. & Cas. Ins. Co. v. Fed. Crop Ins. Corp.*, 440 F.3d 992, 1000 (8th Cir. 2006). "[F]utility may constitute an exception to the requirement of exhaustion of administrative remedies in the area of employment discrimination." *Saunders v. Mills*, 172 F. Supp. 3d 74, 103 (D.D.C. 2016) (quoting *Rann v. Chao*, 154 F.Supp.2d 61, 65 (D.D.C. 2001)); *see also Fowlkes v. Ironworkers Loc. 40*, 790 F.3d 378, 386 (2d Cir. 2015) (recognizing a futility exception to Title VII's exhaustion requirement). The Eighth Circuit has explained that exhaustion is futile when "an agency may be 'unable to consider whether to grant relief because it lacks institutional competence to resolve the particular type of issue presented.'" *Raymond v. Bd. of Regents of the Univ. of Minn.*, 847 F.3d 585, 592 (8th Cir. 2017) (quoting *Bartlett v. U.S. Dept. of Agric.*, 716 F.3d 464, 473 (8th Cir. 2013)). That is exactly the case with this suit.

In its threadbare analysis, Starbucks has not disputed that EEOC's administrative remedies are designed only for individual plaintiffs, not suits by States or suits seeking broader relief. Starbucks fails to cite even a single case where a State has been required to exhaust remedies with the EEOC. That is because the EEOC's administrative claims-processing scheme is not designed for State-led suits or even suits that allege harm against many people. Title VII provides that charges of discrimination "shall contain such information and be in such form as the Commission requires." 42 U.S.C. § 2000e-5(b). But EEOC's forms cannot be completed by States obtaining administrative remedies under their *parens patriae* authority—even though Title VII expressly defines States as "persons" that can sue, 42 U.S.C. § 2000e(a).[2] For example, the Commission requires that the "person making the

---

[2] *See* EEOC Form 5 (Charge of Discrimination) (requiring the individual bringing the charge to put his or her "Name," "Home Phone," "Year of Birth," and "Street Address"), https://www.eeoc.gov/sites/default/files/migrated_files/eeoc/foia/forms/form_5.pdf.

charge must . . . provide the Commission with the name and contact information of the person on whose behalf the charge is made." 29 C.F.R. § 1601.7(1); *see also id.* § 1601.12. But Missouri sues with respect to thousands of citizens, many of whom currently cannot be identified. It is not feasible for the State to provide the "name and context information" for the thousands of citizens implicated by this suit. Everything about Title VII's administrative remedies process is focused on individuals; it is not meant to address claims of systemic employment discrimination on behalf of thousands of people. Starbucks has provided no information to suggest the State *could* exhaust under EEOC's current procedures, so Starbucks has not satisfied its burden to "lack of exhaustion." *Williams*, 479 F. App'x at 28.

That conclusion is even clearer when looking at how Title VII affords relief to large groups. In Title VII class action suits, only the named plaintiff is required to exhaust her administrative remedies. See *Albemarle Paper Co v. Moody*, 422 U.S. 405, 414 n.8 (1975) (unnamed class members need not exhaust administrative remedies). Here, that is impossible for Missouri because Missouri has not been employed by Starbucks. Rather, under ordinary *parens patriae* principles, Missouri's harm flows from the harm Starbucks imposed on thousands of Missouri citizens. Similarly, the U.S. Attorney General is not required to use administrative procedures before bringing an enforcement action under Title VII. *See* 42 U.S.C. § 2000e-6. Title VII's administrative remedies work only for individual claimants who are directly involved in employment, not for governments seeking large-scale relief. Because the EEOC lacks the "institutional competence to resolve the particular type of issue presented"—a *parens patriae* claim implicating thousands of Missourians—exhaustion is futile. *Raymond*, 847 F.3d at 592.

Even if the Court finds that the State failed to exhaust administrative remedies, dismissal is not the appropriate remedy. Failure to exhaust can be cured. *Jones v. Am. State Bank*, 857 F.2d 494, 499 (8th Cir. 1988) ("We hold that the failure to obtain a right-to-sue letter prior to the commencement

of a suit is a curable defect."). Appropriate relief thus would be to stay proceedings on the Title VII claim so the State could pursue administrative remedies while the remainder of the suit proceeds.

