# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

STATE OF MISSOURI, *ex rel.*
*Andrew Bailey, Attorney General of Missouri*,

   Plaintiff,

   v.

STARBUCKS CORP.,

   Defendants.

Case No. 4:25-CV-00165-JSD

## BRIEF OF *AMICUS CURIAE*
## WORKERS UNITED D/B/A STARBUCKS WORKERS UNITED
## IN SUPPORT OF DEFENDANT STARBUCKS CORPORATION'S
## MOTION TO DISMISS

## INTEREST OF THE *AMICUS CURIAE*

Workers United is an international labor union that represents a diverse group of workers across various industries in the United States and Canada. Starbucks Workers United is a campaign of Workers United that is aimed at organizing Starbucks employees. Proposed amicus Workers United d/b/a Starbucks Workers United ("SBWU") represents over 11,000 baristas and shift supervisors at over 500 Starbucks retail locations across the country, including over 400 workers at 13 retail locations in the State of Missouri. SBWU is committed to fighting for an environment where workers from different backgrounds can contribute and excel.

## INTRODUCTION

SBWU supports Starbucks Corporation's ("Starbucks'") policies and programs designed to improve diversity, equity, and inclusion ("DEI") in its stores and its company, and agrees with the arguments set forth in Starbucks' Motion to Dismiss Attorney General Andrew Bailey's Complaint, in particular with the arguments that the Attorney General lacks standing to assert these claims and that his allegations fail to state any claim. For these reasons, the Court should dismiss the Complaint in its entirety without delving into the details of Starbucks' DEI policies and programs.

In this amicus brief, SBWU writes separately to argue that even if the Court were to consider the merits of the policies and programs, they are lawful and important and should be upheld against legal challenge.[1] The Supreme Court has long held that Title VII permits employers to adopt race-conscious programs to remedy manifest imbalances in a company's workforce, and courts have interpreted 42 U.S.C. §1981 ("Section 1981") similarly to Title VII.

---

[1] If this case proceeds beyond the pleadings stage, SBWU intends to file a motion to intervene to assert the separate and independent interests of SBWU's members, who are employees of Starbucks.

1

*See generally Johnson v. Transp. Agency*, 480 U.S. 616 (1987); *United Steel Workers of Am. v. Weber*, 443 U.S. 193 (1979); *see also Setser v. Novack Inv. Co.*, 657 F.2d 962, 966–69 (8th Cir. 1981) (en banc) ("Underlying the Civil Rights legislation of the 1860s and 1960s is the judgment that a just and harmonious society requires the eradication of racial discrimination. The progress in eliminating racial barriers in employment has been slow… In order to get beyond racism, we must first take account of race. There is no other way.") (internal quotation marks omitted).

Likewise, if this Court were to reach the state-law issues, the Missouri Human Rights Act permits affirmative action programs under similar circumstances. The Missouri Human Rights Commission has promulgated regulations setting forth standards for voluntary affirmative action programs. Mo. Code Regs. Ann. Tit. 8, §60-3.080. Those regulations provide that employers may adopt race-conscious programs to, among other things, remedy the effects of prior discrimination or remove obstacles resulting in disparate treatment. *Id.* §60-3.080(2)–(3).

Starbucks' DEI programs are necessary, and indeed should go further than they do, in light of ongoing racial imbalances in company leadership as well as company practices that continue to impede an equitable and inclusive workplace. This brief uses the personal stories of three individual Starbucks workers to emphasize the importance of mentorship programs, affinity groups, and other DEI programs. While the Attorney General portrays these programs as invidious discrimination, the aims of DEI programs like those challenged here are to cultivate an inclusive and welcoming workplace culture and to promote an environment that provides equitable opportunities to a diverse set of individuals. In particular, several of Starbucks' DEI efforts are designed to increase the representation of those minorities who are currently underrepresented in the Company's managerial and leadership positions. It is well-established that such programs are permissible. Federal as well as state law permits employers like

Starbucks to take race and other protected characteristics into account to remedy manifest imbalances.

