**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 4:25-cv-00165-JAR |
| vs. | ) | |
| | ) | |
| STARBUCKS CORP., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendant Starbucks Corporation's motion to dismiss. (ECF No. 16).  Plaintiff, the State of Missouri, filed a response in opposition.  (ECF No. 27). Defendant replied.  (ECF No. 35).  Additionally, Workers United d/b/a Starbucks Workers United filed an *amicus curiae* brief in support of Defendant's motion to dismiss.  (ECF No. 34). This matter is now fully briefed and ripe for disposition.  For the reasons set forth below, the motion will be GRANTED.

**I.    BACKGROUND**

In this employment discrimination action, the Missouri Attorney General, on behalf of the State of Missouri (Plaintiff), challenges certain diversity, equity, and inclusion (DEI) initiatives adopted by Defendant.  Plaintiff alleges that certain of Defendant's DEI policies are unlawful under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Title VII); 42 U.S.C. § 1981 (Section 1981); and the Missouri Human Rights Act, Mo. Rev. Stat. § 213.010, *et seq.* (MHRA).

**A.  Facts Alleged**

1

The Complaint and associated documents set forth the following allegations, which are accepted as true for the purposes of Defendant's motion to dismiss only:[1]

Defendant is a well-known multinational coffee company incorporated in the state of Washington with its principal place of business in Seattle.  Defendant operates a host of retail locations throughout the United States, including nearly 200 locations in Missouri.  As of September 2024, its national workforce totaled over 200,000 workers including "hundreds, if not thousands, of Missourians."[2]  Defendant receives hundreds of employment applications from Missouri residents applying to open positions in Defendant's Missouri locations and to remote positions that could be filled by residents of any state, including Missouri.  The complaint does not specify the demographic makeup of these employees and applicants, including whether and how many of these applicants were white, male, or heterosexual—groups Plaintiff contends were placed in a position of disadvantage by Defendant's DEI policies.  While the complaint is clear that a certain number of Missourians are employed by or have applied to work for Defendant, the complaint does not state whether, and if so how many, Missourians have been discharged or rejected from employment with Defendant.

Plaintiff alleges that starting in October 2020, Defendant announced its intent to implement certain initiatives "to advance racial and social equity" across its organization which, according to Plaintiff, were actually a guise for discriminatory, company-wide practices that

---

[1] *McShane Constr. Co., LLC v. Gotham Ins. Co.*, 867 F.3d 923, 927 (8th Cir. 2017).

[2] ECF No. 1 at p. 8.

placed non-white, non-male, and other "preferred minorit[y]" employees and applicants in an unlawful position of advantage over the rest of Defendant's workforce.[3]

First, Plaintiff alleges that Defendant launched mentorship programs that discriminated in its admission criteria. Defendant established an internal mentorship program designed to connect BIPOC (Black, Indigenous, and People of Color) employees with senior leaders within Defendant's company. Initially, the program allowed BIPOC employees at the director level to become mentees and be paired with mentors at the senior vice president level and above. In 2022, the program was expanded to allow LGBTQ+ corporate and retail employees to become mentees as well. The mentorship program included one-on-one meetings between mentors and mentees, group meetings with three mentees and one mentor, and other "community events."[4] While not much detail is given as to what kind of employment benefits, if any, are conferred through this program, Defendant's records reflect that mentors in the program "offer[ed] guidance, encouragement and a safe space for partners to share their experiences, challenges and aspirations."[5] Plaintiff alleged that "minority employees" were allowed to participate in this mentorship program while employees "of other races or other sexes" were not.[6] However, the

---

[3] ECF No. 1 at p. 15 (quoting *Starbucks Equity, Inclusion and Diversity Timeline*, STARBUCKS (Aug. 1, 2022) (ECF No. 39-1 at p. 8)); *id*. at p. 36.

[4] ECF No. 1 at 34 (quoting Eric Holder, *A Report to Starbucks on the Progress of its Efforts to Promote Civil Rights, Equity, Diversity, and Inclusion*, COVINGTON & BURLING LLP (Mar. 31, 2021) (ECF No. 39-21 at p. 17)).

[5] *Starbucks Fiscal 2023 Annual Report*, STARBUCKS (Nov. 17, 2023) (ECF No. 39-26 at p. 8).

[6] ECF No. 1 at pp. 34-35. Plaintiff also alleges that Defendant has maintained since 2012 a Starbucks Diversity Mentorship Program which connects Defendant's in-house lawyers with junior attorneys in private practice to form one-on-one mentorship relationships. Plaintiff alleges that "minorities and women" are allowed to participate in this program while white men are not. However, it is clear from the materials cited that the junior attorneys participating in this program are not employed by Defendant, so it is not clear why these allegations are included in

program was later expanded to make participation available to all of Defendant's employees.[7]
Plaintiff also points to the Starbucks Diversity Mentorship Program, which connects in-house
lawyers for Defendant with junior attorneys from diverse backgrounds to provide career
mentoring.  According to Plaintiff, white men are not eligible to participate in this program while
women and racial minorities are.

Second, Plaintiff contends that Defendant "segregates its employees on the basis of race
and sex" through Partner Networks that provide "preferred minorities with additional job
benefits."[8]  According to Plaintiff, "[o]n information and belief," employees who belong to
Partner Networks receive some manner of "targeted training for advancement."[9]  Defendant's
Partner Networks are employee-led affinity groups open to all of Defendant's employees.[10]

---

this employment discrimination action.  *See Seattle Associate Amy Taylor Invited to Participate in Starbucks' Diversity Mentorship Program*, GORDON REES SCULLY MANSUKHANI (Aug. 2020) (ECF No. 39-44).

[7] *Starbucks Fiscal 2024 Annual Report*, STARBUCKS (Nov. 20, 2024), https://s203.q4cdn.com/ 326826266/files/doc_financials/2024/ar/Starbucks-Fiscal-2024-Annual-Report.pdf [https://perma.cc/6NFC-73AW].  Defendant requests that the Court take judicial notice of its 2024 10-k, as it is a publicly-filed document.  The Court will do so.  *Levy v. Ohl*, 477 F.3d 988, 991 (8th Cir. 2007) (collecting cases) (courts may take judicial notice of public records, such as state filings on a motion to dismiss without converting it to one for summary judgment). Plaintiff does not raise any question as to its authenticity, nor is it likely Plaintiff would have, as Plaintiff relies on the same public filings for other years in its own complaint.

[8] ECF No. 1 at p. 36.

[9] *Id.* at p. 38.

[10] Plaintiff argues in its opposition that "Starbucks' contention that membership in the Partner Networks is open to all, ECF 17, p.19, does not appear in the Complaint or attached exhibits, so it cannot be considered on a motion to dismiss."  (ECF No. 27 at p. 23 n. 4).  This is demonstrably false.  *See Starbucks Partner Networks help create a culture of belonging*, STARBUCKS (Aug. 24, 2020) (ECF No. 39-46 at p. 2) ("Starbucks has 14 partner networks, **open to all partners**…" (emphasis added)); *2024 Notice of Annual Meeting of Shareholders and Proxy Statement*, STARBUCKS (Jan. 25, 2024) (ECF No. 39-19 at p. 103) ("Partners of represented and underrepresented groups are not only allowed but encouraged to participate fully"; "All partners,

Plaintiff points out a shareholder proposal (proposal no. 5) described in Defendant's 2024 Proxy Report, which was put forth by the National Center for Public Policy Research (NCPPR). This shareholder proposal called for an audit of Defendant's programs, including Partner Networks, as NCPPR alleged that they "direct systemic discrimination against groups or types of employees, including 'non-diverse' employees."[11] No detail is given as to how these programs direct systemic discrimination in light of their availability to all employees.

Third, Plaintiff points to Defendant's strategic partnerships with "professional organizations that focus on the development of BIPOC talent, providing additional development opportunities" for BIPOC employees.[12] In particular, Defendant committed to joining the Board Diversity Action Alliance (BDAA). The BDAA "works to increase the representation of racially and ethnically diverse directors on corporate boards of directors, beginning with Black directors."[13] Signatories to the BDAA committed to "[i]ncrease the number of Black directors on [their] corporate board of directors to one or more," report the ethnic and racial makeup of their board, and report on DEI measures annually.[14] Notably, while Defendant is allegedly associated with the BDAA, it does not currently have a black member of its board of directors.

---

regardless of their identities or backgrounds, are invited to join and contribute to our Partner Networks.").

[11] ECF No. 1 at p. 38 (quoting *2024 Notice of Annual Meeting of Shareholders and Proxy Statement*, STARBUCKS (Jan. 25, 2024) (ECF No. 39-19 at p. 102)).

[12] ECF No. 1 at p. 18 (quoting *Starbucks Fiscal 2021 Annual Report*, STARBUCKS (Nov. 19, 2021) (ECF No. 39-20 at p. 7)).

[13] *Id*. at p. 41 (quoting *Starbucks 2021 Global Environmental & Social Impact Report*, STARBUCKS (2022) (ECF No. 39-24 at p. 15)).

[14] *Id*. (quoting *The Board Diversity Action Alliance*, BD. DIVERSITY ACTION ALL., https://boarddiversityactionalliance.com/ (ECF No. 39-47 at p. 2)).

Fourth, Plaintiff contends that Defendant adopted a series of race and gender-based quotas tied to executive compensation to ensure they were achieved.  In October 2020, Defendant set "diversity goals of achieving BIPOC representation of at least 30 percent at all corporate levels and at least 40 percent of all retail and manufacturing roles by 2025."[15] Importantly, as of August 2020, just before this new goal was announced, Defendant reported that its total workforce was already comprised of 47% BIPOC employees overall, with BIPOC employees holding *over* 30% of corporate positions, *over* 40% of retail roles, and *over* 40% of manufacturing roles specifically.[16]  Defendant also set goals for women to fill 55% of retail roles, 30% of manufacturing roles, and 50% of all enterprise roles overall by 2025.  Plaintiff acknowledges that as of August 2020, Defendant's overall workforce was already just over 69% women (though no role-specific gender breakdown was provided).  Plaintiff alleges that while Defendant described these demographic targets as aspirational goals, they were actually unlawful gender and race quotas.  Plaintiff underscores this allegation by explaining that Defendant tied certain diversity goals to its executive compensation plans to ensure that certain representation metrics were met.  Specifically, in October 2020, Defendant announced that starting in fiscal year 2021, Defendant would add additional targets related to workforce diversity into the fiscal incentive plans for executives to encourage them to make progress towards Defendant's demographic goals.  Two compensation plans were affected: the Annual Incentive Bonus Plan and the Leadership Stock Plan.