### C. The Attorney General is authorized to sue under § 1981.

In asserting that the State cannot sue under § 1981, Starbucks relies solely on cases outside the *parens patriae* context that bear no relevance here while ignoring cases that have squarely held that States can enforce § 1981. First, Starbucks notes that shareholders cannot use § 1981 to sue corporations for harms to share value. *E.g.*, *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 472 (2006); *see also FCS Advisors, LLC v. Missouri*, 929 F.3d 618, 619 (8th Cir. 2019) (similar for corporate investors). Second, Starbucks identifies one 30-year-old case stating that the U.S. Attorney General cannot sue under § 1981. *Watson v. Fraternal Order of Eagles*, 915 F.2d 235, 241 (6th Cir. 1990).

But Starbucks ignores the difference between those contexts and this one. None of those parties could sue on behalf of the individually harmed individuals. When the U.S. Attorney General sues, she does so in the sovereign capacity of the United States "to create and enforce a legal code." *Snapp*, 458 U.S. at 601. Starbucks' assertion that Missouri "cannot claim a greater enforcement power . . . than that given to the United States" misunderstands the difference between a sovereign-capacity suit and a quasi-sovereign suit. And in a shareholder-derivative suit, a shareholder sues for harms to stock value but cannot sue on behalf of the person allegedly injured by the corporation. In a *parens patriae* suit, in contrast, a State is permitted to sue on behalf of its affected citizens—to sue as the "parent" to "take care of persons" harmed. *Snapp*, 458 U.S. at 600. Supreme Court precedent permits States to sue in this context when there is harm to the individuals so large that it creates harm to the State itself. *Id.* at 600–01. So unlike in the other contexts Starbucks raises, States suing as *parens patriae* sue not just on their own behalf, but also on behalf of the upstream individuals injured. *Kentucky v. Biden*, 23 F.4th at 599–601 (holding that States could sue to challenge a vaccine mandate under theories

14

that would ordinarily have been asserted by private citizens). No one disputes that Missouri's individual citizens would be allowed to raise a § 1981 claim, so Missouri can raise one as *parens patriae*.

Starbucks also neglects to mention that courts have held that States have *parens patriae* standing to enforce civil rights laws, including § 1981. *E.g.*, *Commonwealth of Penn. v. Glickman*, 370 F. Supp. 724, 728 (W.D. Pa. 1974) (holding that "Pennsylvania has standing in this case under the doctrine of parens patriae" for claims under § 1981); *Commonwealth of Penn. v. Porter*, 659 F.2d 306, 318 (3d Cir. 1981) (Pennsylvania had *parens patriae* standing to seek to enjoin civil rights violations; "[w]e have held above that the traditional federal law remedy of a parens patriae action is generally available to the states for the enforcement of the fourteenth amendment in appropriate cases"); *Commonwealth of Mass. v. Bull HN Info. Sys., Inc.*, 16 F. Supp.2d 90, 98 (D. Mass. 1998) (Massachusetts Attorney General had *parens patriae* standing to enforce Older Workers Benefit Protection Act and Age Discrimination in Employment Act); *The People by Vacco v. The Mid Hudson Medical Group, P.C.*, 877 F. Supp. 143, 146-49 (S.D.N.Y. 1995) (New York Attorney General had *parens patriae* standing to enforce the Americans with Disabilities Act and the Rehabilitation Act of 1973; "[s]everal cases in this Circuit have upheld New York's *parens patriae* standing in actions for enforcement of various civil rights statutes benefiting population groups comparable to or smaller than New York's deaf population").

In its Complaint, Missouri alleges a quasi-sovereign interest in the physical and economic health and well-being of its residents and in the economic and commercial interests of its residents. ECF 1, ¶¶ 30-31. Missouri has attempted to address these health and welfare concerns through its sovereign lawmaking powers by enacting the Missouri Human Rights Act. *Id.* ¶ 44. Starbucks' policies have harmed Missourians who would like to work there, and indirectly harmed Missouri consumers of Starbucks products. *Id.* ¶ 63. Such interests are the "classic" example of *parens patriae* standing. *See Kentucky v. Biden*, 23 F.4th at 596. This Court should reject Starbucks' attempt to dodge the merits of the § 1981 claim.

15

**D.  The MHRA claims are within the Attorney General's statutory authority.**

Starbucks tries to argue that the Missouri Human Rights Act does not allow the Attorney General to bring this action, ECF 17, II.C., pp. 17–19, but that startling theory has no support in law or fact.[3]

Starbucks' arguments here fail for the same reasons this Court has personal jurisdiction. Starbucks bases its arguments about Missouri state law on the same (false) assumption that the Complaint lacks any connection to decisions made in Missouri. That assumption is wrong. The Complaint repeatedly alleges that Starbucks has a presence in Missouri, that it offers jobs in Missouri, that it makes hiring decisions in Missouri, and that people who live in Missouri face the adverse effects of Starbucks' race-based and sex-based policies in Missouri. ECF 1, ¶¶ 46–48, 50–56. Because Starbucks' premise is wrong, so too is its conclusion.