To argue that Starbucks' DEI efforts are unlawful, the Attorney General relies on *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181, 230 (2023) ("*Students for Fair Admissions*"). Compl. ¶¶2–4. In doing so, the Attorney General seeks to extend the decision beyond the educational context and into the workplace, and overstates what the Supreme Court actually held. In fact, "*Students for Fair Admissions* did not consider DEI policies of private employers, much less rule that such efforts were unlawful." *Dzibela v. BlackRock Inc.*, No. CV 23-02093 (RK) (JBD), 2024 WL 4349813, at *6 n.4 (D.N.J. Sept. 30, 2024); *see also infra*, pp. 7–8.

Attorney General Bailey's insistence that employers like Starbucks may never consider race, even to promote a diverse and equitable workplace environment, may reflect his view of what the law should be. It does not, however, reflect what the law is. Under current law, employers like Starbucks that continue to struggle with issues of racial equity may, and indeed should, employ DEI programs and other efforts aimed at achieving a diverse workforce and inclusive workplace.

## DISCUSSION

### I. Starbucks workers support its DEI policies and programs.

Starbucks' baristas and shift supervisors, the company's frontline retail workers, support the need for the company's DEI efforts. The challenged policies and programs—which aim to increase diversity amongst senior leadership and incentivize the creation of an inclusive and supportive culture—improve the day-to-day working conditions for many workers and continue to be necessary given ongoing racial inequity.

**Moe Mills**, a SBWU union member, is a shift supervisor in St. Louis, Missouri. Moe is a biracial, nonbinary child of a veteran. During Moe's six years working for Starbucks, Moe has experienced violent and abusive behavior from customers. Moe has been physically charged at by customers. Moe has also been subjected to threats of violence, homophobic slurs and epithets, and has been aggressively yelled at by customers. Moe believes that Starbucks leadership can mitigate the impact of challenging situations like these by creating a supportive culture for employees. Moe has worked for managers who were thoughtful and supportive towards employees after difficult experiences, which improved workplace morale and culture. Moe has also worked for managers who made little to no effort to support employees, which made the work environment more difficult. In Moe's view, company leadership sets the tone for how the stores are run, so it is important for the company to incentivize and reward the creation of a positive and welcoming culture.

**Dorissa Tyndall**, a SBWU union member, has been a Starbucks barista in Lindbergh and Clayton, Missouri since October of 2023. Dorissa is proud of her store, which employs baristas from a broad spectrum of backgrounds and life experiences. In Dorissa's view, her local store managers have done a good job with hiring and retaining diverse employees, which contributes to the creation of a welcoming and inclusive culture. However, Dorissa is concerned about racially insensitive policies that have been rolled out by Starbucks corporate leadership in recent months. By way of example, in April of 2025, Starbucks announced a ban on durags and bonnets, which are hair coverings commonly worn by Black people for hair care and protection. In Dorissa's view, Starbucks' banning of hair coverings associated with Black communities, while permitting hair coverings associated with white communities (such as hair scarves), undermines the creation of a welcoming and inclusive workplace culture. For Dorissa, it is

4

necessary to increase diversity among Starbucks' leadership because having diverse perspectives will help the company avoid making policies that marginalize or alienate people of color.

**Vivianna Lewis**, a SBWU union member, has been a Starbucks barista in Crestwood, Missouri since July of 2024.  Vivianna is one of the only Black employees working in her store.  Vivianna recalls that when she first began working for Starbucks, her managers regularly spoke with baristas and shift supervisors about how to create an equitable culture and how to navigate violent or abusive interactions with customers.  However, over the past six to eight months, there has been a reduction in emphasis on diversity, equity, and inclusion.  Vivianna's managers no longer initiate conversations about workplace culture.  Additionally, Vivianna's managers have not been hiring Black applicants.  Vivianna believes that Starbucks should incentivize its managers to cultivate an inclusive workplace.

## II.     Starbucks' DEI policies and programs are valid.

Under *Johnson* and *Weber*, an employer may take race into account pursuant to an affirmative action plan in order to "eliminate a manifest racial imbalance" in traditionally segregated job categories, provided that it is a "temporary measure" that does not "unnecessarily trammel the interests of the white employees." *Weber*, 443 U.S. at 208; *see also Johnson*, 480 U.S. at 628–30; *Setser*, 657 F.2d at 966–69 (interpreting Section 1981 consistently with Title VII).  The challenged policies and programs satisfy these requirements.