---

[15] *Id*. at p. 16 (quoting *Starbucks Equity, Inclusion and Diversity Timeline*, STARBUCKS (Aug. 1, 2022) (ECF No. 39-1 at p. 8)).

[16] *2021 Notice of Annual Meeting of Shareholders and Proxy Statement*, STARBUCKS, (Jan. 22, 2021) (ECF No. 39-23 at p. 16).

Under the Annual Incentive Bonus Plan, the weight given to the Individual Performance Factor (IPF)—the metric considering the individual performance of each senior leader—was increased from 30% to 50% of the overall calculation of each senior leader's bonus for 2021. Weighting the IPF more heavily allowed Defendant to more easily hold leaders individually accountable for driving "inclusion and sustainability at Starbucks, among meeting other goals" because a portion of the IPF assessed participation in Defendant's inclusion and diversity programs.[17]  From 2022 to 2024, the portion of the IPF dedicated to assessing inclusivity goals included metrics such as participation in Defendant's mentorship program as a mentor, the BIPOC retention rate within that leader's chain of command, and their average score on an inclusive leadership survey.[18]  A leader's BIPOC retention rate assessed the number of BIPOC employees within an executive's functional hierarchy at the beginning of the fiscal year who remained employed by Defendant throughout that year.[19]  For example, in 2024, a retention rate among BIPOC employees of more than 87% would mean a 50% payout of the IPF portion

---

[17] ECF No. 1 at p. 21 (quoting *2021 Notice of Annual Meeting of Shareholders and Proxy Statement*, STARBUCKS, (Jan. 22, 2021) (ECF No. 39-23 at p. 52)).  Since 2022, the weight given to the IPF in determining executive bonuses has decreased each year.  In 2024, the IPF accounted for only 15% of the overall bonus assessment, and only 7.5% was specifically tied to inclusion & diversity, characterized as an ESG goal and no longer part of the IPF.  *See 2024 Notice of Annual Meeting of Shareholders and Proxy Statement*, STARBUCKS (Jan. 25, 2024) (ECF No. 39-19 at pp. 58, 61) (15% weight given to IPF in 2024, 7.5% tied to inclusion & diversity); *2023 Notice of Annual Meeting of Shareholders and Proxy Statement*, STARBUCKS (Jan. 27, 2023) (ECF No. 39-27 at p. 45) (30% weight given to IPF in 2023); *2022 Notice of Annual Meeting of Shareholders and Proxy Statement*, STARBUCKS (Jan. 28, 2022) (ECF No. 39-18 at p. 60) (50% weight given to IPF in 2022).

[18] ECF No. 1 at pp. 27-28; *see also 2022 Notice of Annual Meeting of Shareholders and Proxy Statement*, STARBUCKS (Jan. 28, 2022) (ECF No. 39-18 at p. 67); *2023 Notice of Annual Meeting of Shareholders and Proxy Statement*, STARBUCKS (Jan. 27, 2023) (ECF No. 39-27 at p. 53); *2024 Notice of Annual Meeting of Shareholders and Proxy Statement*, STARBUCKS (Jan. 25, 2024) (ECF No. 39-19 at p. 64).

[19] *Id.*

dedicated to inclusivity, a retention rate of more than 90% would mean a 100% payout, and a retention rate of 98-100% would mean a 200% payout.[20]  And indeed, Plaintiff points out, all of Defendant's named executive officers whose payout under the Annual Incentive Bonus Plan was described in Defendant's 2024 Proxy Statement received between 100% and 137.5% of their target payout.[21]

As for the Leadership Stock Plan, Defendant incorporated a new "representation target" which aimed to incentivize executives to increase the representation of Black, Indigenous and LatinX individuals in roles at the manager level and above within the corporate sector by at least 5% over the next three years.[22]  To do this, the value of performance-based restricted stock units (PRSU) awarded to each executive under the Leadership Stock Plan was subject to a tiered modification based on progress towards the three-year representation goal: (1) if Black, Indigenous and LatinX representation in specified roles increased by 5% or more, the award would be subject to an upward modifier of 110%; (2) if Black, Indigenous and LatinX

---

[20] Before 2024, BIPOC retention was not tied to specified payouts, but one "goal" taken into account in the IPF was a BIPOC retention rate of more than 90%.  *2022 Notice of Annual Meeting of Shareholders and Proxy Statement*, STARBUCKS (Jan. 28, 2022) (ECF No. 39-18 at p. 67); *2023 Notice of Annual Meeting of Shareholders and Proxy Statement*, STARBUCKS (Jan. 27, 2023) (ECF No. 39-27 at p. 53).

[21] This did not necessarily signal their compliance with the stated diversity and inclusion objectives.  For example, two of the five named executive officers identified in the 2024 proxy statement did not serve as mentors to BIPOC employees (as was required to receive a 100% in this metric) but achieved scores of 100% on this metric anyway due to extenuating personal circumstances.  One was participating in a unique global immersion program precluding his ability to serve as a mentor and the other was hired after mentors were already assigned.  *2024 Notice of Annual Meeting of Shareholders and Proxy Statement*, STARBUCKS (Jan. 25, 2024) (ECF No. 39-19 at p. 65).

[22] ECF No. 1 at p. 21 (quoting *2021 Notice of Annual Meeting of Shareholders and Proxy Statement*, STARBUCKS (Jan. 22, 2021) (ECF No. 39-23 at p. 52)).

representation in specified roles increased by less than 5%, the award would be reduced by 5%; and (3) if Black, Indigenous and LatinX representation in specified roles decreased, the award would be reduced by 10%.  In 2024, this modifier was renamed the "talent metric" or "talent modifier" and Defendant revised the associated goals "to include a broader spectrum of the workforce and provide for different representation improvement targets."[23]  In 2024, the talent metric assessed as part of an individual's performance operated as a modifier of up to 10% of the payout of fiscal year 2024 PRSU awards.  In 2025, Defendant stated its intent to hold senior leaders "collectively accountable for meeting a three-year talent goal for the fiscal year 2024 PRSUs, which focuses on improvement in U.S. people of color representation at the manager level and above by 1.5 percentage points or more by fiscal year 2026."[24]  However, Defendant announced the removal of this "talent metric" from the fiscal year 2025 PRSU design.[25]

Plaintiff alleges that "employees, officers, and agents" who fail to meet Defendant's "diversity quotas" are subject to adverse employment actions including "decreased bonuses or payouts, issuing negative employment evaluations, placing them on performance improvement plans (or PIPs), and/or terminating their employment or contractual relationship with [Defendant]."[26]  Plaintiff does not allege whether any particular employee, officer, or agent has ever actually failed to meet these goals, made employment decisions with these goals in mind, or

---

[23] ECF No. 1 at p. 32; (quoting *2024 Notice of Annual Meeting of Shareholders and Proxy Statement*, STARBUCKS (Jan. 25, 2024) (ECF No. 39-19 at p. 78)).

[24] ECF No. 1 at pp. 32-33 (quoting *Starbucks 2025 Notice of Annual Meeting of Shareholders and Proxy Statement*, STARBUCKS (Jan. 24, 2025) (ECF No. 39-33 at p. 62)).

[25] *Starbucks 2025 Notice of Annual Meeting of Shareholders and Proxy Statement*, STARBUCKS (Jan. 24, 2025) (ECF No. 39-33 at p. 70).

[26] ECF No. 1 at p. 30.

faced penalties for any decision made without prioritizing those goals. Plaintiff also does not specify whether any of the employees or agents subject to meeting Defendant's demographic targets are Missouri residents or make employment decisions that affect Missouri residents.

Plaintiff contends that after these initiatives were implemented, Defendant's U.S. workforce became "more female and less white" between 2020 and 2024.[27] To be exact, as of August 2020, Defendant reported that its U.S. workforce was 69% women and 47% BIPOC. As of September 2024, Defendant reported that its U.S. workforce was 70.9% women and 47.8% white. Plaintiff does not, however, specify whether there was any meaningful demographic change in Missouri, whether the alleged hiring quotas applied to Defendant's Missouri locations, or whether any of the senior leaders subject to the Annual Incentive Bonus Plan or Leadership Stock Plan directed employment practices in Missouri.

Plaintiff's allegations culminate in ten counts against Defendant. In Counts 1 and 2, Plaintiff alleges that Defendant engaged in "Unlawful Hiring, Firing, and Discriminatory Practices" under Title VII and the MHRA respectively.[28] Count 3 contends that Defendant aided, abetted, compelled, or coerced violations of the MHRA. In Counts 4 and 5, Plaintiff alleges that Defendant discriminates on the basis of protected classes in its promulgation of training programs, in violation of Title VII and the MHRA, respectively. Counts 6 and 7 allege that Defendant unlawfully limits, segregates, or classifies its employees based on protected characteristics, in violation of Title VII and the MHRA, respectively. Counts 8 and 9 claim that Defendant unlawfully printed or published discriminatory employment notices in violation of

---

[27] ECF No. 1 at p. 29.

[28] ECF No. 1 at pp. 47, 49.

Title VII and the MHRA, respectively.  Count 10 is asserted under Section 1981 for alleged contract impairment on the basis of race.

## B.  The Parties' Arguments

The parties' arguments can be found in full in their briefing (ECF Nos. 16, 17, 27, 35) but are briefly summarized here.  Defendant begins by attacking the basis for both personal and subject matter jurisdiction.  Defendant argues that general personal jurisdiction does not exist in Missouri where Defendant does not maintain its principal place of business, and Defendant has not consented to general jurisdiction by registering to do business here.  Defendant also attacks the sufficiency of its contacts with Missouri, arguing that the complaint does not contain enough allegations linking this action to any contacts with the state of Missouri specifically.  Plaintiff argues there is general jurisdiction over Defendant here, as the language of Missouri's business registration statute implies that nonresident corporations, such as Defendant, consent to general jurisdiction when they register to do business in Missouri.  Plaintiff argues that Defendant's contacts with the forum are sufficient to justify specific jurisdiction too.

Defendant also claims that subject matter is lacking here because Plaintiff cannot establish Article III standing.  Plaintiff relies on a *parens patriae* theory, which requires Plaintiff to demonstrate a quasi-sovereign interest implicated by more than just injuries to a group of private citizens.  Plaintiff points to its quasi-sovereign interest in the health and wellbeing of its citizens, including a quasi-sovereign interest "in ensuring its residents are not excluded from the benefits" and protections of federal law.[29]  Defendant contends that the complaint offers no allegation that any specific Missourian has ever actually been unlawfully harmed or disadvantaged by Defendant's policies, and even if the complaint established that they had been,

---

[29] ECF No. 1 at p. 7.

Plaintiff has raised no quasi-sovereign interest separate and apart from the personal injuries of a private group of individuals.