Starbucks next asks this Court to hold that there is no intentional pattern or practice of discrimination, ECF 17, p. 18, but that, too, ignores the facts as pleaded in the complaint—as well as the Supreme Court's *Harvard* decision. Starbucks suggests (at 18) that considering race or sex in hiring is "not *per se* unlawful." But the Supreme Court expressly held the opposite two years ago. Organizations subject to federal antidiscrimination laws "may *never* use race as a stereotype or negative," which occurs whenever race is used in a "zero-sum" context. *Harvard*, 600 U.S. at 213, 218 (emphasis added). Employment is a zero-sum context.

---

[3] Starbucks also says that cases under Missouri law can be filed only in state court, ECF 17, p. 17, but a state statute's venue limitations do not bar a suit when the federal court otherwise has subject matter jurisdiction. *See Tennessee Coal, Iron & R. Co. v. George*, 233 U.S. 354, 360 (1914). To hold otherwise would mean that a State could strip federal courts of diversity jurisdiction.

A plaintiff alleges a pattern or practice of discrimination when it alleges that "discrimination was the company's standard operating procedure"—in other words, "the regular rather than the unusual practice." *Int'l Broth. of Teamsters v. United States*, 431 U.S. 324, 336 (1977). Here, the Complaint alleges that Starbucks requires that its executives fulfill unlawful hiring quotas and participate in unlawful hiring and training programs on pain of losing their bonus. ECF 1, ¶¶ 101–32, 147–52.[45]

## IV.    The Complaint states a claim.

Starbucks ends its motion with a brief discussion on why it thinks the entire Complaint fails to state a claim for relief. Each argument fails.

**Counts 1, 2, and 10.** Counts 1 and 2 allege unlawful discrimination under 42 U.S.C. § 2000e-2(a)(1) and Mo. Rev. Stat. § 213.055.1(1). Count 10 alleges unlawful discrimination in contracting under § 1981. Decisions interpreting Title VII govern the analysis for all three counts. *See, e.g.*, *Matthews v. Harley-Davidson*, 685 S.W.3d 360, 366–67 (Mo. 2024), *reh'g denied* (Apr. 2, 2024); *Collins v. Union Pac. R.R. Co.*, 108 F.4th 1049, 1052 (8th Cir. 2024). A plaintiff alleges claims under Title VII, the MHRA, and § 1981 when there is "an adverse employment action," which "is a disadvantageous change to the compensation, terms, conditions, or privileges of employment." *Cole v. Group Health Plan, Inc.*, 105 F.4th 1110, 1114 (8th Cir. 2024). Firing or failure to hire is an adverse employment action. *E.g.*, *Parisi v. Boeing Co.*, 400 F.3d 583, 586 (8th Cir. 2005).

---

[4] Starbucks' contention that membership in the Partner Networks is open to all, ECF 17, p. 19, does not appear in the Complaint or attached exhibits, so it cannot be considered on a motion to dismiss, *Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019).

[5] That some statutes might require employers to "make good faith efforts to employ, at a minimum, commensurate with the percentage of minority populations in the state of Missouri," Mo. Rev. Stat. § 620.2020.3, does not give employers a right to exclude people from programs on the basis of race or sex and tie compensation to race-based and sex-based quotas. In any event, Starbucks has failed to cite any Missouri provision enacted after *Harvard* clarified that race never can be used as a negative factor, such as by considering it in a zero-sum context.

The Complaint easily passes muster. It expressly alleges that Starbucks sets hiring and reten-tion quotas, and it explains those quotas in detail. ECF 1, ¶¶ 17–19, 85–114, 146-51. And the com-plaint details how Starbucks ties executive compensation to meeting those quotas. *e.g.* ECF 1 ¶¶114-24. Implicit in those facts is the reality that Starbucks will let go or refuse to hire a meritorious applicant of a certain demographic if they have "too many" of that demographic because the executives need to make sure an artificial percentage of their workforce meets racial or other demographic quotas set at the corporate level.