First, Starbucks' DEI efforts were designed to remedy imbalances in Starbucks' management and corporate leadership positions.  Workers of color have been, and continue to be, significantly underrepresented in Starbucks' management and corporate leadership positions.  A 2020 report, for example, showed that workers of color made up 46% of Starbucks' U.S. workforce but only 22.2% of Starbucks' senior-level officials and managers and 33.6% of Starbucks' U.S. mid-level officials and managers.  *2020 Employer Information Report EEO-1*,

5

STARBUCKS (Oct. 8, 2021), https://about.starbucks.com/uploads/2023/03/SBX230321-EEO-1_2020_Consolidated-Report_2.pdf.

In light of these disparities, according to the Complaint and the 2021 Starbucks Global Environmental & Social Impact Report ("2021 ESG"), the company launched a mentorship program, which aimed to improve retention and development of diverse talent by connecting Black, indigenous, and people of color employees with senior leaders.  Compl. ¶¶189–199; 2021 ESG at 16 (cited in Compl. ¶104 n.43).  The company also offers "Partner Networks" (i.e., affinity groups), which bring together employees based on shared identities to offer mutual support and mentorship.  Compl. ¶¶200–201; 2021 ESG at 10.  Additionally, the company implemented an initiative to financially reward U.S.-based executives for increases in representation of people of color at the manager level and above, as part of its Long-Term Leadership Stock Plan ("LSP Plan").  Compl. ¶115; Starbucks 2025 Notice of Annual Meeting of Shareholders and Proxy Statement ("2025 Proxy") at 56 (cited in Compl. ¶136 n.66).

Second, Starbucks' DEI programs do not impinge upon the rights of white employees. Under these programs, there is clearly no "absolute bar to the advancement of white employees." *Johnson*, 480 U.S. at 630.  Management and corporate leadership positions remain available to white employees.  While the mentorship program was initially reserved for employees of color, it quickly became available to all employees.[2]  The affinity groups are open to all employees. 2021 ESG at 10.  *See Diemert v. City of Seattle*, No. 2:22-CV-1640, 2025 WL 446753, at *17 (W.D. Wash. Feb. 10, 2025) ("Racial affinity groups … have become a familiar presence in today's workplaces.… When properly structured, they are voluntary and open to all who share the

---

[2] *2024 Annual Report (Form 10-K)*, STARBUCKS 4 (Nov. 20, 2024), https://s203.q4cdn.com/326826266/files/doc_financials/2024/ar/Starbucks-Fiscal-2024-Annual-Report.pdf.

6

group's goals, and can foster a sense of belonging and respect that advances equity in the workplace and improves the bottom-line."). And many of the affinity groups revolve around common interests or shared experiences unrelated to race or any other protected characteristics.

Finally, Starbucks' DEI programs are temporary measures. In fact, Starbucks has already ended many of them—prematurely, in the view of SBWU, given that racial inequities persist in Starbucks' workplaces and corporate structure. Starbucks has expanded eligibility to the mentorship program; it is now available to all employees.[3] In fiscal year 2025, Starbucks eliminated the financial incentive for increasing diversity in management and leadership positions. 2025 Proxy at 64.[4]

Although the Attorney General seeks to portray the *Students for Fair Admissions* case as outlawing voluntary affirmative action programs in private employment, that is not what the Supreme Court held. *See Dzibela v. BlackRock Inc.*, No. CV 23-02093 (RK) (JBD), 2024 WL 4349813, at *6 n.4 (D.N.J. Sept. 30, 2024); *Perkins Coie LLP v. U.S. Dep't of Just.*, No. CV 25-

---

[3] *Id.*

[4] Besides these initiatives, the Complaint attacks Starbucks' announcement of aspirational representations goals for increasing diversity and representation in various job positions across the company and in its board. Compl. ¶¶85, 89, 104–106, 229, 234. But it is clear from the face of the Complaint that these representation goals are merely aspirational statements made by the company for promotional purposes. Mere statements concerning a company's commitment to diversity are unactionable puffery. These statements provided "no specific plans for how its diversity goals are to be achieved." *Bradley v. Gannett Co.*, No. 1:23-cv-1100, 2024 WL 3905817, at *5 (E.D. Va. Aug. 20, 2024). Nor has the Attorney General alleged that Starbucks' aspirational representation goals were "actually implemented" or "held sway over the decision maker." *Pilon v. Saginaw Valley State Univ.*, 298 F. Supp. 2d 619, 632-33 (E.D. Mich. 2003).