Defendant then lodges a series of attacks on the adequacy of the allegations under Rule 12(b)(6).  First, Defendant argues that Plaintiff is not authorized to bring claims under Title VII, Section 1981, or the MHRA, all of which specifically delineate the groups of plaintiffs conferred the right to pursue claims.  Defendant contends that Plaintiff cannot bring employment discrimination claims under Title VII claims because Plaintiff is not "aggrieved" by the unlawful actions of an employer.  Similar to its arguments regarding standing, Defendant contends the complaint lacks allegations demonstrating any injury to the State of Missouri sufficient to show that Plaintiff has faced the injuries meant to be redressed by Title VII and thereby authorized to bring claims under Title VII.  Further, Plaintiff did not exhaust required administrative prerequisites by first presenting a charge of discrimination to the EEOC and receiving a notice of right to sue.  Plaintiff largely reiterates its arguments in favor of standing in response to these attacks as well, insisting that it is sufficiently "aggrieved" to allow it to bring suit under Title VII because, according to Plaintiff, its complaint demonstrates that a segment of its population was injured by the wrongful conduct of Defendant.  Plaintiff argues that the exhaustion requirement should be forgiven where, as here, it would be futile because the EEOC's investigatory process does not contemplate suits by states.  As to Section 1981, Defendant points out that the statute authorizes actions only by a plaintiff who would have possessed rights under a contract at issue. Plaintiff has no such rights, according to Defendant.  Plaintiff disagrees by arguing that it is asserting contractual employment rights on behalf of Missouri citizens.  As for the MHRA, Defendant argues that the Attorney General has exceeded statutory authority to enforce the MHRA by pursuing claims outside of state court, seeking to enforce the MHRA

extraterritorially, and presenting insufficient facts to demonstrate a pattern or practice of ongoing violations of the MHRA.  Plaintiff replies by pointing to its allegations regarding the purported adverse consequences of Defendant's employment practices felt in Missouri, supposed injuries to non-minority Missouri workers, and its allegations regarding the discriminatory operating procedures pervading Defendant's employment practices.

Defendant next argues that the complaint falls short of alleging the essential elements of each of the ten stated counts.  As for Counts 1, 2, 6, 7, and 10, Defendant argues that Plaintiff offers only conclusory allegations and unsupported implications of harm that could be felt by Missouri citizens, which are not sufficient to demonstrate unlawful hiring, firing, segregation, classification, contract impairment, or other discrimination.  In response, Plaintiff points to its allegations that Defendant maintains unlawful quotas for the racial and gender makeup of its workforce enforced by its executive compensation plans, which Plaintiff contends necessarily establish that Defendant has made and will continue to make unlawful hiring, firing, and advancement decisions to fulfill those quotas.  Plaintiff also cites the Partner Networks, which it alleges classify and segregate employees based on protected class.

Defendant contends that Count 3 is insufficient, as Plaintiff cannot raise a colorable claim that Defendant aided, abetted, or incited discrimination having only described Defendant's own actions in the complaint.  Plaintiff defends Count 3 by arguing that it focuses on the MHRA's prohibition on compelling or coercing discrimination, rather than aiding or abetting, which Defendant committed by compelling its executives to meet certain gender and race quotas or face a reduction in their bonus compensation.  Defendant reiterates in its reply that a company cannot compel or coerce its own employees, as it necessarily acts through them.  Plaintiff further points to its allegations that Defendant has engaged with certain contractors in support of Plaintiff's

contention that Defendant aided or abetted discrimination.  Defendant replies that the complaint contains only non-specific allegations that Defendant discriminated *against* contractors.

Defendant contends that Counts 4 and 5, attacking unlawful "training programs" likewise fail as Plaintiff has not identified any training program that has actually disadvantaged any employee, if the programs identified in the complaint can be considered "training programs" at all.  Plaintiff points to Defendant's mentorship programs and Partner Networks, all of which Plaintiff alleges conferred some kind of training to participants on a discriminatory basis.

Finally, Defendant claims that Counts 8 and 9 fail because Plaintiff did not identify any publication by Defendant advertising employment opportunities that contains unlawfully discriminatory statements or advertisements.  Plaintiff points to the materials incorporated in its complaint, such as Defendant's proxy statements and annual reports, which tout Defendant's DEI policies that Plaintiff contends are unlawful.

Starbucks Workers United (SBWU), the labor union representing Defendants' unionized retail employees, writes separately as *amicus curiae* to discuss the lawfulness and necessity of the programs and policies described in the complaint.  SBWU argues that state and federal law, even as interpreted by *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181, 230 (2023), do not preclude private employers from adopting programs to affirmatively rectify organization-wide demographic imbalances, such as those SBWU contends exist among Defendant's workforce.  Contrary to Plaintiff's contention that Defendant's policies exceed the bounds of antidiscrimination law, SBWU believes Defendant's policies do not go far enough.  SBWU emphasizes Defendant's point that its policies do not exclude or disadvantage any workers but instead are designed to ensure inclusion of all of Defendant's employees and

14

rectify ongoing imbalances in company leadership and past practices that have impeded equity and inclusion.

## II.    LEGAL STANDARDS

As an initial matter, "[t]hough matters outside the pleading may not be considered in deciding a Rule 12 motion to dismiss, documents necessarily embraced by the complaint are not matters outside the pleading." *Gorog v. Best Buy Co., Inc.*, 760 F.3d 787, 791 (8th Cir. 2014) (quoting *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012)).  Documents quoted in and attached to the complaint are necessarily embraced by the complaint and may thus be considered on a motion to dismiss. *See Quinn v. Ocwen Fed. Bank FSB*, 470 F.3d 1240, 1244 (8th Cir. 2006) ("a court ruling on a motion to dismiss under Rule 12(b)(6) may consider material attached to the complaint"); *Silver v. H&R Block, Inc.*, 105 F.3d 394, 397 (8th Cir. 1997) (selectively quoted statements in pleading may be submitted and considered in full without converting motion to dismiss into summary judgment motion when plaintiff's "entire lawsuit is based only on the statements, and he does not dispute their content.").  Therefore, the Court will consider ECF No. 39 and all attached exhibits, which are documents quoted and incorporated by reference into the complaint, in considering Defendant's motion to dismiss.

### a.   Rule 12(b)(1)

"Subject matter jurisdiction… is a threshold requirement that must be assured in every federal case." *Turner v. Armontrout*, 922 F.2d 492, 493 (8th Cir. 1991).  Rule 12(b)(1) permits a party to move for dismissal when it believes the district court lacks subject matter jurisdiction. The existence of subject matter jurisdiction is a question of law. *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016).  If a plaintiff has no standing, then the district court lacks subject matter jurisdiction. *ABF Freight Sys., Inc. v. Int'l Broth. of Teamsters*, 645 F.3d 954, 958 (8th

Cir. 2011).  The plaintiff bears the burden of proving that subject matter jurisdiction exists. *Buckler v. United States*, 919 F.3d 1038, 1044 (8th Cir. 2019).

In deciding a motion under Rule 12(b)(1), the Court "must distinguish between a facial attack—where it looks only to the face of the pleadings—and a factual attack—where it may consider matters outside the pleadings."  *Croyle ex rel. Croyle v. United States*, 908 F.3d 377, 380 (8th Cir. 2018) (citing *Osborn v. United States*, 918 F.2d. 724, 729 n.6 (8th Cir. 1990)).  "If it is a facial attack, the court looks only at the pleadings and gives the non-moving party the same protections available under Rule 12(b)(6)."  *Smith v. UnitedHealth Grp. Inc.*, 106 F.4th 809, 813 (8th Cir. 2024).  While Defendant does not explicitly indicate whether it lodges a facial or factual attack, it is clear from Defendant's motion that it attacks the face of the complaint for its inadequacy in alleging the elements of standing.  Such arguments are consistent with established law.  *See Gaylor v. GS Brentwood LLC*, No. 4:11-CV-506 CAS, 2011 WL 5079588, at *2 (E.D. Mo. Oct. 25, 2011) (treating defendant's motion to dismiss for lack of standing as a facial attack where defendant argued plaintiff was unable to prove the elements of standing); *Little v. Kirkstall Rd. Enters., Inc.*, No. 4:19CV1786 RLW, 2020 WL 435747, at *2 (E.D. Mo. Jan. 28, 2020).  Thus, in assessing standing, the Court focuses on the allegations in the complaint and documents incorporated therein.

### b.  Rule 12(b)(2)

Rule 12(b)(2) allows a defendant to seek dismissal of a lawsuit when the court lacks personal jurisdiction over it.  Personal jurisdiction over a defendant "represents the power of a court to enter a valid judgment imposing a personal obligation or duty in favor of the plaintiff." *Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589, 592 (8th Cir. 2011) (internal quotation marks and citation omitted).  The plaintiff bears the burden of establishing a

16

"prima facie showing of jurisdiction," and the Court views the facts in the light most favorable to the plaintiff. *Kaliannan v. Liang*, 2 F.4th 727, 733 (8th Cir. 2021). "The evidentiary showing required at the prima facie stage is minimal." *Bros. and Sisters in Christ, LLC v. Zazzle, Inc.*, 42 F. 4th 948, 951 (8th Cir. 2022) (citation omitted). To establish the prima facie showing, a plaintiff must plead sufficient facts to support a reasonable inference that the defendant can be subjected to jurisdiction within the state. *Id*. The Court must view the evidence "in a light most favorable to the plaintiff and resolve factual conflicts in the plaintiff's favor; however, the party seeking to establish the court's personal jurisdiction carries the burden of proof and that burden does not shift to the party challenging jurisdiction." *Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 820 (8th Cir. 2014).

### c.  Rule 12(b)(6)

The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint. A complaint must be dismissed for failure to state a claim when it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Pleadings must include sufficient factual information to provide notice of the grounds on which the claims rest and must "raise a right to relief above a speculative level." *Id*. at 555; *see also Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 549 (8th Cir. 2008). This obligation requires a plaintiff to plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. A complaint "must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Id*. at 562 (citation omitted). When considering a motion to dismiss, the Court accepts as true all factual

allegations contained in the complaint and reviews the complaint to determine whether its allegations show that the pleader is entitled to relief. *Id*. at 555-56; Fed. R. Civ. P. 8(a)(2).

## III.    DISCUSSION

### A.  Personal Jurisdiction

Personal jurisdiction generally takes two forms based on the defendant's contacts with the forum: general and specific. *See Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cnty.*, 582 U.S. 255, 262 (2017). For a corporation, the paradigm forum for the exercise of general jurisdiction is its state of incorporation or its principal place of business. *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014); *see also Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358-59 (2021).