**Count 3.** Count 3 alleges that Starbucks is committing "attempted or actual" aiding, abetting, compelling, *or* coercing unlawful conduct under the MHRA. *Id.*, ¶¶ 294–301. Starbucks does this by conditioning executive compensation on complying with the unlawful diversity quotas. *Id.*, ¶¶ 101–88. Starbucks completely ignores this when complaining about Count 3, arguing only that it cannot aid and abet itself. But aiding and abetting liability is not the only way to violate the MHRA, *see* Mo. Rev. Stat. § 213.070.1(1)—the count also refers to "attempted or actual . . . compelling or coercion" violations, covering all possible mental states the corporation and its representatives may have engaged in to achieve a discriminatory purpose; so either way the Complaint still states facts showing that Starbucks has violated the cited provisions of the MHRA. Starbucks cannot expect this Court to dis-miss this count by claiming without evidence that one subset of its alleged liability is impossible while ignoring the others. And in any event, the complaint also alleges that Starbucks's illegal practices ex-tend to its relationships with contractors (count 10)—individuals and corporations Starbucks must acknowledge are not part of "itself" and which it certainly has the legal ability to "aid, abet or coerce" into illegal activity.  ECF 1, ¶¶ 295-6, 328-36.

**Counts 4 and 5.** Counts 4 and 5 allege that Starbucks has created discriminatory training programs. *Id.*, ¶¶ 302–11. Starbucks again ignores the plain language of the Complaint in alleging that

Missouri has not pled a violation of that provision. Missouri provides detailed allegations about training and mentorship programs where minority individuals are paired with high-level executives for one-on-one meetings and small group mentorship events. *Id.*, ¶¶ 189–99. And Missouri also provides detailed allegations about the training opportunities for members of the Partner Networks. *Id.*, ¶¶ 202-14.

Starbucks disputes the truth of these allegations, *see* ECF 17, p. 21–22, but that is improper in a motion to dismiss. In any event, even Starbucks' view of the facts would be illegal. Starbucks argues (at 10, 21) that these exclusionary programs are, for example, between Starbucks lawyers and "private-practice" lawyers for a purpose unstated. That of course is not in the Complaint. But even if true, that just means Starbucks is discriminating in its mentorship or apparent recruitment efforts. That too is unlawful.

**Counts 6 and 7.** Counts 6 and 7 allege that Starbucks is unlawfully segregating its employees. *Id.*, ¶¶ 312–19. Starbucks claims that the State has not pled that the segregation would limit employment opportunities, *see* ECF 17, p. 21, but that ignores the extensive discussion in the Complaint of the advancement opportunities given to people in the Partner Networks and other minority-only training programs. The Complaint explains that "Starbucks' Partner Networks serve as a source of job benefits for its employees," including "development and recognition programs" that provide "targeted training for advancement to people who belong to these Partner Networks." ECF 1, ¶¶ 202, 212, 214.

**Counts 8 and 9.** Counts 8 and 9 allege that Starbucks has printed or circulated statements expressing a limitation on the employment opportunities at Starbucks. ECF 1, ¶¶ 320–27. The Complaint alleges that the statements giving rise to this Complaint (that certain racial demographics have advantages in getting job and mentorship opportunities) are printed in documents like Starbucks' proxy statements and then circulated to others. *Id.*, ¶¶ 84–188 & nn.23–106.

19

## CONCLUSION

Missouri has standing as *parens patriae* to due to correct discriminatory policies that affect its citizens. And this court has jurisdiction to enforce the same. The motion to dismiss should be denied.

Dated: May 21, 2025                    Respectfully submitted,

**ANDREW BAILEY**
ATTORNEY GENERAL

JOSHUA M. DIVINE
SOLICITOR GENERAL

*/s/ Peter F. Donohue, Sr.*
Peter F. Donohue, Sr., #75835(MO)
*Deputy Director of Special Litigation*
Patrick Sullivan, #42968(MO)
*Chief of Litigation*
Victoria Lowell, #76461(MO)
Dominic X. Barceleau, #76510(MO)
*Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
207 W. High Street
Jefferson City, MO 65101
Tel: (573) 751-0812
Fax: (573) 751-0774
Peter.Donohue@ago.mo.gov
Patrick.Sullivan@ago.mo.gov
Victoria.Lowell@ago.mo.gov
Dominic.Barceleau@ago.mo.gov

*Counsel for the Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2025, the foregoing was filed electronically through the Court's electronic filing system to be served electronically on counsel for all parties.

*/s/ Peter F. Donohue, Sr.*

20