Additionally, the Complaint attacks Starbucks' policy of compensating executives based on the extent to which the company has created a culture of belonging (referred to as a "belonging index"). Compl. ¶¶115, 176; 2025 Proxy at 63; 2021 ESG at 45. But actions that contribute to a strong belonging index benefit all employees. For example, the company's 2025 Proxy statement declared that an executive's behavior of "[e]ncourag[ing] feedback and engag[ing] collaboratively with peers" contributed to a "strong belonging index score." 2025 Proxy at 52.

716 (BAH), 2025 WL 1276857, at *46 n.38 (D.D.C. May 2, 2025) (*SFFA* "considered challenges to … college admissions systems," not corporate diversity initiatives); Angela Onwuachi-Willig & Anthony V. Alfieri, *Biglaw's Race Problem,* 125 Colum. L. Rev. 703 (2025) ("*SFFA* applies only to college and university admissions, not recruitment, hiring, DEI programs"); Ally Coll, *In Search of Solid Ground: Constitutional Standing in Challenges to Corporate Diversity, Equity, and Inclusion Programs*, 27 CUNY L. Rev. 185, 187 (2024) ("*Students for Fair Admissions* (*SFFA*) does not have direct precedential effect on diversity programs in the private sector"). Voluntary affirmative action programs in private employment continue to be lawful under Title VII and Section 1981.

For similar reasons, if this Court were to reach the state-law issues, Starbucks' DEI efforts fall squarely within the standards set forth by the Missouri Human Rights Commission. The Commission expressly provided that employers may develop "[t]raining plans and programs, including on-the-job training, which emphasize providing members of the protected categories with the opportunity, skill and experience necessary to perform the functions of skilled trades, crafts or professions." Mo. Code Regs. Ann. tit. 8, §60-3.080(2)(B).  The regulations further state that reasonable affirmative action plans may include practices "which will eliminate the actual or potential adverse impact, disparate treatment or effect of past discrimination by providing opportunities for members of groups which have been excluded." *Id.* §60-3.080(3)(C). Starbucks' mentorship program, affinity groups, and incentive compensation plan clearly fall within the scope of such programs.

Starbucks needs to do more—not less—to advance diversity, equity, and inclusion across the company.  Its baristas face violence, abuse, and discrimination from customers, often without adequate support from the company.  These harmful experiences are compounded by corporate

8

policies that have, at times, reflected racial insensitivity, highlighting a concerning lack of diversity in leadership and decision-making positions. Starbucks should increase—not decrease, suspend, or end—its efforts to create a more welcoming and inclusive workplace, including by investing in meaningful support systems for frontline retail workers and by ensuring that its leadership reflects its workforce and the communities it serves.

## CONCLUSION

Workers United respectfully requests that this Court grant Defendant's motion to dismiss the Complaint.

Dated: May 21, 2025                  Respectfully submitted,

**SCHUCHAT, COOK & WERNER**

/s/ Christopher N. Grant
Christopher N. Grant (MO #53507)
555 Washington Avenue, Suite 520
St. Louis, MO 63101
Telephone: 314-732-1127
Facsimile: 314-621-2378
cng@scwattorney.com

**ALTSHULER BERZON LLP**

/s/Stacey Leyton
Stacey M. Leyton (pro hac vice pending)
Talia Stender (pro hac vice pending)
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
sleyton@altber.com
tstender@altber.com

*Counsel for Amicus Curiae Workers United d/b/a Starbucks Workers United*

9

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Missouri by using the court's CM/ECF system on May 21, 2025.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the court's CM/ECF system.

*/s/ Christopher N. Grant*