### i.    Consent to General Jurisdiction

Plaintiff's argument as to general jurisdiction is unpersuasive. Plaintiff acknowledges that Defendant maintains its principal place of business in Washington, negating the usual grounds for general jurisdiction. Plaintiff instead contends that Defendant nonetheless consents to general jurisdiction in Missouri because it registered to do business here. Plaintiff points to Mo. Rev. Stat. § 351.582.2, which provides that foreign corporations that register to transact business in Missouri are "subject to the same duties, restrictions, penalties, and liabilities now or later imposed on, a domestic corporation of like character." Without any explicit language indicating as much, Plaintiff suggests these "same duties, restrictions, penalties, and liabilities" as domestic corporations that nonresident foreign corporations consent to includes general jurisdiction in Missouri. This suggested interpretation is inconsistent with our authority. Relying on the Supreme Court's analysis of a *dissimilar* registration statute in Pennsylvania (which *did explicitly* require nonresident foreign corporations registered to do business in

Pennsylvania to submit to personal jurisdiction in the state), Plaintiff argues that because Defendant has registered to do business in Missouri, it has "consented" to "all purpose" jurisdiction in any lawsuit filed here.  (ECF No. 27 at p. 13) (citing *Mallory v. Norfolk S. R.R. Co.*, 600 U.S. 122 (2023)).  This argument has been discussed at length and rejected by this Court and by Missouri's Supreme Court, and Plaintiff offers no novel reasoning to justify departing from that well-reasoned authority here.  *See Sahm v. Avow Corp.*, 705 F. Supp. 3d 925, 931-33 (E.D. Mo. 2023) (rejecting plaintiff's argument that nonresident foreign corporation consented to general jurisdiction in Missouri by registering to do business in Missouri under Mo. Rev. Stat. §§ 351.582 and 351.57); *Peeler v. SRG Glob. Coatings, LLC*, No. 1:23-CV-23-SNLJ, 2024 WL 4008735, at *2-3 (E.D. Mo. Aug. 30, 2024) (same); *State ex rel. Bayer Corp. v. Moriarty*, 536 S.W.3d 227, 232-33 (Mo. 2017) (defendant "did not consent to personal jurisdiction merely because it registered to do business and appointed registered agents in Missouri. To otherwise hold would result in universal personal jurisdiction for corporations complying with registration statutes in many states and would be inconsistent with the holdings of *Daimler* and *Norfolk*.").  The Court does find, however, that specific jurisdiction exists here.

### ii.    Specific Jurisdiction

Specific jurisdiction arises when there is "an affiliation between the forum and the underlying controversy…."  *Zazzle*, 42 F.4th at 952 (quoting *Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cnty.*, 582 U.S. 255, 262 (2017)).  "[T]he existence of personal jurisdiction depends on the long-arm statute of the forum state and the federal Due Process Clause."  *Id.* at 951 (citation omitted).  "[B]ecause the Missouri long-arm statute authorizes the exercise of jurisdiction over non-residents to the extent permissible under the due process clause," the Court will consider "whether the assertion of personal jurisdiction would violate due process."  *Aly v.*

*Hanzada for Imp. & Exp. Co., LTD*, 864 F.3d 844, 849 (8th Cir. 2017) (internal quotations and citations omitted).[30]

To establish specific jurisdiction, a district court "must decide whether the defendant has certain minimum contacts with the forum state and whether the plaintiffs' claims 'arise out of or relate to the defendant's contacts.'" *Kaliannan v. Liang*, 2 F.4th 727, 733 (8th Cir. 2021) (quoting *Ford Motor Co.*, 592 U.S. at 359). In other words, district courts must determine that the defendant's forum contacts are both sufficient and related to the litigation. "A defendant's contacts with the forum state must be sufficient so that a non-resident defendant should reasonably anticipate being haled into court there." *Fastpath*, 760 F.3d at 820–21 (citing *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 297 (1980)). "Sufficient minimum contacts requires some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* at 821 (citation and internal quotation marks omitted). This requirement "ensures that a defendant will not be haled into a jurisdiction solely as the result of random, fortuitous, or attenuated contacts or of the unilateral activity of another party or a third person." *Id.* (quoting *Stanton v. St. Jude Med., Inc.*, 340 F.3d 690, 693–94 (8th Cir. 2003)).

---

[30] Prior to *Hanzada*, the Eighth Circuit once viewed these inquiries as separate steps in the jurisdictional analysis line with the Missouri Supreme Court. *See Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589, 593 n. 2 (8th Cir. 2011) (quoting *Bryant v. Smith Interior Design Grp.*, 310 S.W.3d 227, 231 (Mo. 2010)). However, more recent Eighth Circuit decisions have considered only whether the assertion of personal jurisdiction violates due process, as the Missouri long-arm statute extends jurisdiction to the limits of due process. *See, e.g., Hanzada*, 864 F.3d at 849 (quoting *Eagle Tech. v. Expander Americas, Inc.*, 783 F.3d 1131, 1136 (8th Cir. 2015)). Further, Defendant does not dispute that Missouri's long-arm statute authorizes jurisdiction over Defendant and focuses its argument only on the sufficiency of its contacts with the forum.

In reviewing the defendant's forum contacts, the court looks only at the forum contacts related to the claims at issue. *Zazzle*, 42 F. 4th at 952 (citation omitted). The standard cited by Defendant with regard to this part of the inquiry is just shy of the Supreme Court's instructions in *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358-59 (2021). While Defendant asserts that Plaintiff "must plead non-conclusory facts that identify [Defendant]'s actions within Missouri from which the State's claims *arise*," (ECF No. 17 at pp. 5-6) (emphasis added), this is not necessarily the case. In *Ford Motor Co.*, the Supreme Court emphasized that personal jurisdiction over the defendant exists when the claims either "arise out of *or relate to* the defendant's contacts with the forum"—two independently sufficient conditions. *Id*. at 362. The plaintiff need not establish a *causal* connection between the defendant's contacts and the claims pleaded so long as a sufficient link exists between the defendant's contacts, the forum, and the litigation at issue. *Id*. To assess this link, District courts in the Eighth Circuit consider five aspects of the defendant's forum contacts: (i) the nature and quality of the contacts, (ii) the quantity of the contacts, (iii) the relationship of the cause of action to the contacts, (iv) the interest of the forum state in providing a forum to its residents, and (v) the convenience to the parties. *See Pederson v. Frost*, 951 F.3d 977, 980 (8th Cir. 2020). Courts give "significant weight to the first three factors." *Fastpath, Inc.*, 760 F.3d at 821. A court's overall focus is "on the relationship among the defendant, the forum, and the litigation." *Enterprise Rent-A-Car Co. v. U-Haul Int'l, Inc.*, 327 F. Supp. 2d 1032, 1036 (E.D. Mo. 2004) (citing *Calder v. Jones*, 465 U.S. 783, 788 (1984)).

According to the complaint, Defendant's contacts with Missouri are significant and relate to the claims at issue. Defendant maintains almost 200 locations in Missouri in which it employs "hundreds, if not thousands, of Missourians." (ECF No. 1 at p. 8). Defendant also advertises

21

hundreds of openings for jobs in Missouri and "100% remote" roles that could be filled by Missourians. *Id*. at p. 9. The sizable workforce here demonstrates a sufficient connection to Missouri related to Plaintiff's claims regarding employment discrimination. As the Supreme Court instructed in *Ford Motor Co.*, Plaintiff need not establish that the pervasive contacts Defendant has with Missouri gave rise to these specific causes of action so long as Plaintiff establishes that they are sufficiently related. Plaintiff has established that link. Defendant employs a significant workforce in Missouri, solicits hundreds of applicants for employment in Missouri, and maintains employment policies that Plaintiff alleges are discriminatory. This is enough. Defendant's observation that injuries to actual Missourians are nearly nonexistent in the complaint is better suited to its argument regarding standing, addressed below.

Once a district court determines that the defendant does have sufficient minimum contacts with the forum state related to the litigation, there is one step remaining to ensure the exercise of jurisdiction over a nonresident defendant comports with due process. The Court must determine whether exercising jurisdiction over the defendant would offend traditional notions of "fair play and substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-77 (1985) (quoting *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 320 (1945)). To make this determination, courts consider: (1) "the burden on the defendant"; (2) "the forum state's interest in adjudicating the dispute"; (3) "the plaintiff's interest in obtaining convenient and effective relief"; (4) "the interstate judicial system's interest in obtaining the most efficient resolution of controversies"; and (5) "the shared interest of the several States in furthering fundamental substantive social policies." *Id*. (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297-298 (1980)). This step in the analysis is meant to give a defendant who seeks to defeat jurisdiction a chance to raise another "a compelling case that the presence of some other considerations would

22

render jurisdiction unreasonable." *Id.* at 477. The Court finds that Defendant has presented no such compelling case.

Defendant's significant operations here render Missouri a predictable and convenient forum for this action, in which the State of Missouri calls into question Defendant's actions under, in part, Missouri law. While some of Defendant's out-of-town executives may be witnesses to the implementation of relevant policies, especially its executive compensation scheme, the majority of the witnesses in this case would likely be comprised of local managers, hiring staff, and others that make decisions specifically in Missouri. This is not a case in which it would be "so gravely difficult and inconvenient" that Defendant would be placed at a "'severe disadvantage' in comparison to [its] opponent." *Burger King*, 471 U.S. at 478 (quoting *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 18 (1972)). Thus, the traditional notions of fair play and substantial justice are not at odds with personal jurisdiction. Subject matter jurisdiction, however, is lacking.

### B. Standing

Defendant next argues that the Court lacks subject matter jurisdiction because Plaintiff lacks standing to assert the federal claims alleged in the complaint. The Court agrees for the reasons set out below. "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To establish standing, every plaintiff must sufficiently allege that they have suffered an "injury in fact" that was "fairly traceable to the challenged conduct of the defendant" and would likely be redressed by a favorable judicial outcome. *Id.* The injury must be "concrete, particularized, and actual or imminent" to establish standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Allegations of a possible or theoretical injury are not enough. *Id.* The requirement that there be

an injury in fact is of paramount importance in the analysis, and a plaintiff who cannot demonstrate that element cannot proceed in court. *Spokeo*, 578 U.S. at 338. When standing is challenged, the party invoking federal jurisdiction (here, Plaintiff) bears the burden of establishing an injury in fact. *See City of Clarkson Valley v. Mineta*, 495 F.3d 567, 569 (8th Cir. 2007).

In addition to the typical requirements of Article III standing, Plaintiff has invoked the doctrine of *parens patriae* standing, which presents its own, additional standing requirements. The doctrine of *parens patriae* is a judicial vehicle by which a state may assert standing to prevent or repair an injury to its own interests as a sovereign. In a *parens patriae* action, the attorney general acts on behalf of a state as "a representative of the public" to vindicate on behalf of the state "a wrong which, if proven, limits the opportunities of her people, shackles her industries, retards her development, and relegates her to an inferior economic position among her sister States." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 605-606 (1982) (quoting *Georgia v. Pennsylvania R. Co.*, 324 U.S. 439, 450-451 (1945)). "[T]o have such standing the State must assert an injury to what has been characterized as a 'quasi-sovereign' interest, which is a judicial construct that does not lend itself to a simple or exact definition." *Id*. at 601. "Far from being a substitute for Article III injury" the requirement to demonstrate a quasi-sovereign interest "raise[s] an additional hurdle for a state litigant…." *Massachusetts v. EPA*, 549 U.S. 476, 538 (2007) (Roberts, C.J., dissenting) (quoting *Snapp*, 458 U.S. at 607). Because Plaintiff so insistently relies on the injuries of a group of private citizens to establish *parens patriae* standing, discussion regarding the distinction between individual harms and those that raise a quasi-sovereign interest is needed here.

A quasi-sovereign interest is one that is separate and distinct from the interests of private citizens. *Snapp*, 458 U.S. at 600-601. Quasi-sovereign interests include the state's stake in the "health and well-being—both physical and economic—of its residents in general." *Id*. at 607. However, to prove that the wellbeing of the populace is threatened, the attorney general must start by proving an injury to a "sufficiently substantial segment of its population," rather than an injury to an identifiable group of private citizens. *Id*. One hallmark of a quasi-sovereign interest is that it is one that the state would, if it could, likely attempt to protect through its sovereign lawmaking powers (beyond "private bills" designed to aid specific individuals). *Id*.

While there exists no formal definition of what a quasi-sovereign interest is, the Supreme Court has made clear that quasi-sovereign interests are *not* synonymous with "private interests pursued by the State as a nominal party." *Id*. at 601. While a group of citizens has nearly always been harmed in a *parens patriae* action, that is not all that gives rise to a quasi-sovereign interest. When only a group of individual citizens is injured, the state's interest in those claims, while existent, does not rise to the level of quasi-sovereign. *Id*. at 602. The harm the attorney general must demonstrate must be to a "sufficiently substantial segment of its population" such that the injury it seeks to redress harms the state itself, or its populace "in general." *Id*. at 601, 607. Contrary to Plaintiff's explanation of the standard, *more* must be alleged than an injury to a large enough group to assert *parens patriae* standing; the state *itself* must have been injured in some way by the defendant's conduct. *Id*. at 607.

"The quasi-sovereign interest recognized by the Supreme Court in *Snapp* as to the health and well-being of a state's citizens is not a blank check. *Parens patriae* standing does not allow Missouri to 'merely litigate as a volunteer the personal claims of its citizens.'" *Wyatt Bury, LLC, et al. v. City of Kansas City*, 804 F.Supp.3d 939, 964 (W.D. Mo. 2025) (quoting *Paxton v.*

*Dettelbach*, 105 F.4th 708 (5th Cir. 2024) (cleaned up)).  In *Snapp*, the Court warned against the misconception that *parens patriae* standing could allow a state to pursue actions on behalf of a group of private citizens that do not truly raise a quasi-sovereign interest of the state itself:

> [A] State may, for a variety of reasons, attempt to pursue the interests of a private party, and pursue those interests only for the sake of the real party in interest. Interests of private parties are obviously not in themselves sovereign interests, and they do not become such simply by virtue of the State's aiding in their achievement. In such situations, the State is no more than a nominal party.

*Snapp*, 458 U.S. at 602.

In *Snapp* (the seminal case discussing *parens patriae* standing relied on by both parties), the Commonwealth of Puerto Rico filed suit in its capacity as *parens patriae* against a group of apple growers in the contiguous United States.  The defendant apple growers refused to employ Puerto Rican migrant workers based on their Puerto Rican ethnicity.  *Snapp*, 458 U.S. at 597-98. Effectively, the labor force of the entire commonwealth was unwelcome to apply for employment with the defendants, though only a few hundred had actually been directly turned away.  *Id*. at 597.  In allowing Puerto Rico to proceed *parens patriae*, the Supreme Court set out in detail the standard we now apply, which requires a state to demonstrate its *own* stake in securing its residents from the alleged discrimination by the named defendant.  This interest was "peculiarly strong in the case of Puerto Rico simply because of the unfortunate fact that invidious discrimination frequently occurs along ethnic lines," and the populace of the commonwealth possessed the ethnicity against which the defendants discriminated.  *Id*. at 609. This case demonstrated the canonical quasi-sovereign interest in threats to a state's populace *in general* rather than to a discrete group of private parties who could bring suit themselves.[31]

---

[31] By way of a more recent example, the State of Missouri was permitted to bring an action *parens patriae* in *Missouri ex rel. Bailey v. People's Republic of China*, 769 F. Supp. 3d 877,

Here, Plaintiff points to its quasi-sovereign interest in the health and wellbeing of Missouri residents, alleging that it seeks to protect its interest "in securing residents from the harmful effects of discrimination."  (ECF No. 1 at p. 6).  More specifically, Plaintiff points to four aspects of the complaint it believes demonstrate injuries to its citizens that implicate its quasi-sovereign interests: (1) "harm to a substantial number of Missourians…who do not have Starbucks' preferred racial or sex characteristics"; (2) Defendant's actions stigmatizing Missouri's labor force as inferior by denying Missourians the ability to participate in the free flow of commerce; (3) Defendant's violations of federal law; and (4) the inadequacy of individual relief.  (ECF No. 27 at p. 15).  The Court will address each of these in turn, finding ultimately that Plaintiff has not adequately pleaded an Article III injury or demonstrated the implication of a quasi-sovereign interest separate from theoretical injuries to individual citizens, if even that much has been pleaded.

First, Plaintiff's allegations alluding to harm to Missourians fall far short of the standard to establish standing under both basic Article III requirements and the unique, additional hurdles of *parens patriae* standing.  It is unclear from the complaint whether any Missourian has actually been injured by Defendant's practices.  Plaintiff did not point to even a single Missouri resident who lacked "Starbucks' preferred racial or sex characteristics" and suffered an adverse employment action as a result.  Plaintiff contends that its complaint establishes "employment discrimination against thousands of people," but the most the complaint establishes is that Defendant employs a large number of Missourians.  The Court cannot reasonably draw the inference that any of them have been harmed simply because of Defendant's alleged DEI

882 (E.D. Mo. 2025), to vindicate vast direct and indirect harms to the state and its entire populace caused by the defendants' alleged obstruction of information regarding the global COVID-19 pandemic and the necessary supplies to weather this crisis.

policies, as Plaintiff leaves to the imagination the actual enforcement and implementation of these policies. Plaintiff failed to allege that any actual Missouri residents applied for an open position in Missouri and were rejected, were passed over for promotion, were disciplined or demoted unfairly, or tried and failed to take advantage of any other benefit of employment with Defendant because of a protected characteristic. To proceed under Article III, more is required than a speculative and inferred injury that lacks even a tie to the plaintiff. *Spokeo*, 578 U.S. at 339-40 ("a 'concrete' injury must be '*de facto*'; that is, it must actually exist" beyond conjecture; so too must the injury be "particularized," i.e. personal to the plaintiff); *see also, e.g.*, *L.H. v. Indep. Sch. Dist.*, No. 4:22-cv-00801-RK, 2023 WL 3132003, at * (W.D. Mo. Apr. 27, 2023) (dismissing claims for lack of standing, as plaintiffs pleaded only a risk of injury posed by the existence of a district policy without allegations as to actual, injurious enforcement). Thus, Plaintiff has not met the first basic requirement of establishing Article III standing. Without having pleaded any concrete or particularized injury, Plaintiff cannot hope to establish the "additional hurdle" of the necessary quasi-sovereign interest called into action when the State's populace in general has been harmed. *See Massachusetts v. EPA*, 549 U.S. at 538 (Roberts, C.J., dissenting).

Even assuming arguendo that Plaintiff's vague allegations established a concrete, plausible injury to an identifiable group of Missourians (it does not), the complaint still fails to demonstrate a harm to the quasi-sovereign interests of the state *itself*. The theorized injuries at stake here, which are to the employment opportunities of certain Missourians, would be injuries to a group of individual private citizens, in which the state has at most a nominal interest. Plaintiff has not identified a quasi-sovereign interest that has been harmed. If individuals in Missouri do exist who have been personally discriminated against by Defendant, they are free to

redress those injuries in their own individual lawsuits.  The State of Missouri cannot simply step into the shoes of any group of aggrieved citizens without a quasi-sovereign interest of its own. On a close and thorough review of each allegation specific to the State of Missouri, the Court finds that no quasi-sovereign interest is at stake here.  What exists before the Court is the Attorney General's attempt to advance the interests of a select group of private citizens, no different or more righteous than the allegedly discriminatory employment policies Plaintiff seeks to defeat.  A different result would lead to a dangerously expansive view of *parens patriae* standing allowing state attorneys general to leverage the full weight of the state's resources to vindicate the individual claims of any citizen they currently deem worthy of attention.

Even when the theoretical indirect economic effects Plaintiff describes are considered, they do not bolster Plaintiff's argument either.[32]  Plaintiff's complaint alleges theoretical indirect economic injuries from Defendant's policies by describing a scenario in which Missouri consumers are forced to absorb higher costs associated with hiring, training, and correcting allegedly unqualified employees who were hired based on "non-merit considerations."  (ECF No. 1 at p. 12).  This allegation that DEI policies (assuming such policies were even implemented in Missouri) will necessarily lead to hiring unqualified workers and will necessarily raise prices for consumers is entirely speculative and conclusory.[33]  And even if these indirect economic effects were within the realm of reason to assume, they fall short of plausible without any factual

---

[32] *See Snapp*, 458 U.S. at 607 (indirect effects of the alleged injury should also be considered in determining whether the state has raised a quasi-sovereign interest implicated by harm to a substantial segment of its population).

[33] A complaint cannot rest on mere speculation to state a plausible claim for relief.  *See Bell v. Annie's, Inc.*, 673 F. Supp. 3d 993, 997 (E.D. Mo. 2023) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Spokeo*, 578 U.S. at 339 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)) (in addition to the Article III requirement that an injury be concrete and particularized, it must also be "actual or imminent, not conjectural or hypothetical.").

allegations establishing that Defendant's DEI policies were actually practiced *in Missouri* in a way that did lead to the presumed skew in prices, wait times, and product quality. An injury to any specific Missourian cannot be reasonably inferred from the facts alleged here without any allegations regarding whether or how Defendant's allegedly discriminatory policies were practiced in Missouri. It would be a far leap for the Court to infer that the conclusory allegations specific to Missouri establish that any portion of the state's population has been harmed by Defendant's actions. Without having established an injury to a substantial segment of its population, Plaintiff is precluded by both Article III and the common law doctrine of *parens patriae* standing from proceeding. However, even if Plaintiff had cleared this first set of hurdles, Plaintiff's second, third, and fourth arguments as to its purported quasi-sovereign interest are also unavailing.

Plaintiff's second argument attempts to invoke language from *Snapp* in which Puerto Rico cited the defendants' "efforts to stigmatize [the state's] labor force as inferior," but this citation is misplaced and unpersuasive. *Snapp*, 458 U.S. at 599. In *Snapp*, the defendants rejected Puerto Rican workers on the basis that they were Puerto Rican, effectively disqualifying the entire eligible labor force and placing them on unequal footing with other states' citizens. Here, Plaintiff alleged no such effort to stigmatize Missourians *as Missourians*. This failed analogy instead only further highlights the difference between the quasi-sovereign interest that arose in *Snapp*—in which the state intervened to protect its entire labor force and the equality of their footing with other states' citizens—and Plaintiff's allegations, which establish, at most, potential disadvantage to a discrete group of individual citizens in which the State of Missouri possesses only a nominal interest. Unique here too is the fact that the policies described by

Plaintiff purportedly seek to advantage and equalize opportunities for a portion of Missouri's population, albeit not the portion the Attorney General has chosen to represent.

Third, Plaintiff argues that "the Complaint alleges violations of federal civil rights law, which is a quasi-sovereign interest." (ECF No. 27 at p. 15). Plaintiff misstates the law. A violation of federal civil rights law does not automatically implicate a quasi-sovereign interest. While a violation of federal law may be a ticket to court for *individuals*, a state must prove far more to exercise its sovereign power to secure the benefits of the federal system for its residents. For example, a quasi-sovereign interest can exist where a violation of federal civil rights law harms an entire state's populace or impairs a state's equal participation in the federal system. *See Snapp*, 458 U.S. at 608; *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 258 (1972) (collecting cases); *see also generally Minnesota v. Fleet Farm LLC, et al.*, No. 22-2694 (JRT/JFD), 2025 WL 2802243, at *11 (D. Minn. Oct. 1, 2025) (*parens patriae* standing existed where Minnesota alleged a quasi-sovereign interest affected by violation of state common and statutory law causing "ongoing and diffuse harms to the entire population of Minnesota"). Plaintiff's complaint does not establish that. Instead, it presumably purports to establish harm to a group of private individuals, i.e. some group of white, male, and/or heterosexual employees or applicants whom Defendant's policies were not designed to benefit. Such non-specific, generalized harms are insufficient to raise *parens patriae* standing.

Finally, Plaintiff points to the inadequacy of individual lawsuits, which it contends "would not resolve the harm to the entire state." (ECF No. 27 at p. 15). Plaintiff has not adequately pleaded any harm to "the entire state" apart from alleged injuries to private individuals. *Id*. Plaintiff's complaint is also devoid of any indication that individual relief would be inadequate to rectify alleged discrimination against employees and applicants who can pursue

their own claims against Defendant.  Each of the statutes under which Plaintiff's claims arise contemplates individual relief for aggrieved employees and applicants.  Plaintiff cites the general proposition that "private litigants 'have greater incentive to compromise requests for injunctive relief in exchange for increased money damages.'"  (ECF No. 27 at p. 15 (quoting *In re New York City Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 399 (S.D.N.Y. 2021)).  However, the court in *In re New York City Policing During Summer 2020 Demonstrations* found this fact notable because, unlike in this case, the state sought only injunctive relief.  Plaintiff fails to cite any convincing authority from the Eighth Circuit in which individual relief in an employment discrimination action was not enough.

Plaintiff places significant weight on the Second Circuit's opinion in *New York, by James v. Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th 270 (2nd Cir. 2024).  In that case, the State of New York was permitted to bring a *parens patriae* action against a school district that allegedly failed to address repeated reports of student-on-student sexual harassment and assault.  In that case, the court emphasized that New York had established a group of specific citizens who had experienced concrete and particularized harm with far-reaching direct and indirect effects that could not adequately be addressed in individual lawsuits.  The Court notes that *Niagara-Wheatfield Cent. Sch. Dist.* is not binding authority and did not arise under the same statutes cited here.  Moreover, the existence of a quasi-sovereign interest was decided without opposition from the defendant.  *See id*. at 279 (noting that the defendant's only challenge to *parens patriae* standing was to the impact or involvement of a substantial enough segment of the state's population).  These distinctions were recently pointed out to Plaintiff by the Western District of Missouri in *Wyatt Bury, LLC*, 804 F.Supp.3d at 965 n. 11 (finding State of Missouri did not sufficiently raise a quasi-sovereign interest to support *parens patriae* standing in an action

32

challenging local ordinances banning conversion therapy).  In addition to those well-reasoned concerns, the Court reiterates those expressed by the concurrence *dubitante* in *Niagara-Wheatfield Cent. Sch. Dist.*, which aptly pointed out the precarious application of the *Snapp* standard, subject to criteria in the Second Circuit which do not seem to concretely align with *Snapp*, and which the concurrence stated have too often been used to allow states like New York "to bring headline-grabbing suits ostensibly on behalf of their citizens but without satisfying the 'additional hurdle' of *parens patriae* standing." *Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th at 285 (Cabranes, J., concurring *dubitante*) (quoting *Massachusetts v. EPA*, 549 U.S. at 538 (Roberts, C.J., dissenting)).  Plaintiff's reliance on this precedent is unavailing in establishing the requisite requirements of *parens patriae* standing.  Without standing, Plaintiff's claims cannot proceed.  However, even assuming Plaintiff could proceed *parens patriae*, the claims would still be subject to dismissal under Rule 12(b)(6) for the additional reasons below.

### C. Authorization

Even if Plaintiff did have standing to pursue the claims of individual citizens, Plaintiff's claims are still doomed.  Defendant argues that Plaintiff's claims should each be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief could be granted, as the Attorney General lacks statutory authority to bring claims under Title VII, Section 1981, or the MHRA in this action.  For the reasons below, the Court agrees.

### i. Title VII

Defendant alleges that Plaintiff is not an entity authorized by Title VII to bring an action against an employer, and even if Plaintiff was authorized to bring Title VII claims, the procedural prerequisite of pursuing a charge of discrimination has not been met.  In relevant part, Title VII provides that a civil action may be brought by a person who is "aggrieved."  42 USCS §

2000e-5(f)(1).  The Supreme Court's interpretation of this provision in *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170 (2011), is instructive here.  In that case, the Supreme Court concluded that Title VII's conferral of a cause of action on a person "aggrieved" demands *more* than a demonstration that the plaintiff has an injury sufficient to give rise to Article III standing.  *Id*. at 177.  That injury must be one Title VII was created to redress.  The term "aggrieved" incorporates the familiar test requiring a plaintiff to fall within "the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Id*. (quoting *Lujan v. National Wildlife Federation*, 497 U.S. 871, 883 (1990)).  The purpose of Title VII, and the specific provisions cited by Plaintiff, is to protect employees and applicants from adverse employment actions based on unlawful considerations such as membership in a protected class or participation in the prosecution of a complaint under the statute.  *Id*. at 178.

Because Plaintiff lacks standing, it necessarily cannot demonstrate that it is "aggrieved" under Title VII.  However, even if Plaintiff possessed standing, Plaintiff has not sufficiently alleged an injury that falls within the zone of interests protected by Title VII.  The "persons aggrieved" who are conferred a cause of action under Title VII comprise a more expansive list than Defendant insists, but it does not include state attorneys general attempting to shoehorn the complaints of private citizens into their own cause of action against a private employer.  Plaintiff is not an employee or applicant who has faced discrimination or retaliation at the hands of Defendant.  While Plaintiff seeks to step into the shoes of allegedly harmed employees and applicants (whom the complaint does not identify), it is not enough to demonstrate that some person could be aggrieved—the *plaintiff* must be aggrieved.  In this aspect, again, Plaintiff conflates the standing requirement to demonstrate an injury to a sufficiently substantial group of citizens with a quasi-sovereign interest.  An injury to a segment of the population does not

automatically injure the state, and failing to allege an injury to the interests of the state is fatal to Plaintiff's ability to bring a claim under Title VII.  Thus, Defendant is correct that the Title VII claims must be dismissed on this basis too.[34][35]

### ii.    Section 1981

Plaintiff attempts to justify its claim under Section 1981 by asserting that "a State is permitted to sue on behalf of its affected citizens," essentially stepping into their shoes to raise any claim a citizen within the state could have raised.  First, Plaintiff again misstates the permissible basis for standing here, which requires the state to pursue its *own* interests and not just injuries to a group of private citizens.  Like any other litigant, to establish standing to sue under any statute, a state must demonstrate a concrete, redressable injury to itself.  This misstatement of Plaintiff's authority under Section 1981 also ignores the important holding in *Domino's Pizza v. McDonald*, 546 U.S. 470, 476 (2006), in which the Supreme Court instructed

---

[34] Defendant suggests that even if Plaintiff had successfully established standing, its grievance would still fall outside of the "zone of interests" protected by Title VII because a state's quasi-sovereign interests are not within the zone contemplated by Title VII.  There are, however, conceivable circumstances in which a state would possess a quasi-sovereign interest in protecting its populace from discrimination, as Puerto Rico did in *Snapp*, 458 U.S. 592 (1982) (though *Snapp* did not arise specifically under Title VII).  Such facts simply were not alleged *here*.

[35] Defendant also attacks Plaintiff's failure to exhaust administrative remedies by not filing a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and receiving a notice of right to sue before proceeding with litigation.  42 U.S.C. § 2000e-5(b), (f).  Plaintiff cites equitable exceptions to this requirement and insists that the EEOC administrative process is unfit for states suing *parens patriae*.  Neither party discusses authority analyzing the fitness of the administrative exhaustion requirement for states specifically.  However, the Court notes that in one case cited by Defendant, *People of State of N.Y. by Abrams v. Holiday Inns, Inc.*, 656 F. Supp. 675, 678-79 (W.D.N.Y. 1984), "Right to Sue letters were in fact subsequently issued by the EEOC to *all plaintiffs*" (emphasis added) presumably including the plaintiff State of New York.  It would seem that the administrative process before the EEOC is not, as Plaintiff insists, impossible for a state to successfully pursue.  However, because the Court holds that Plaintiff could not assert a claim under Title VII at all, it is unnecessary for the Court to rule on whether Plaintiff was required to pursue administrative remedies here.

that Section 1981 authorizes claims only by a plaintiff who has rights under the contract at issue, either as a party or third-party beneficiary to the contract. Plaintiff here is neither. Plaintiff is not an applicant for employment by Defendant, an employee of Defendant, or a third-party beneficiary to any contract with Defendant. Plaintiff cites *Com. of Pa. v. Glickman*, 370 F.Supp. 724 (W.D. Pa. 1974) in protest to this proposition, which allowed the Commonwealth of Pennsylvania to proceed *parens patriae* under Section 1981 to enjoin a group of defendants from allegedly engaging in racial discrimination against black applicants to the City of Pittsburgh Bureau of Fire. However, Plaintiff's reliance on this case is unavailing. *Glickman* predated the important clarification in *Domino's Pizza* as to the authorized plaintiffs under Section 1981 as well as the Supreme Court's expanded discussion in *Snapp* regarding the specific basis for *parens patriae* standing cited in *Glickman*. Because Plaintiff has demonstrated no personal stake in any contract at issue, Plaintiff is not authorized to bring a lawsuit under Section 1981.

### iii. The MHRA

Defendant contends that Plaintiff lacks authority to bring an action under the MHRA, and the Court agrees that Plaintiff has not pleaded the necessary connection to Missouri requisite to an MHRA claim. The MHRA authorizes the Attorney General to initiate a civil action when an employer is engaged in "a pattern or practice" of unlawful employment discrimination or when a group of persons is denied equal employment opportunity in such a way that raises an issue of general public importance. Mo. Rev. Stat. § 213.126(1). While enforcing the MHRA is among the Missouri Attorney General's important responsibilities, the Attorney General possesses the authority to sue only when the harm of alleged discrimination is felt *in Missouri*. *Tuttle v. Dobbs Tire & Auto Ctrs., Inc.*, 590 S.W.3d 307, 310-11 (Mo. 2019). While Plaintiff insists in its opposition that harm has been felt in Missouri, this argument is not supported by allegations in

the complaint.  While the complaint purports to describe a series of policies promoting discrimination within Defendant's organization, especially affecting Defendant's senior leadership, there is nothing regarding how and whether those policies were implemented in Missouri or affected employment decisions in Missouri.  Taking the allegations as true, there is no doubt that Defendant operates hundreds of locations in Missouri, employs a host of Missouri workers, and makes employment decisions in Missouri.  However, without pleading facts linking the allegedly discriminatory policies to these Missouri operations, the presumption against extraterritorial application of the MHRA bars the claims stated under that state statute.  *Id.* at 312.  Thus, Plaintiff has failed to adequately plead a claim under the MHRA.  Defendant's arguments regarding whether the allegations actually describe a pattern or practice of discrimination best belong in the next section regarding the adequacy of the allegations as they pertain to the actual prima facie elements of the claims.

### D.  Failure to State a Claim

Finally, Defendant argues that even if Plaintiff did have standing to pursue individual claims of employment discrimination against its citizens, Plaintiff still has not sufficiently stated the requisite elements of claims upon which relief should be granted warranting the dismissal of the complaint under Rule 12(b)(6).  The Court agrees and concludes that the allegations do not demonstrate unlawful discrimination under Title VII, Section 1981, or the MHRA sufficient to state any of the ten claims in the complaint.

### i.    Counts 1, 2, 6, 7, and 10

Counts 1, 2, 6, 7, and 10 allege that Defendant engaged in discriminatory adverse employment actions based on race and gender.  Specifically, Counts 1 and 2 accuse Defendant of "Unlawful Hiring, Firing, and Discriminatory Practices" under Title VII and the MHRA,

respectively.  (ECF No. 1 at pp. 47, 49).  Counts 6 and 7 allege "Unlawful Limiting, Segregation, or Classification" under Title VII and the MHRA, respectively.  (ECF No. 1 at pp. 53-54).  Count 10 alleges discriminatory contract impairment under Section 1981.  As Defendant points out, the four causes of action articulated in Counts 1, 2, 6, and 7 all require Plaintiff to demonstrate that the alleged discriminatory conduct caused a concrete harm to a term or condition of employment or to an employment opportunity.  Similarly, an essential element of a racial discrimination claim under Section 1981 is actual interference with an activity protected by the statute (i.e., the making and enforcement of contracts).  *Nahum v. LMI Aero., Inc.*, No. 4:20 CV 1524 RWS, 2023 WL 3177806, at *7 (E.D. Mo. May 1, 2023) (citing *Harris v. Hays*, 452 F.3d 714, 718 (8th Cir. 2006)).[36]  The Court finds that Plaintiff has failed to plead any specific adverse action by Defendant, which is essential to stating a claim under each of these five counts.

To demonstrate an adverse action, Plaintiff must allege that Defendant discharged, failed to hire, or imposed some other detrimental change in the terms, conditions, or privileges of employment.  42 U.S.C.A. § 2000e-2(a)(1) (Title VII); Mo. Rev. Stat. § 213.055.1(1)(a) (MHRA); *Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024).  Title VII and the MHRA also prohibit employers from limiting, segregating, or classifying their employees based on their membership in a protected class in a way that *adversely affects* their employment status or deprives them of an employment opportunity.  42 U.S.C.A. § 2000e-2(a)(2) (Title VII); Mo.

---

[36] Other than the heightened standard under which causation is assessed under Section 1981, race discrimination claims under Section 1981 and Title VII are generally subject to the same analysis.  *Id*.  MHRA claims too are subject to the same analysis we apply in Title VII cases.  *Evans v. Siegel-Robert, Inc.*, 139 F. Supp. 2d 1120, 1124 (E.D. Mo. 2001) (citing *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1055 (8th Cir. 1997)).  Thus, Counts 1, 2, 6, 7, and 10 may all be analyzed under the same general framework.  *Id*. (applying the same analysis to race discrimination claims under Section 1981, Title VII, and the MHRA).

Rev. Stat. § 213.055.1(1)(b) (MHRA); *EEOC v. AutoZone, Inc.*, 860 F.3d 564, 568-69 (7th Cir. 2017) (segregating employees by ethnicity was not enough to violate Title VII without meaningful change in the terms, conditions, or benefits of employment). As such, an essential element of Counts 1, 2, 6, 7, and 10 is an action that actually negatively impacted an employee or applicant. In other words, here too, Plaintiff's failure to point to an actual, concrete injury is dispositive. Even if Plaintiff could sue *parens patriae* on behalf of an injured citizen, it must still plead facts showing just that—*injured* citizens. *Muldrow*, 601 U.S. 354 (citing *Bostock v. Clayton County*, 590 U.S. 644, 681 (2020)) (discrimination necessarily requires the plaintiff to show some adverse action negatively affecting the terms, conditions, or benefits of employment). It is not enough to state that an allegedly discriminatory policy existed; Plaintiff must plead that because of Defendant's alleged DEI policies, individuals *were actually* fired, not hired, segregated or classified in a way that harmed them, or otherwise suffered some other adverse change in the terms and conditions of their employment.

In support of Counts 1 and 2, Plaintiff points to its allegations that "Starbucks sets hiring and retention quotas" and "ties executive compensation to meeting those quotas." (ECF No. 27 at p. 24 (citing ECF No. 1 at ¶¶ 17-19, 85-124, 146-51)). Defendant disputes Plaintiff's characterizations and describes its stated ideals regarding workforce demographics as "aspirational representation goals." (ECF No. 17 at pp. 8-9). Regardless of how these demographic targets are characterized, Defendant's policies operated as follows, assuming the allegations in the complaint and associated documents are true. In October 2020, Defendant announced a series of demographic objectives. First, Defendant stated its desire to have women to fill 55% of retail roles, 30% of manufacturing roles, and 50% of all enterprise roles overall by

2025.[37]  In addition to this gender balance, Defendant stated that by 2025, Defendant wanted its workforce to be comprised of at least 30% BIPOC employees in all corporate levels and 40% BIPOC employees in retail and manufacturing roles.  Importantly, these percentages had *already been exceeded*, indicating that Defendant need not make any employment decisions, adverse or not (i.e. hiring new employees, firing existing employees, or transferring employees into new roles) to achieve this demographic balance.  Plaintiff also failed to set out any allegations as to how or whether these percentages were communicated to hiring managers or those with relevant decision-making authority such that any internal employment decision would be made with these percentages in mind and further, whether any employment decision would be made with these percentages in mind.  Additionally, whether Defendant's applicant pool or internal turnover in subsequent years ever threatened to upend this balance or necessitated race-based employment decisions is not a fact pleaded in the complaint.

As for the financial incentives tied to demographic objectives, a small fraction of the potential bonus awarded to senior leaders under Defendant's Annual Incentive Bonus Plan was modified in past years based on specified levels of *retention* of BIPOC employees.  Employee retention is not a zero-sum game necessitating an adverse consequence for one side, and thus adverse employment actions cannot be inferred from this scheme.  In this aspect again, Plaintiff failed to adduce any allegation as to how this financial incentive operated to cause Defendant to take an adverse employment action.

Plaintiff also pointed to Defendant's Leadership Stock Plan, another executive compensation plan that took the racial diversity of Defendant's workforce into account in

---

[37] Notably, the complaint contains no allegation that these gender-based metrics were tied to executive compensation or any other form of incentive to encourage their achievement.  More attention is given to the race-based metrics that were tied to executive compensation incentives.

valuing PRSUs awarded to senior leaders.  From 2021 through fiscal year 2024, the Leadership Stock Plan valued PRSUs differently based on criteria that included a tiered modification related to the increase or decrease in BIPOC employees in specified roles.  Initially, senior leaders were incentivized to increase BIPOC representation by 5% over three years.  This was later reduced to a 1.5% increase in BIPOC representation over three years before the modifier based on racial diversity was removed entirely in fiscal year 2025.  While Plaintiff did plead that Defendant's workforce "has become more female and less white" (ECF No. 1 at p. 29), this correlation alone does not raise an inference of causation.  Without any allegation whatsoever that an adverse action was taken to get to this "more female and less white" workforce, Plaintiff's allegations do not establish that discrimination actually took place.[38]

These allegations are not enough. "'[T]he mere existence of a diversity policy, without more,' is insufficient to make out a prima facie case of discrimination under federal employment statutes like Title VII."  *Weinerth v. Talley*, No. 4:17-CV-00067, 2018 WL 2729205, at *4 (W.D. Va. June 6, 2018); *see also Dzibela v. BlackRock Inc.*, No. 23-02093 (RK) (JBD), 2024 WL 4349813, at *4 (D.N.J. Sept. 20, 2024) (dismissing claims analyzed under Title VII framework because conclusory allegations regarding defendant's DEI policies were not sufficient to give rise to an inference of discrimination).  The "more" that is required is application of that policy in a way that materially disadvantaged an employee or applicant.  Both Defendant and *amicus curiae* both point to case law in the context of affirmative action plans, which they argue must be

---

[38] The *amicus curiae* brief also gives much attention to whether race- and gender- based goals are permissible, including the appropriate consideration to be given to certain lawful affirmative action plans.  It also provides anecdotal evidence of why Defendant's policies in particular are important and necessary, though these additional stories are comprised of facts not properly before the Court on this motion to dismiss and are thus not considered herein.  Because the Court finds that Plaintiff's allegations fall short of stating a claim of unlawful discrimination, the analysis provided in the amicus curiae is not necessary.

"actually implemented" or shown to "[hold] sway over the decision maker" to be actionable. (ECF No. 34 at p. 7 n. 4 (quoting *Pilon v. Saginaw Valley State Univ.*, 298 F. Supp. 2d 619, 632-33 (E.D. Mich. 2003))).  Regardless of whether Defendant's policies were formally styled as affirmative action plans or not, this analogy underscores the requirement for an actual adverse action and aligns with Eighth Circuit case law.  *See generally Humphries v. Pulaski County Special Sch. Dist.*, 580 F.3d 688, 694 (8th Cir. 2009) (joining other circuits in holding that evidence that a defendant followed an affirmative action plan *when carrying out an adverse employment action* may constitute unlawful discrimination).  Without any allegation that Defendant actually enforced race or gender quotas in a way that caused at least someone to be fired, hired, or adversely affected because of their race or gender, Plaintiff falls short of pleading a prima facie case of discrimination.[39]

While Plaintiff attempts to save these claims by pointing to allegations regarding Defendant's Partner Networks, these are plainly not groups that segregate or classify employees to their detriment as alleged in Counts 4 and 5.  Even assuming they offer some sort of competitive advantage or benefit, they are open to all employees regardless of protected class. Plaintiff has definitively failed to state a claim for discrimination under any conception alleged in Counts 1, 2, 6, 7, or 10.

---

[39] Defendant also addressed Plaintiff's allegations regarding its participation in the BDAA in this section of its argument, to which Plaintiff offered no response.  To the extent Plaintiff relies on its allegation that Defendant participated in the BDAA to plead the element of adverse action, the Court agrees with Defendant that these allegations establish no such thing.  Plaintiff acknowledges that as of January 2025, Defendant does not have a black director on its board, which was the purported goal of participation in the BDAA.  As such, the complaint is left without any allegation establishing that participation in the BDAA caused harm.

ii.    **Count 3**

In Count 3, Plaintiff claims that Defendant engaged in "Unlawful Attempted or Actual Aiding, Abetting, Compelling, or Coercion" in violation of the MHRA.  The MHRA makes it unlawful to "aid, abet, incite, compel, or coerce the commission of acts prohibited" by the statute.  Mo. Rev. Stat. § 213.070(1).  Defendant points out the absurdity of this added count, which would require Defendant to have acted upon itself in aiding, abetting, compelling or coercing unlawful discrimination since Defendant necessarily acts through its own employees. The Court agrees based on its review of *Matthews v. Harley-Davidson*, 685 S.W.3d 360, 369-70 (Mo. 2024), a very recent case which purported to be the first decision from the Missouri Supreme Court to speak to the facts necessary to plead a claim under this provision of the MHRA.  In that case, the Missouri Supreme Court focused on the "aiding and abetting" portion of the MHRA provision and found sufficient allegations from the plaintiff's narrative describing two joint employing entities that encouraged and assisted the other in committing or covering up unlawful discrimination among their shared workforce.  Similar facts are not at issue here to create an inference that any of Defendant's agents or employees aided, abetted, coerced, or compelled someone into unlawfully discriminating.  Plaintiff also pointed to allegations regarding contractors as evidence that Defendant aided, abetted, compelled or coerced another entity to commit unlawful discrimination.  However, as Defendant aptly notes, the complaint points only to vague and conclusory allegations (e.g. Paragraph 333) in which Plaintiff alleged that Defendant discriminated *against* some unspecified contractors.  The Court finds that none of the allegations sufficiently describes the aiding, abetting, coercion, or compelling of unlawful discrimination sufficient to state a claim in Count 3.

### iii.    Counts 4 and 5

In Counts 4 and 5, Plaintiff alleges that Defendant promulgated unlawful training programs in violation of Title VII and the MHRA.  These statutes prohibit an employer from discriminating based on a protected characteristic "in the admission to, or employment in, any program established to provide apprenticeship or other training."  42 U.S.C. § 2000e-2(d) (Title VII); Mo. Rev. Stat. § 213.055.1(2) (MHRA).  Here, Plaintiff seems to point to three programs that provide some level of mentorship and community among Defendant's workforce: its Partner Networks, internal mentorship program for employees, and the external Starbucks Diversity Mentorship Program that connects Defendant's in-house lawyers with junior attorneys from diverse backgrounds.  Even assuming these programs provide training to participants, as Plaintiff alleges, Defendant argues that these programs do not discriminate against employees.

As explained above, all of Defendant's employees are welcome to join any of the Partner Networks regardless of their race, gender, sexual orientation, or other protected class.  Thus, there is no discrimination in any program available through Partner Networks.  Similarly, Defendant's internal mentorship program originally designed for BIPOC employees to connect with mentors in senior leadership is now open to all employees.  Importantly, Plaintiff again fails to point to any white or male employee turned away from these programs despite alleging that they were, at least initially, unavailable to white men.  Finally, Plaintiff attacks the Starbucks Diversity Mentorship Program available to lawyers outside of Defendant's organization.  Plaintiff contends that even if this program is available to individuals not employed by Defendant, it would still demonstrate discriminatory recruitment efforts.  Nothing in the complaint or associated documents establishes that this program provides job training or aims to recruit participants.  Plaintiff cannot add new allegations via its opposition to the motion to

44

dismiss that do not in fact exist in the complaint.  Plaintiff falls short of pleading any discriminatory training program sufficient to state claims in Counts 4 and 5.

### iv.  Counts 8 and 9

Finally, in Counts 8 and 9, Plaintiff alleged that Defendant engaged in "Unlawful Printing or Circulation" under Title VII and the MHRA, respectively.  Plaintiff notes that both statutes make it unlawful for an employer to print or publish any notice or advertisement relating to employment or prospective employment that expresses any preference, limitation, specification, or discrimination based on any protected class.  *See* 42 U.S.C. § 2000e-3(b); Mo. Rev. Stat. § 213.055.1(3).  While Plaintiff offers only conclusory allegations that Defendant has printed or published (or in the case of the MHRA claim, "has, is, or will print or circulate" (ECF No. 1 at p. 55)) unlawful notices regarding employment, it is unclear in the counts themselves which of the many publications cited by Plaintiff contain the allegedly unlawful notices. Plaintiff argues that Defendant's proxy and annual statements, presumably those that describe its demographic objectives, have communicated that "certain racial demographics have advantages in getting job and mentorship opportunities."  ECF No. 27 at p. 19.  The problem for Plaintiff is that none of the publications cited actually say these things, nor has Plaintiff pleaded as much. In fact, the complaint undercuts Plaintiff's argument by citing language in Defendant's 2023 Annual Report stating that Defendant's publications describe its demographic goals as "aspirational" (a statement Plaintiff goes on to allege is untrue).  Plaintiff also fails to point to any authority in this circuit expanding on Title VII and the MHRA's prohibition on discriminatory notices regarding employment to general statements in an annual report describing an employer's DEI policies which do not themselves advertise for or describe an

employment opportunity.[40]  Thus, these counts too have not pled enough to state claims under the statutes cited.

## IV.    CONCLUSION

In this case, Plaintiff attempts to forge a path for the State of Missouri to challenge the implementation of DEI policies by private companies operating within the state.  However, the well-established doctrines of standing at issue here do not allow this quest to proceed under the minimal allegations presented.  While the complaint does enough to establish personal jurisdiction, Plaintiff's success ends there.  Plaintiff's complaint is devoid of non-conclusory and non-speculative allegations establishing any actual, concrete, and particularized injuries to Missouri citizens.  This deficiency is fatal on multiple fronts, the first of which is Article III standing.  Even if Plaintiff's complaint met that minimum requirement, Plaintiff has not pleaded the additional elements of *parens patriae* standing mandating the demonstration of a quasi-sovereign interest at stake.  Thus, the Court lacks subject matter jurisdiction, warranting dismissal under Rule 12(b)(1).

Even assuming Plaintiff could properly assert standing, each of the ten counts fails to state a claim for which relief can be granted.  Plaintiff lacks authorization to bring a claim under each statute cited without having adequately pleaded an actual injury, especially one to

---

[40] Further, Eighth Circuit case law regarding this unique provision of Title VII, while sparse, suggests that Plaintiff must be able to demonstrate an actual deterrent effect arising from the allegedly discriminatory advertisement to recover under this provision of Title VII.  *See Banks v. Heun-Norwood*, 566 F.2d 1073 (8th Cir. 1977) (finding that while defendant's ad soliciting a "young man" facially violated Title VII's prohibition on discriminatory job advertisements, plaintiff nonetheless could not recover, as the advertisement did not deter her from applying for employment with the defendant).  While the likelihood of ultimate recovery is not evaluated on a motion to dismiss, Plaintiff failed to even attempt to plead (1) what notice or advertisement Plaintiff believed was discriminatory, and (2) what effect it had, if any, on potential applicants for employment with Defendant.

Missourians, sufficient to show that Plaintiff is an aggrieved party entitled to proceed under the federal and state law cited.  Even if authorized to proceed under the anti-discrimination statutes invoked, the factual allegations do not fulfill the elements of any claim under those laws. Plaintiff fails to allege any actual adverse employment action undertaken as a result of unlawful discrimination, and the policies and goals described do not confer employment opportunities to one protected class at the expense or to the exclusion of another.  Plaintiff's reliance on allegations that Defendant adopted certain alleged policies does nothing to establish actual justiciable claims without any allegations as to how those policies were actually enforced in a way that violated any law.  Because Plaintiff's allegations do not demonstrate the minimum essential elements of each claim presented, dismissal is warranted under Rule 12(b)(6) as well. For all of these reasons, this case must be dismissed.

Accordingly,

**IT IS HEREBY ORDERED** that the Defendant's motion to dismiss (ECF No. 16) is **GRANTED**.

A separate Order of Dismissal will accompany this Memorandum and Order.

Dated this 5th day of February 2026.

_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE